**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| KENNETH EUGENE SMITH,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | Case No. 2:22-cv-00497-RAH |
| v.  ) | |
| ) | **CAPITAL CASE** |
| JOHN Q. HAMM, Commissioner, Alabama ) | |
| Department of Corrections,  ) | **SCHEDULED FOR EXECUTION ON** |
| ) | **NOVEMBER 17, 2022** |
| Defendant.  ) | |

**MOTION FOR PRELIMINARY INJUNCTION TO ENJOIN DEFENDANT FROM**
**EXECUTING MR. SMITH BY LETHAL INJECTION**

Plaintiff Kenneth Eugene Smith submits this memorandum of law in support of his motion for a preliminary injunction to enjoin Defendant from executing him by lethal injection. He has contemporaneously filed an emergency motion to stay his execution pending a decision on his request for a preliminary injunction to prevent Defendant from mooting Mr. Smith's claims by executing him at 6 pm CST today, as Defendant currently plans to do.

**INTRODUCTION**

Mr. Smith brought this action under 42 U.S.C. § 1983 to prevent the State from subjecting him to the same cruelty it inflicted on Joe Nathan James in July 2022 and most recently, Alan Miller, in violation of his constitutional rights under the Eighth and Fourteenth Amendments. Mr. Smith's Complaint and proposed Amended Complaint set forth detailed allegations regarding the myriad ways in which Defendant's implementation of its lethal injection protocol subjected Mr. James and Mr. Miller to hours of gratuitous pain and suffering through constant poking, prodding, and jabbing. *See* Docket Entry No. (DE) 1, 24-1. This Court initially dismissed Mr. Smith's Eighth Amendment claim as untimely. DE 22. When Mr. Smith sought leave to amend, the Court

1

denied that request as futile, concluding that Mr. Smith's allegations were insufficient to state an Eighth Amendment violation.  DE 33.

Minutes ago, the Eleventh Circuit Court of Appeals reversed this Court's judgment dismissing Mr. Smith's complaint with prejudice.  The Court concluded, upon reviewing the proposed amended complaint *de novo*, that Mr. Smith has pleaded sufficient facts to "to plausibly support an Eighth Amendment method-of-execution claim that is not barred by the applicable statute of limitations" and is not moot.  *See* Ex. A at 10.  The Court found that Mr. Smith's factual allegations "show a pattern of difficulty by ADOC in achieving IV access with prolonged attempts." *Id.* at 12.  It also concluded that "Mr. Smith has plausibly alleged that there will be extreme difficulty in accessing Smith's veins." *Id.* at 13.  It further concluded that Mr. Smith "plausibly pleaded that, considering ADOC's inability to establish difficult IVs swiftly and successfully in the past, he will face superadded pain as the execution team attempts to gain IV access." *Id.* at 13-14.  Thus, Mr. Smith's allegations are sufficient to state an Eighth Amendment claim, and as explained below, compelling evidence supports his allegations.

## BACKGROUND

### A.    Procedural History

Mr. Smith was convicted of capital murder and sentenced to death in November 1989.  In 1992, the Alabama Court of Criminal Appeals vacated Mr. Smith's conviction and sentence and ordered a new trial because the State had exercised its peremptory challenges to prospective jurors on the basis of their race.  *Smith v. State*, 620 So.2d 732 (Ala. Crim App. 1992).

In May 1996, Mr. Smith was retried and convicted of capital murder.  The jury determined by a vote of 11 to 1 that he be sentenced to life imprisonment without the possibility of parole. The trial court nevertheless overrode the jury's advisory verdict and sentenced Mr. Smith to death.

The Alabama Court of Criminal Appeals affirmed in December 2000.  *Smith v. State*, 908 So.2d 273 (Ala. Crim. App. 2000).  After initially granting certiorari to review Mr. Smith's conviction and sentence, the Alabama Supreme Court vacated that order and denied certiorari in 2005.  *Ex parte Smith*, 908 So.2d 302 (Ala. 2005).  Later that year, the United States Supreme Court denied certiorari.  *Smith v. Alabama*, 546 U.S. 928 (2005).

In March 2006, Mr. Smith filed a petition for postconviction relief under Alabama Rule of Criminal Procedure 32 in the Circuit Court for Jefferson County, Alabama and subsequently filed an amended petition in June 2007.[1]  In March 2008, the Alabama circuit court dismissed Mr. Smith's petition.  In December 2010, the Alabama Court of Criminal Appeals reversed and remanded the case to the circuit court.  *Smith v. State*, 160 So.3d 40 (Ala. Crim. App. 2010).  In July 2011, the Alabama circuit court dismissed Mr. Smith's amended petition.  After several additional remands, the Alabama Court of Criminal Appeals affirmed in April 2013, and the Alabama Supreme Court denied certiorari in August 2014.

In March 2015, Mr. Smith filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Alabama.  The district court (Kallon, J.) denied Mr. Smith's claims and dismissed his petition in September 2019.  *Smith v. Dunn*, No. 2:15-cv-0384, 2019 WL 4338349 (N.D. Ala. Sept. 12, 2019).  The United States Court of Appeals for the Eleventh Circuit granted a certificate of appealability on a single claim and affirmed in April 2021.  *Smith v. Comm'r, Ala. Dep't of Corrs.*, 850 F. App'x 726 (11th Cir. 2021).  In February 2022, the United States Supreme Court denied certiorari.  *Smith v. Hamm*, 142 S. Ct. 1108 (2022).

---

[1] Venue of Mr. Smith's trial was transferred from Colbert County to Jefferson County due to prejudicial pretrial publicity in Colbert County.

Mr. Smith filed his Complaint in this action on August 18, 2022 seeking injunctive and declaratory relief to prevent Defendant from executing him by lethal injection absent a change in Defendant's lethal injection process to reduce the intolerable risk of torture, cruelty, or substantial pain. *See* DE 1. It also sought an injunction preventing Defendants from enforcing any waiver of Mr. Smith's right to elect nitrogen hypoxia as the method for his execution. *Id.* On August 26, 2022, Defendant moved to dismiss the Complaint. *See* DE 10. On September 30, 2022, the Alabama Supreme Court scheduled Mr. Smith's execution for November 17, 2022 at 6 pm CT. DE 13-1. On October 11, 2022 Mr. Smith filed a motion to expedite discovery and set a scheduling order to allow a preliminary injunction motion to be decided in advance of the scheduled execution date. DE 20. During a hearing on October 13, 2022, counsel for Mr. Smith stated his intent to file a preliminary injunction motion by October 19, 2022. DE 32 at 48. But on October 16, 2022, this Court dismissed Mr. Smith's complaint with prejudice. DE 22, 23. On October 19, 2022, Mr. Smith filed a motion to alter or amend the judgment and attached in support a proposed Amended Complaint and requested an expedited ruling in light of the scheduled execution. *See* DE 24, 24-1. After requesting supplemental briefing, this Court denied Mr. Smith's motion to alter or amend the judgment on November 9, 2022. DE 33.

Mr. Smith appealed to the U.S. Court of Appeals for the Eleventh Circuit on November 10, 2022. DE 34. On November 17, 2022, the Eleventh Circuit Court of Appeals reversed.

**B.     Facts**

**1.     *The State's Two Most Recent Execution Attempts Demonstrate That Its Protocol, As Implemented Results in Hours of Torture.***

The State's three-hours-long execution of Joe Nathan James in July 2022 and its failed attempt to execute Alan Eugene Miller in September 2022 have made clear that once the State is allowed to begin an execution, it will not stop until the warrant expires and, during that time, will

do anything obtain intravenous (IV) access—including disregarding its own lethal injection protocol (the Protocol).   Indeed, Defendant confirmed the improvisational, ends-justifies-the-means approach when he claimed that each procedure to which ADOC subjected Mr. James and Mr. Miller in attempting to establish IV access "appears to constitute a medical decision to carry out the lethal injection." DE 31 at 11.   The State's disregard of the Protocol during Mr. James's execution resulted in the superadding of unnecessary cruelty and pain for three hours prior to his death.   Ex. A, Declaration of Dr. Joel Zivot ("Zivot Dec.") ¶ 8.   Similarly, the State's failed attempt to execute Mr. Miller resulted in two hours of unnecessary cruelty and pain.   *Id.* ¶¶ 14, 20.   And given the similarities between Mr. Smith and Mr. Miller—coupled with the State's failure to investigate its previous botched executions or even acknowledge that Protocol deviations occurred—there is a substantial likelihood that Mr. Smith will undergo the same torture if his execution is allowed to proceed on November 17.   *Id.* ¶¶ 19–20.

> a.   *The Protocol provides only two methods for establishing IV access, and if those are unsuccessful, the execution should stop.*

The Protocol provides that an IV team will establish IV access in the execution chamber before curtains to the witness rooms are opened.    DE 12-1, Ex A, Alabama Lethal Injection Protocol ("the Protocol"), IX.K.   The Protocol authorizes only two methods for establishing IV access:   the "standard" method and a "central line method."   *Id.* Annex C, ¶ c.   The Protocol specifies that "[t]he standard procedure for inserting IV access with be used," but "[i]f the veins are such that intravenous access cannot be provided, [redacted] will perform a central line procedure."   *Id.*[2]   The Protocol does not permit any other procedure to establish IV access.   *See*

---

[2] Central line placement requires "more equipment, time, and expertise" than a standard IV procedure, and involves inserting a catheter through the skin and into deeper and larger veins using a guidewire.   *See* Ex. B, Declaration of Dr. Jason Yong ("Yong Dec."), at 4–5.   In medical practice, ultrasound machines are used to allow proper placement of central lines.   *Id.* at 8.

Protocol § Annex C. Accordingly, if the IV team is unable to obtain IV access through the standard procedure, it should use a central line procedure, and if that procedure is not feasible, then the execution attempt should stop. *See id.*

The IV team's work is shrouded in secrecy. Under the Protocol, the IV team is to "complete its task" before the curtains to the witness rooms are opened, meaning only the condemned and the Defendant's agents can bear witness to the IV team's actions. *Id.* at § IX.K. Indeed, the very identity of the IV team is secret: the Protocol does not identify the members of the IV team or whether those individuals have any sort of medical training or qualifications. *See generally id.* And the secrecy continues long after the execution is completed. Defendant offers only conclusory denials of any wrongdoing, *see, e.g.,* DE 14 at 9, and has issued public statements claiming that it "strictly" follows its protocol."[3] Because of this secrecy, it was only after Defendant's botched execution of Mr. James on July 28, 2022 that other condemned persons like Mr. Smith could have known that the Protocol is advisory only.

> b.    *Mr. James was subjected to three hours of unnecessary cruelty and pain because the State did not follow its Protocol.*

On June 7, 2022, the Alabama Supreme Court scheduled Mr. James' execution for July 28, 2022. *See James v. Attorney General*, No. 22-12345 & 22-12346, 2022 WL 2952492, at *2 (11th Cir. July 26, 2022). ADOC issued a press release stating that the execution was scheduled to begin

---

[3] *See, e.g., See* Bruenig, Elizabeth, Dead to Rights: What did the state of Alabama do to Joe Nathan James in the three hours before his execution? https://www.theatlantic.com/ideas/archive/2022/08/joe-nathan-james-executionalabama/671127/ (last visited Oct. 17, 2022).

at 6 pm.[4]  Mr. James was not pronounced dead until 9:27 pm,[5] meaning the execution lasted more than three hours.  Zivot Dec. ¶ 5.  Immediately after the execution, Defendant made a public statement that he "did not know" if the execution team had issues finding a vein, but insisted that "nothing out of the ordinary" happened during the more than three hours that elapsed while the IV team performed unknown procedures on Mr. James out of public view.[6]

But Mr. James's maimed body tells a much different story—one in which Mr. James was subjected to hours of unnecessary cruelty and pain at the hands of incompetent individuals who blatantly disregarded the Protocol.  Zivot Dec. ¶¶ 4–13.  Five days after Mr. James was executed, Dr. Joel Zivot, an associate professor and senior member of the Departments of Anesthesiology and Surgery at Emory University School of Medicine in Atlanta, Georgia, observed an autopsy of Mr. James's body.  *Id.* ¶ 8.  Dr. Zivot concluded that "[u]pon examination of the body," there were "signs that strongly suggested" that Mr. James "had been subjected to a torturous process during his execution," meaning "the process caused unnecessary pain in advance of" Mr. James's death. *Id.*

Mr. James's execution was "highly troubled" from the start and characterized by numerous Protocol violations.  *Id.* ¶ 5.  Although the execution was scheduled for 6 pm, the curtains to the

---

[4] *See* Ala. Dep't of Corrections, Execution Set for Alabama Death Row Inmate, *available at* http://doc.state.al.us/NewsRelease?article=Execution+Set+for+Alabama+Death+Row+Inmate (last visited Nov. 5, 2022).

[5] *See* Ala. Dep't of Corrections, Execution carried Out for Alabama Death Row Inmate, *available at* http://www.doc.state.al.us/NewsRelease?article=Execution+Carried+Out+for+Alabama+Death+Row+Inmate (last visited Nov. 5, 2022).

[6] *See* Evan Mealins, Joe Nathan James' execution delayed more than three hours by IV issues, ADOC says, *available at* https://www.montgomeryadvertiser.com/story/news/2022/07/29/joe-nathan-james-execution-alabama-delayed-iv-issues/10187322002/ (last visited Nov. 5, 2022).

execution chamber were not opened until after 9 pm.[7]  Thus, three hours passed "between the start of seeking IV access and the completion of the task."  Zivot Dec. ¶ 5.  But it should have taken nowhere near three hours for the IV team to either establish an IV though one of the two procedures specified in the Protocol, or alternatively, to determine that access was not possible.  *Id.*  As Dr. Zivot explains, "in a medical setting and in the hands of skilled medical professionals, it would be highly unusual to take three hours to start 2 IVs by one of those procedures or to determine that neither is achievable."  *Id.*  Even Defendant himself has admitted in a separate lawsuit that "the time required to prepare James for a lethal injection procedure was longer than usual."  *Miller v. Hamm*, 2:22-cv-506, DE 115 ¶ 73 (M.D. Ala. Nov. 10, 2022).

Under the Protocol, the IV team should have switched to a central line procedure if Mr. James's veins were such that the standard procedure was not possible.  *See supra* p. 5.  But there is no evidence that the IV team ever attempted a central line procedure in accordance with the Protocol.  Zivot Dec. ¶ 13.  Instead, the autopsy revealed multiple puncture sites in both arms and both hands, as well as "in areas where anatomically, veins suitable for IV access are not present."  *Id.* ¶ 9; *see also* Ex. C, Declaration of Dr. David Pigott ("Pigott Dec.") ¶ 6 (concluding that the bruising in the autopsy photographs indicated "multiple attempts to establish IV access using a needle").  In other words, the autopsy results suggest that the IV team repeatedly poked and prodded Mr. James—even in areas in which a vein was not likely to be found—long after it should have been apparent that the standard procedure was not appropriate and a central line should have been used.

What is more, the IV team further resorted to a cutdown procedure instead of switching to a central line procedure.  *See* Zivot Dec. ¶ 9–10; Pigott Dec. ¶¶ 4–5.  In a medical setting, a cutdown

---

[7] *See supra* n.5.

procedure is a surgical procedure that involves a surgeon or physician with surgical experience making an incision into the skin until a vein is directly visualized and a catheter can be inserted under direct vision.   Yong Dec. at 8; *see also* Zivot Dec. ¶ 11.   In medical practice, cutdown procedures have "fallen out of favor given the surgical expertise required, potential for bleeding and failure to adequately visualize the vein."   Young Dec. at 8; *see also* Zivot Dec. ¶ 11.   The use of a cutdown procedure is not permitted under the Protocol, as the State has previously conceded.   *See* Protocol; *see also* DE 14 at 8 ("Defendants' lethal injection protocol *does not* provide for the use of a 'cutdown' procedure.").

Both Dr. Zivot and Dr. David Pigott—a professor and Vice Chair for Faculty Development in the Department of Emergency Medicine at the University of Alabama School of Medicine in Birmingham—concluded that an incision in Mr. James's arm is consistent with an attempted cut-down procedure.   Zivot Dec. ¶¶ 9–10; Pigott Dec. ¶¶ 4–5.   The attempted cutdown is shown in the autopsy photo below:



Nor can the cuts on Mr. James's arms be explained as a post-mortem occurrence because the blood and tissue response in and around the wounds would not have occurred if the incision were made after death.  *See* Zivot Dec. ¶ 12 (explaining that the cut depicted above "could not possibly occur in the postmortem period because, simply put, the dead don't bleed, ever, not after death."); *see also* Pigott Dec. ¶ 5 (explaining that the photograph above "shows what appear to be tissue response and blood in and around the laceration, suggesting that the laceration was made while the individual was still alive, as post-mortem wounds typically do not bleed").  Moreover, the lacerations shown above "appear to have what physicians refer to as 'hesitation marks' on the edges, which suggests that the individual making the cuts was not experienced in doing so,

although inadvertent movement of the arm during the procedure may have a similar appearance." Pigott Dec. ¶ 5.

Dr. Zivot further concluded from the autopsy that there was evidence of puncture wounds in areas where, "anatomically, veins suitable for IV access are not present." Zivot Dec. ¶ 9. Those puncture wounds suggest that Mr. James was given an intramuscular injection, but no type of intramuscular injection is permitted by the Protocol. *See* Protocol. Witnesses to the execution have publicly stated that when Mr. James was made visible to the witnesses, he did not open his eyes, move on the gurney, or respond when asked for his final words.[8] Indeed, ADOC officials have publicly stated that they "cannot confirm" whether Mr. James was fully conscious before the lethal agents were administered.[9] Taken together, those circumstances suggest that Mr. James was given some sort of sedative drug through an intramuscular injection, in violation of the Protocol. Furthermore, the Protocol provides that the Warden "will read the warrant to the condemned offender" and that the "condemned offender will be allowed to make any last remarks." Protocol § IX.L; IX.M. Neither of those steps can be completed if the condemned is unconscious, which adds to the already substantial Protocol violations during Mr. James's execution.

In response to the Court's order requiring the parties to brief whether Mr. Smith should be allowed to amend his complaint, the State submitted an affidavit from Dr. Boris Datnow, who claims to be a pathologist who conducted an autopsy on Mr. James's body on August 3, 2022, after the ADOC had completed its autopsy. DOC. No. 31-1. Dr. Datnow summarily states that he saw

---

[8] See Evan Mealins, ADOC 'cannot confirm' if Joe Nathan James Jr. was fully conscious before his execution, The Montgomery Advertiser, Aug. 2, 2022, https://www.montgomeryadvertiser.com/story/news/2022/08/02/joe-nathan-james-jr-execution-adoc-cannot-confirm-if-conscious/10168003002/.

[9] *See* supra n.7.

11

"no evidence that a cutdown procedure was performed or attempted," but provides no other explanation for the cuts on Mr. James's arm, which are plainly visible in the autopsy photos and noted in Dr. Datnow's own autopsy report. *Id.* ¶ 9; *see also* DOC. No. 31-1, Ex. B at 10.[10]  He also summarily states that his autopsy and toxicological screen did not suggest that Mr. James "had been administered an intramuscular sedative," but his affidavit fails to explain the presence of puncture marks in areas where veins would not typically be found or whether any sedative medication would be detectable on a toxicological screen conducted several days after death, and after another autopsy had already been performed.

It is also notable that the State has chosen to rely on Dr. Datnow's summary "nothing to see here" proclamations instead of providing sworn testimony from the individuals who participated or witnessed the IV team's work.  In fact, to date, neither ADOC nor any State representative has publicly indicated that any review or other investigation, much less an independent one, of ADOC's lethal injection process to reduce the intolerable risk of torture, cruelty, or substantial pain to which it subjects condemned people is underway or contemplated.

> c.   *The attempted execution of Alan Miller further demonstrates that ADOC's implementation of the Protocol results in gratuitous suffering.*

Mr. Miller was scheduled to be executed on September 22, 2022; because of pending court proceedings, Mr. Miller's execution began around 10 pm CT.  See *Miller v. Hamm*, No. 2:22-cv-00506, DE 79-1 ¶¶ 100–04 (Oct. 6, 2022) ("Miller Second Am. Compl.").  Mr. Miller's Second Amended Complaint provides his first-hand account of the IV team's process in the execution

---

[10] Because the pages of Dr. Datnow's autopsy report are not numbered, the pin cite refers to the blue CM/DOC. numbering at the top of the page.

chamber, which is typically shielded from public view.  *See id.*  That account shows that the Protocol deviations during Mr. James's execution were not an aberration.

For example, according to Mr. Miller, he was strapped in a gurney in a stress position while two unidentified men in medical scrubs with unknown medical credentials, if any, repeatedly slapped, poked, prodded, and punctured him for nearly two hours.  *Id.* ¶¶ 109–26.  There is no indication that the IV team ever sought to use a central line procedure, as specified by the Protocol when the standard procedure cannot be used.  Moreover, according to Mr. Miller, a third unidentified man in medical scrubs entered the execution chamber and began slapping the skin on Mr. Miller's neck.  *Id.* ¶ 129.  But as Dr. Zivot has explained, "[t]he suitability of establishing an intravenous catheter in the neck would never involve feeling the skin and slapping the neck."  Zivot Dec. ¶ 14.  "Such actions under the circumstance suggest that those present lacked the skills and knowledge of how to place a neck central line."  *Id.*  The execution gurney was then lifted to an upright position so that Mr. Miller was left hanging vertically in a crucifixion position—with his chest and outstretched arms strapped to the gurney—for 20 minutes while blood leaked from his wounds, which seemingly served no purposes, and was not permitted by the Protocol.  Miller Sec. Am. Compl. ¶ 134.  Then just before midnight, an ADOC employee told Mr. Miller that his execution had been "postponed," and he was taken to the medical unit where ADOC documented a "body chart" exam but offered no medical assistance for Mr. Miller's pain.  *Id.* ¶¶ 135, 140.

### 2. *There Is A Substantial Risk That Mr. Smith Will Be Subjected To Torture If His Execution Proceeds On November 17.*

Both the botched execution of Mr. James and the failed attempt to execute Mr. Miller show that the Protocol is merely advisory and may be disregarded once ADOC officials receive permission to begin an execution and are shielded from public view.  Those two events—coupled with the State's lack of transparency and refusal to provide available information about what

occurred out of public view both times—demonstrate that there is a substantial likelihood that Mr. Smith will be subjected to the same cruelty if ADOC is permitted to execute him on November 17. *See* Zivot Dec. ¶ 15.

As a general matter, "[e]stablishing IV access in an execution setting with a condemned person strapped to a gurney is subject to inherent risks above and beyond any that might exist in establishing IV access . . . in a medical setting." *Id.* ¶ 16.  "When a person is nervous or frightened, the sympathetic nervous system is activated, and this leads to the release of certain hormones and chemical mediators," which "causes the blood vessels to constrict," making it "much harder to locate suitable veins" for IV access.  *Id.* ¶ 17; *see also* Yong Dec. at 6.  "Further, unlike medical professionals who are highly trained and skilled and establish IV access in patients on a daily basis . . . the unidentified people who perform these procedures during ADOC executions are not likely to have the same training and experience, if they have any at all."  Zivot Dec. ¶ 18.  "They also may not have the same equipment available to them to find accessible veins when standard processes are not achievable as would be available in a hospital or other medical facility."  *Id.*

All of those factors make it likely that the Protocol deviations that plagued the two previous execution attempts will continue to occur, resulting in cruelty and the superadding of unnecessary pain.  Nor is that risk speculative: when two executions attempted within 2 months of each other are plagued by the same problem—an inability to obtain IV access—it is more than reasonable to infer that the problem will continue, particularly when ADOC denies the existence of any problem and had not indicated it is taking any steps to show that it is willing and able to avoid similar occurrences in the future.

There are also risks specific to Mr. Smith that further increase those risks.  For example, Mr. Smith's height and weight combination corresponds to a BMI that is borderline obese, which

makes it more difficult to locate suitable veins.  Zivot Dec. ¶ 19; Yong Dec. at 6.  Accordingly, the risks of "a failed intravenous attempt are very likely quite similar in circumstance to the recent failed attempt at IV access" for Mr. Miller.  Zivot Dec. ¶ 20.

### 3. Nitrogen Hypoxia Is A Feasible And Readily Available Alternative That Would Significantly Reduce The Intolerable Risk to Mr. Smith From Lethal Injection.

Nitrogen hypoxia is a feasible and readily available alternative that would significantly reduce the intolerable risk to Mr. Smith from lethal injection.  Nitrogen hypoxia is a method of execution permitted under Alabama law.  *See* Ala. Code § 15-18-82.1.  And it would significantly reduce the intolerable risk of cruelty because "execution by inhalation of nitrogen gas would seem to avoid the need to establish IV access, which would eliminate the problems of establishing IV access that arose during the execution of [Mr.] James and the attempted execution of [Mr.] Miller."  Zivot Dec. ¶ 26.

## LEGAL STANDARD

Mr. Smith "is entitled to a preliminary injunction if he demonstrates (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to him outweighs the harm the injunction would cause the Defendant[]; and (4) that the injunction would not be adverse to the public interest."  *Miller v. Hamm*, No. 2:22-cv-00506, 2022 WL 4348724, at *8 (M.D. Ala. Sept. 19, 2022), *application to vacate granted sub nom.*, *Hamm v. Miller*, No. 22A258, 2022 WL 4391940 (U.S. Sept. 22, 2022). "Where, as here, 'the [State] is the party opposing the preliminary injunction, its interest and harm merge with the public interest,' and thus the third and fourth elements are the same."  *Id.* (citation omitted, alteration in original).

15

**ARGUMENT**

In moving for a preliminary injunction, Mr. Smith seeks only to preserve the status quo while he litigates his constitutional claims.  Mr. Smith is likely to prevail on the merits of those claims.  And absent relief, he undoubtedly will suffer irreparable harm—death by lethal injection.  A preliminary injunction would not substantially injure Defendants because they will still be able to carry out their execution via nitrogen hypoxia.  Finally, the public interest counsels in favor of a preliminary injunction because it would allow the Court to resolve Mr. Smith's important and timely constitutional challenges while having minimal, if any, impact on Defendants' interests.  A preliminary injunction is also in the public's interest to ensure that a third botched execution via lethal injection (in about as many months) does not occur.

**I.   MR. SMITH IS LIKELY TO SUCCEED ON THE MERITS OF HIS EIGHTH AMENDMENT CLAIM**

The Eighth Amendment to the U.S. Constitution proscribes "cruel and unusual punishments."  U.S. Const. amend. VIII.[11]  The Supreme Court has long held that the prohibition on cruel and unusual punishments forbids the State from the "unnecessary and wanton infliction of pain" on Mr. Smith during his execution.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotation marks omitted); *see also In re Kemmler*, 136 U.S. 436  447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . . ."); *Wilkerson v. Utah*, 99 U.S. 130, 136 (1879) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment . . . .").  The "relevant Eighth Amendment inquiry is whether the State's chosen method of execution "'superadds' pain well beyond what's needed to effectuate a death sentence."  *Bucklew v. Precythe*, 139 S. Ct. 1112,

---

[11] The Eighth Amendment is applicable to the States through its incorporation into the Fourteenth Amendment's Due Process Clause.  *See Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021).

1126–27 (2019).  And "[t]o determine whether the State is cruelly superadding pain," the Supreme

Court requires "asking whether the State had some other feasible and readily available method to

carry out its lawful sentence that would have significantly reduced a substantial risk of pain."  *Id.*

at 1127.  Mr. Smith can satisfy that standard.

### A.     There is an Intolerable Risk that Mr. Smith Will be Subjected to Cruelty

The Supreme Court has explained that "[p]unishments are cruel when they involve torture

or a lingering death."  *Baze v. Rees*, 553 U.S. 35, 49 (2008) (citation and internal quotation marks

omitted).  As the Supreme Court has further explained, "cruel" as "the people who ratified the

Eighth Amendment would have understood it" means:

> "[p]leased with hurting others; inhuman; hard-hearted; void of pity; wanting
> compassion; savage; barbarous; unrelenting," or "[d]isposed to give pain to others,
> in body or mind; willing or pleased to torment, vex or afflict; inhuman; destitute of
> pity, compassion or kindness."

*Bucklew*, 139 S. Ct. at 1123 (quoting 1 S. Johnson, A Dictionary of the English Language (4th ed.

1773) and 1 N. Webster, An American Dictionary of the English Language (1828)); *see also Baze*,

553 U.S. at 49 (a cruel punishment "implies there is something inhuman and barbarous, something

more than the mere extinguishment of life").  And while a "method of execution [that] cruelly

superadds pain to the death sentence" violates the Eighth Amendment, *Bucklew*, 139 S. Ct. at 1125,

"[i]t is certainly possible to imagine a painless but lingering death" that "would . . . violate the

Eighth Amendment," *In re Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, 2017 WL 2964901,

at *22 (S.D. Ohio July 12, 2017).

By any measure, ADOC's implementation of its Protocol to establish IV access subjects

condemned people to inhuman, hard-hearted, savage, barbarous, and unrelenting conduct that is

void of pity and wanting of compassion.  ADOC's efforts to establish IV access during Mr. James'

execution and during Mr. Miller's aborted execution demonstrate that.

During Mr. James' execution, ADOC took three hours just to establish IV access. Zivot Dec. ¶ 5. During that time, Mr. James was cruelly subjected to unnecessary (or superadded) pain when ADOC personnel poked and prodded him for three hours, used a cutdown procedure to attempt to establish IV access, and sedated him rendering him nonresponsive before ADOC administered its lethal three-drug cocktail.   And during Mr. Miller's aborted execution, unidentified ADOC personnel poked, prodded, and punctured him all over his body and sometimes simultaneously for nearly two hours while ignoring his questions and expressions of pain, causing him mental anguish to this day.   Mr. James' lingering death and Mr. Miller's nearly two-hour ordeal plainly exhibited barbarous treatment and a lack of pity and compassion.

Moreover, Mr. James' execution and Mr. Miller's aborted execution demonstrate that the Protocol is merely advisory and that ADOC will do whatever it thinks is necessary and for however long it takes until the warrant expires to establish IV access well beyond the point when it has become unnecessarily cruel and painful.   ADOC's Protocol authorizes only two methods to establish IV access: "The standard procedure for inserting IV access will be used.  If the veins are such that intravenous access cannot be provided,  will perform a central line procedure to provide an intravenous access." Doc. No. 12, Ex. 1, Annex C at ¶ c (redaction in original).  It should not take three hours, as it did during Mr. James' execution, or nearly two hours, as it did during Mr. Miller's aborted execution, to establish IV access by one of those methods or, alternatively, to determine that it is not reasonably possible by either method.  *See* Zivot Dec. ¶ 5.  Yet, in both situations, ADOC continued its efforts well past the point that it should have determined that neither method was reasonably possible and subjected Mr. James and Mr. Miller to unnecessarily cruel and painful treatment in violation of their Eighth Amendment rights.

Defendant confirmed this ends justifies the means approach in a previous submission when he claimed that each procedure to which ADOC subjected Mr. James and Mr. Miller in attempting to establish IV access "appears to constitute a medical decision designed to carry out the lethal injection." Doc. 31 at 11.  In other words, ADOC will do anything it believes necessary "to carry out the lethal injection" without regard to whether it has become gratuitously cruel and painful.

The Eleventh Circuit's decision reversing the dismissal of Mr. Smith's complaint underscores that underlying facts are sufficient to show an Eighth Amendment violation.  *See* Mtn. to Stay Execution Ex. A at 13-14.  Specifically, facing superadded pain as the execution team attempts to gain IV access due to its inability to swiftly and successfully establishing IV access violates the Eighth Amendment, as there is a feasible and readily-available alternative.  *Id.* at 10–14.  Moreover, the Eleventh Circuit has already held that this claim is not time-barred, as it was "the emergence of ADOC's pattern of superadding pain through protracted efforts to establish IV access in the two previous execution attempts that caused Smith's claim to accrue."  *Id.* at 10, 14.

It is telling that the only evidence Defendant has submitted to date about what happened during the three hours that ADOC attempted to establish IV access to Mr. James comes from Dr. Boris Datnow, a pathologist who performed an autopsy on Mr. James.  *See* Doc. No. 31-1.  Defendant controls the members of the IV team responsible for establishing IV access and the members of the execution team who observed their actions.  Yet, Defendant has not submitted any evidence from any eyewitness to Mr. James' execution (or Mr. Miller's aborted execution), and ADOC's public statements since that event are so vague as to be meaningless and not credible.

Dr. Datnow's declaration raises many questions that Mr. Smith should have a right to ask him and that ADOC can answer by producing the IV team and members of the execution team who witnessed their actions for questioning subject to cross-examination.  As just a few examples:

- If, as Dr. Datnow contends, he "was able to positively identify only two needle punctures," Doc. No. 31-1 at ¶ 10, why did it take three hours to establish IV access through those two needle punctures?

- If, as Dr. Datnow contends, "[n]othing in my autopsy, or in a toxicological screen of a sample of peritoneal fluid taken from Mr. James suggested that Mr. James had been administered an intramuscular sedative," *id.* at ¶ 11, why did Mr. James appear nonresponsive to observers and why is ADOC unable to say whether Mr. James was fully conscious before ADOC administered its lethal three-drug cocktail?

- If not an attempted cutdown, what explains the three "linear abrasions" averaging 4.5 cm in length, *id.*, Ex. B at 2, noted in Dr. Datnow's autopsy report?

If ADOC is permitted to execute Mr. Smith by lethal injection on November 17, there is a substantial likelihood that Mr. Smith will be subjected to the same cruelty and pain to which ADOC subjected Mr. James and Mr. Miller.  Unlike in a medical setting, establishing IV access in an execution setting entails inherent risks.  First, a condemned person facing imminent death is likely to be nervous or frightened, which "causes the blood vessels to constrict" and makes it "much harder to locate suitable veins" for IV access.  Zivot Dec. ¶ 17; *see also* Yong Dec. at 6. Second the unidentified people responsible for establishing IV access during ADOC executions "are not likely to have the same training and experience" and likely do not have the same equipment available to them as medical professionals who establish IV access on a daily basis. Zivot Dec. ¶ 18.  In addition, factors specific to Mr. Smith, including that he is borderline obese, increase the risks to him.  *Id.* ¶ 19; Yong Dec. at 6.  For those reasons, the risk to Mr. Smith of "a failed intravenous attempt are very likely quite similar in circumstance to the recent failed attempt

at IV access" for Mr. Miller.  Zivot Dec. ¶ 20.  And Defendant's failure to acknowledge the problems in the previous two executions or take any steps to prevent similar occurrences in the future make it highly likely that whatever prevented its agents from obtaining IV access in a humane manner for Mr. James and Mr. Miller is likely to keep recurring.

Accordingly, Mr. Smith is likely to succeed in establishing that there is an intolerable risk that the Protocol deviations that plagued the two previous execution attempts will continue to occur if his scheduled execution goes forward on November 17, resulting in the superadding of cruelty and unnecessary pain.

### B.    Nitrogen Hypoxia Is a Feasible and Readily Available Alternative That Will Significantly Reduce the Risk to Mr. Smith Posed by Lethal Injection

The Supreme Court has held that a condemned person asserting an Eighth Amendment challenge to the method of his execution "must identify an alternative [method] that is feasible, readily implemented, and in fact significantly reduce[s]' the risk of harm involved" because "[o]nly through a 'comparative' exercise . . . can a judge 'decide whether the State has cruelly "superadded" pain to the punishment of death."  *Nance v. Ward*, 142 S. Ct. 2214, 2220 (2022) (citations omitted); *see also Bucklew*, 139 S. Ct. at 1125 (same).  That standard is satisfied here with respect to nitrogen hypoxia.

### 1.    As a Matter of Eleventh Circuit Law, Nitrogen Hypoxia is a Feasible and Readily Available Method of Execution

Execution by nitrogen hypoxia is a feasible and readily available alternative to execution by lethal injection in Alabama because "[i]f a State adopts a particular method of execution—as the State of Alabama did in March 2018—it thereby concedes that the method of execution is available to its inmates."  *Price v. Comm'r, Ala. Dep't of Corrs.*, 920 F.3d 1317, 1327–28 (11th Cir. 2019).  "Indeed, Alabama's official legislature-enacted policy is that nitrogen hypoxia is an

available alternative method of execution in the State." *Id.* at 1328.   The Eleventh Circuit's decision rejected Defendant's argument to the contrary, noting that he "completes misses our point from *Price*" and that "nitrogen hypoxia is an available alternative method for method-of-execution claims."   Emergency Mtn. to Stay Execution Ex. A at 14.

### 2. Execution by Nitrogen Hypoxia Would Substantially Reduce the Risk to Mr. Smith Posed by Execution by Lethal Injection

Execution by nitrogen hypoxia also would substantially reduce the intolerable risk to Mr. Smith from ADOC's lethal injection Protocol.   Most significantly, execution by nitrogen hypoxia would not require ADOC personnel to establish IV access. *See* Zivot Dec. ¶ 26; *see also* Michael Copeland, Thom Parr, Christine Pappas, *Nitrogen Induced Hypoxia as a Form of Capital Punishment* ("Nitrogen Report") at 10 ("The administration of a death sentence via nitrogen hypoxia does not require the use of a complex medical procedure or pharmaceutical products.").[12] In turn, that would eliminate the intolerable risk to Mr. Smith that ADOC will extend the process of establishing IV access well beyond the point where it has become unnecessarily cruel and painful as it did when it executed Mr. James and it attempted to execute Mr. Miller.

Additionally, inhaling nitrogen gas would cause death by starving the body of oxygen without which it cannot survive, but with a minimum of pain and discomfort, if any. *See id.* ¶ 22. "The capital punishment protocols cited that utilize nitrogen to administer a death sentence do not actually rely on the nitrogen itself to bring about death.   Nitrogen simply displaces the oxygen normally found in air and it is the resulting lack of oxygen which causes death."   Nitrogen Report at 4.

---

[12] The Nitrogen Report was prepared in 2015 at the request of the Oklahoma state legislature.   A copy is attached as Exhibit D.

Thus, the air people normally breathe consists of about 80% nitrogen and about 20% oxygen. *See* Zivot Dec. ¶ 22. Chemical receptors in the brain monitor and regulate the amount of oxygen and carbon dioxide, the waste product of respiration, in the blood. *See id.* ¶ 23. The carbon dioxide detector is particularly sensitive, which makes [a]n elevated blood carbon dioxide level . . . a powerful trigger for respiratory distress." *Id.* ¶ 24. As a result, when the amount of carbon dioxide in the blood rises above normal levels, the body experiences "extreme discomfort and an overwhelming need to exhale." *Id.* ¶ 23.

Because there is no specific receptor to detect nitrogen levels in the blood and the receptor for oxygen is not particularly sensitive for warning about low blood oxygen levels, a low blood oxygen level will not cause distress if carbon dioxide levels remain in the normal range. *See id.* ¶ 24. And because "nitrogen is an odorless, colorless, non-noxious gas, breathing increasing amounts of nitrogen to the exclusion of oxygen will not cause discomfort "as long as our breathing remains unobstructed and we are permitted to exhale carbon dioxide at a normal rate." *Id.*

Thus, theoretically (because it would be unethical to conduct experiments with death by inhaling nitrogen gas), execution by nitrogen hypoxia would not cause the condemned person to experience the sensation of suffocating. *See id.* ¶ 25; *see also* Nitrogen Report at 5 ("Unlike asphyxiation, hypoxia via the inhalation of nitrogen allows the body to expel the carbon dioxide buildup that is normally associated with the respiratory cycle" and "helps prevent a condition known as hypercapnia - an accumulation of carbon dioxide in the blood."). The Nitrogen Report described the likely effects of nitrogen hypoxia as follows:

> The literature indicates after breathing pure nitrogen, subjects will experience the following: within eight-to-ten seconds the subjects will experience a dimming vision, at fifteen-to-sixteen seconds they will experience a clouding of consciousness, and at seventeen-to-twenty seconds they will lose consciousness. There is no evidence to indicate any substantial physical discomfort during this process.

Nitrogen Report at 9.

Given those likely effects, "[s]uicide by hypoxia using an inert gas such as nitrogen or helium is the most widely promoted method of human euthanasia by right-to-die advocates." *Id.* at 6. Further, autopsies of people who have died accidentally by inhaling nitrogen gas show no evidence of pulmonary edema, which is seen on autopsies of condemned people executed by lethal injection, and which is accompanied by the sensation of drowning if the condemned person is conscious. *See id.* ¶¶ 27–28; *see also* Doc. No. 31-1, Ex. B at 4 (finding "[p]ulmonary congestion and edema" on Mr. James' autopsy).

All of this is consistent with the Legislature's purpose in authorizing execution by nitrogen hypoxia, which was intended to be a "more humane" method of execution than lethal injection similar "to how aircraft passengers lose consciousness if the plane depressurizes." Kim Chandler, *Alabama Senate votes to allow execution by nitrogen gas*, Associated Press (Feb. 22, 2018), available at https://apnews.com/article/64a91b4e5be147dd8417df80488dc4fc. It also is consistent with the findings in the Nitrogen Report:

1. An execution protocol that induced hypoxia via nitrogen inhalation would be a humane method to carry out a death sentence.

2. Death sentence protocols carried out using nitrogen inhalation would not require the assistance of licensed medical professionals.

3. Death sentences carried out by nitrogen inhalation would be simple to administer.

4. Nitrogen is readily available for purchase and sourcing would not pose a difficulty.

5. Death sentences carried out by nitrogen inhalation would not depend upon the cooperation of the offender being executed.

6. Use of nitrogen as a method of execution can assure a quick and painless death of the offender.

Nitrogen Report at 8–9.

Put simply, execution by nitrogen hypoxia would substantially reduce the risks to Mr. Smith posed by ADOC's planned execution of him by lethal injection.

## II.   MR. SMITH WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION

There is nothing more final and irreversible than death.  What Mr. Smith stands to suffer, however, would compound that.  Without a preliminary injunction, Mr. Smith is scheduled for an unconstitutional death that will strip him of his "'final dignity.'" *Miller v. Hamm*, No. 2:22-CV-506-RAH, 2022 WL 4348724, at *21 (M.D. Ala. Sept. 19, 2022), *vacated*, No. 22A258, 2022 WL 4391940 (U.S. Sept. 22, 2022) (citing *Smith v. Comm'r, Ala. Dep't of Corrs.*, No. 21-13581, 2021 WL 4916001, at *5 (11th Cir. Oct. 21, 2021) (Pryor, J., concurring)).  Although Mr. Smith has identified a feasible and readily available alternative method of execution that the State authorizes because it is "more humane" than lethal injection and that will substantially reduce the risk to Mr. Smith posed by lethal injection, the State nevertheless insists on executing Mr. Smith by lethal injection.

The evidence available from the recent execution of Mr. James underscores the irreparable harm that Mr. Smith will face:

- Mr. James's execution extended for more than three hours.  Am. Compl. ¶ 29.

- In the two minutes that Mr. James was visible to observers before the administration of the lethal drug cocktail, Mr. James did not open his eyes, move, or respond when asked if he had any last words.  *Id.* at  ¶ 37.

- The State admitted that it "cannot confirm" whether Mr. James was fully conscious when he was executed.  *Id.* at ¶ 43.

- An autopsy revealed that the State attempted a cutdown procedure to access a vein. *Id.* at ¶ 32; *see also* Zivot Dec. ¶¶ 9–12; Pigott Dec. ¶¶ 4–5.

The attempted execution of Mr. Miller provides further gruesome details of the torturous method:

- Mr. Miller, who is shorter than the height that the execution gurney is designed for, was placed in a position that caused him pain in his chest, neck, and arms.  Second Amended Complaint, *Miller v. Hamm*, No. 2:22-CV-506-RAH, DOC. No. 79-1, at ¶ 105 (Oct. 6, 2022) ("Miller SAC").

- The State worked their way around Mr. Miller's body for nearly two hours, poking, puncturing, and slapping various parts of Mr. Miller's body in an attempt to access a vein, including his elbows, hands, feet, legs, and forearms.  Miller SAC ¶¶ 113–29.

- After these unsuccessful attempts to access a vein, the State raised the execution gurney from a horizontal to a vertical position, leaving Mr. Miller hanging vertically from the gurney for 20 minutes.  *Id.* at ¶¶ 132–34

- While suspended vertically from the gurney, blood leaked from Mr. Miller's wounds.  *Id.* at ¶ 134.

- The State did not call off the execution until midnight—when the death warrant expired.  *Id.* at ¶ 138.

If Defendant is permitted to proceed with the scheduled execution before Mr. Smith has an opportunity to complete discovery and a trial on the merits, the injury to Mr. Smith will be irreparable.

III.    **THE THREATENED INJURY TO MR. SMITH OUTWEIGHS THE HARM AN INJUNCTION WOULD CAUSE THE STATE**

The balance of equities weighs heavily in Mr. Smith's favor.  "The public interest is served when constitutional rights are protected." *Melendez v. Sec'y, Fla. Dep't of Corrs.*, No. 21-13455, 2022 WL 1124753, at *17 (11th Cir. Apr. 15, 2022) (internal quotation marks and citation omitted); *see also Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation and citation omitted)); *Ray v. Comm'r, Ala. Dep't of Corrs.*, 915 F.3d 689, 701 (11th Cir. 2019) ("the public has a serious interest in the proper application and enforcement of the Establishment Clause"); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (same).  This case involves serious constitutional violations.  The State has scheduled Mr. Smith for execution by lethal injection despite an intolerable risk that its Protocol for establishing IV access will subject Mr. Smith to torture, cruelty, and substantial pain as evidenced by the State's last two executions and despite a feasible and available alternative method of execution.  Thus, it is in the public's interest to ensure that Defendant complies with the protections afforded to Mr. Smith under the Eighth Amendment to the Constitution to be free from the infliction of such cruel and unusual punishments.

To be sure, the State and crime victims have an interest in carrying out executions in a timely manner.  *See Hill v. McDonough*, 547 U.S. 573, 584 (2006).  But Mr. Smith does not seek an injunction to forever prevent the State from executing him.  Rather, Mr. Smith seeks only to enjoin Defendant from attempting an unconstitutional execution.  Any harm to Defendant resulting from a temporary injunction is inconsequential compared to the harm Mr. Smith stands to suffer. After all, "[t]he state will get its man in the end.  In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution

suffers an injury that can never be repaired." *Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's motion for a preliminary injunction to enjoin Defendant from executing him by lethal injection.

<div style="margin-left:50%">

*/s/ Andrew B. Johnson*

Andrew B. Johnson (ASB: 8504-r76j)
BRADLEY ARANT BOULT CUMMINGS,
LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Tel: (205) 521-8000
Fax: (205) 521-8800
ajohnson@bradley.com

Jeffrey H. Horowitz (NY Bar No. 3949070)
Robert M. Grass (NY Bar No, 2501278)
David Kerschner (NY Bar No. 5126420)
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, New York 10019-9710
Tel: (212) 836-8000
Fax: (212) 836-8689
jeffrey.horowitz@arnoldporter.com
robert.grass@arnoldporter.com
david.kerschner@arnoldporter.com

Angelique Ciliberti (ASB: 1504-T44C)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Tel: 202-942-5000
Fax: 202-942-5999
angelique.ciliberti@arnoldporter.com

*Attorneys for Plaintiff Kenneth Eugene Smith*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the Pacer system, which will send notification to the following:

Richard D. Anderson
Assistant Attorney General
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Richard.Anderson@AlabamaAG.gov

Thomas A. Wilson
Deputy Solicitor General
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
Thomas.Wilson@AlabamaAG.gov

*Attorneys for Defendant*

*/s/ Andrew B. Johnson*
Of Counsel