**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

KENNETH EUGENE SMITH,     )
           )
     Plaintiff,     )
           )     Case No. 2:22-cv-00497-RAH
v.           )
           )     CAPITAL CASE
JOHN Q. HAMM, Commissioner, Alabama )
Department of Corrections,     )     **EXECUTION SCHEDULED FOR**
           )     **NOVEMBER 17, 2022**
     Defendant.     )

## AMENDED COMPLAINT

Plaintiff Kenneth Eugene Smith alleges as follows:

## INTRODUCTION

1.     Plaintiff Kenneth Eugene Smith is in the custody of the Alabama Department of Corrections ("ADOC") at William C. Holman Correctional Facility ("Holman") under a death sentence imposed by the State of Alabama ("State") despite the jury's recommendation by a vote of 11 to 1 that he be sentenced to life imprisonment without the possibility of parole.

2.     As the Eleventh Circuit Court of Appeals has recognized, "if Smith's trial had occurred today, he would not be eligible for execution because, in 2017, Alabama amended its capital-sentencing scheme," which had allowed elected state court judges to override a jury's sentencing determinations. *See Smith v. Comm'r*, 850 F. App'x 726, 726 n.1 (11th Cir. 2021). But because Alabama's amendment applied only prospectively, Mr. Smith has been denied relief from his death sentence, even though that same sentence could not be imposed today if—as happened in Mr. Smith's case—a jury of his peers recommended life in prison.

3.     Plaintiff brings this action under 42 U.S.C. § 1983 to enjoin an imminent deprivation of his rights and privileges secured by the Constitution and laws of the United States.

4.    If ADOC is allowed to execute Plaintiff by lethal injection on November 17, 2022, as it currently plans to do, there is a substantial likelihood that he will be subjected to an intolerable risk of torture, cruelty, or substantial pain.

5.    That is what occurred when ADOC executed Joe Nathan James on July 28, 2022 and when it attempted to execute Alan Eugene Miller on September 22, 2022. ADOC's execution of Mr. James—one of the longest executions in history—and its failed attempt to execute Mr. Miller both made clear that once ADOC is allowed to begin an execution, it will not stop until the warrant expires, and during that time, will do anything to obtain intravenous ("IV") access, including disregarding its own lethal injection protocol ("the Protocol").

6.    The Protocol provides that an IV team will establish IV access before curtains to the witness rooms are opened—*i.e.*, out of public view. It authorizes only two methods for establishing IV access in a condemned inmate: the "standard" method, and if that cannot be provided, then a central line may be used. It also sets out the steps that follow the IV team's secret procedures, including the reading of the warrant and the condemned offender's last words. *See* Protocol, Attached as Exhibit 4 to Declaration of Joel B. Zivot, MD, FRCP(C), MA, dated October 17, 2022 ("Zivot Decl."). A copy of the Zivot Declaration is attached as Exhibit A.

7.    ADOC's public position is that it follows its protocol carefully in carrying out executions. For example, following the execution of Mr. James, ADOC's commissioner John Hamm claimed, "we have protocols and we're very deliberate in our process, and making sure

everything goes according to the plan."[1]  An ADOC spokesperson later emailed the media that "ADOC's execution team strictly followed the established protocol" in executing Mr. James.[2]

8.     But Mr. James's maimed body, which was examined by a physician after his execution, tells a much different story:  one in which he was subjected to more than three hours of pain and torture at the hands of incompetent, unknown individuals who blatantly disregarded Alabama's execution protocol.   His body alone is evidence of two significant protocol violations: (1) an unauthorized "cutdown" procedure in which an incision is made with a scalpel directly into the skin in an attempt to find a vein (2) an unauthorized intramuscular injection.   Eyewitness accounts of the execution also provide evidence of a third protocol violation: upon information and belief, Mr. James was rendered unconscious before the warrant was read and his last remarks were requested, two steps in the Protocol that cannot meaningfully occur if the condemned is unconscious.

9.     Mr. Miller—who survived his botched execution attempt—has, by way of his own Second Amended Complaint, provided a first-hand account of what occurred in the execution chamber when the public was not permitted to watch.  *See Miller v. Hamm*, No. 2:22-cv-506-RAH, Doc. No. 79-1. That account is further evidence of ADOC's failure to follow the Protocol.   For example, Mr. Miller allegedly was strapped to a gurney in a stress position, which is not authorized by the Protocol, and was "slapp[ed] . . . on his neck," *id.* ¶ 129, which is not necessary or even useful in establishing an IV catheter in the neck, nor is it permitted by the Protocol.

---

[1] *See* Bruenig, Elizabeth, Dead to Rights: What did the state of Alabama do to Joe Nathan James in the three hours before his execution?   https://www.theatlantic.com/ideas/archive/2022/08/joe-nathan-james-execution-alabama/671127/ (last visited Oct. 17, 2022.

[2] *Id.*

10.     The James execution and Miller attempted execution made clear for the first time that ADOC's lethal injection "protocol" is entirely advisory—meaning executions are being carried out by individuals who are either unable or unwilling to follow the Protocol.  Instead, once ADOC is given permission to begin an execution, it will not stop until the death warrant expires, even when those efforts go beyond the Protocol and cross the threshold into torture, cruelty, or substantial pain.  And because this process is largely shielded from public view, ADOC is protected from public accountability for its actions because the only person who could bear witness to the cruelty and pain he experienced will be deceased.

11.     ADOC's present attempt to deflect from Plaintiff's allegations by representing that it will not perform a cutdown procedure or give intramuscular injections during Plaintiff's execution is inadequate to ensure that Mr. Smith will not be subjected to the same torture as Mr. James and Mr. Miller.

12.     Put simply, it is impossible to reconcile ADOC's insistence that it strictly follows its protocol with the facts that can be gleaned from the James autopsy and Mr. Miller's account of ADOC's attempt to execute him.  And with the rare exception of Mr. Miller, unidentified ADOC personnel are the only witnesses to what occurs outside public view, and ADOC has not been forthcoming about those events.  Without more factual development about what the IV team is doing while shielded from the public view, it is difficult for Plaintiff to know what other painful and unnecessary procedures need to be enjoined.  For example, even if ADOC does not perform a cutdown or give an intramuscular injection, as it has claimed it will not do, will it restrain Plaintiff in a stress position and hit him unnecessarily, as allegedly happened to Mr. Miller?  What else might it do?  Without discovery to understand the reasons for ADOC's apparent inability to perform what should be quick, relatively painless IV access procedures, Plaintiff and other

condemned individuals are presented with a horrifying game of whack-a-mole—even if they succeed in preventing the protocol violations that previously occurred, more protocol violations are likely to occur during their own executions, but by the time the nature of those violations becomes apparent, Plaintiff will be strapped to a gurney, out of public view, with no attorneys or other representatives present to bear witness to what ADOC officials do to him.

13.     Given that ADOC's lethal injection protocol is only advisory, shrouded in secrecy, and, therefore, insufficient to prevent subjecting Plaintiff to an intolerable risk of torture, cruelty, or substantial pain, permitting ADOC to execute Plaintiff by lethal injection would violate his Eighth Amendment rights under the U.S. Constitution.

14.     As a matter of law, nitrogen hypoxia is feasible and readily available alternative that would significantly reduce the intolerable risk to Mr. Smith from lethal injection. Plaintiff was unable to make an informed decision regarding legislation enacted in 2018 that provided condemned people, including Plaintiff, a right to elect execution by nitrogen hypoxia rather than lethal injection. By its terms, the statute gave condemned people a 30-day window in June 2018 to make that election or waive their right. Plaintiff lacked notice of his right during the election window. But even putting that aside, Plaintiff lacked information necessary to make a knowing and voluntary waiver of that right. During the 30-day election window, Plaintiff did not know that ADOC had no protocol for execution by nitrogen hypoxia and no prospect for developing one, thereby resulting in indefinite delays of execution for condemned people who chose execution by nitrogen hypoxia. Nor did Plaintiff know that ADOC's lethal injection process would subject him to an intolerable risk of a more than three-hour, non-public, torturous ordeal before the administration of the lethal drug cocktail as ADOC inflicted on Mr. James. Had he known that the State was offering him a choice between an unknown nitrogen hypoxia protocol that may not

5

be implemented for many years and a lethal injection protocol that subjects him to an intolerable risk of torture, cruelty, or substantial pain, Plaintiff would have chosen to be executed by nitrogen hypoxia.

## JURISDICTION AND VENUE

15. This is an action for declaratory and injunctive relief.

16. The Court has subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), and 2201(a).

17. Venue is proper in the Middle District of Alabama under 28 U.S.C. § 1391(b).

## PARTIES

18. Plaintiff Kenneth Eugene Smith, a citizen of the United States and resident of the State, is an inmate at Holman under Defendants' supervision and subject to execution under a State court judgment of conviction for capital murder. His execution is currently scheduled for November 17, 2022.

19. Defendant John Q. Hamm, in his official capacity, is the Commissioner of the Alabama Department of Corrections, which is an administrative Department of the State responsible for administering and exercising the direct and effective control over penal and corrections institutions within the State, including for administering the lethal injection process by which the State intends to execute Plaintiff.

## CASE OR CONTROVERSY

20. There is a real and justiciable case or controversy between the parties.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

21. Plaintiff has no available administrative remedies because State law exempts "[t]he policies and procedures of the Department of Corrections for executions of persons sentenced to

death . . . from the Alabama Administrative Procedure Act, Chapter 22 of Title 41." Ala. Code § 15-18-82.1(g).[3]

<h1 style="text-align:center">FACTUAL ALLEGATIONS</h1>

**A.     ADOC's Lethal Injection Protocol**

22.     ADOC's lethal injection protocol (the "Protocol") authorizes only two methods for establishing intravenous access in a condemned inmate.

23.     According to the Protocol:  "The standard procedure for inserting IV access will be used.  If the veins are such that intravenous access cannot be provided,  will perform a central line procedure to provide an intravenous access."  *See* Protocol, Annex C, ¶ c (redaction in original).

24.     It should not take three hours, as it did in Mr. James case, or nearly two hours, as it did in Mr. Miller's case to establish intravenous access by the standard procedure or determine that is not possible, and then to establish intravenous access by a central line procedure or determine that is not possible. *See* Zivot Decl. ¶ 5.

25.     The execution of Mr. James and the aborted execution of Mr. Miller demonstrate that the Protocol serves only an advisory function.  Once an execution begins, ADOC reserves the right to deviate from the protocol to establish intravenous access as long as that is accomplished before the warrant expires at midnight.  If the result is the death of the condemned person, there are no witnesses to what occurred other than ADOC personnel.  And ADOC is not forthcoming about that process.

**B.     ADOC Materially Deviated from the Protocol During the Execution of Mr. James**

---

[3] In a previous litigation, the State has "[a]dmitted" that '[n]o administrative grievance process is available for . . . death row inmates to challenge the procedures to be employed during their executions." *In re Ala. Lethal Injection Protocol Litig.*, No. 12-cv-316 (M.D. Ala. 2012) Doc. 348 at ¶ 22, Doc. 354 at ¶ 22.

26. On June 13, 2022, the Alabama Supreme Court scheduled Mr. James' execution for 6 pm CT on July 28, 2022.

27. ADOC's lethal injection process subjected Mr. James to at least a three- and one-half-hour ordeal, including torture, cruelty, or substantial pain. That process was replete with violations of the Protocol which amply demonstrate that the "Protocol" is merely advisory in nature, and ADOC officials, whether through incompetence or maleficence, are free to deviate from its provisions to accomplish its end of executing the condemned before the warrant expires.

28. At the scheduled time, there were no legal obstacles that prevented ADOC from proceeding with Mr. James' execution. But ADOC did not administer its lethal drug cocktail to Mr. James at or around 6 pm CT as scheduled.

29. Instead, without explanation from ADOC and without public observation, Mr. James execution extended for more than three hours. He did not appear to observers until approximately 9 pm CT and was not pronounced dead until 9:27 CT.

30. During the three hours of the process that was not open to the public, ADOC strapped Mr. James to a gurney and poked, prodded, and cut him attempting multiple times to access a vein for intravenous injection of the lethal drug cocktail. Zivot Decl. ¶ 5; *see also* Declaration of David C. Pigott, MD, dated October 12, 2022 ("Pigott Decl.") ¶¶ 4–6. A copy of the Pigott Declaration is attached as Exhibit B.

31. The Protocol provides that if IV access cannot be achieved through the standard procedure, a central line procedure should be performed. *See* Protocol, Annex C, ¶ c. Even though it should have been apparent to the IV team within a short period of time—certainly much less than three hours—that the standard procedure was not possible, there is no evidence that a central

line procedure was ever attempted. Instead, rather than follow the Protocol, the IV team seemly moved to a different, unauthorized procedure, as described below.

32.     Based on the results of an autopsy on Mr. James performed by an independent pathologist, among other things, ADOC staff attempted a cutdown procedure to access a vein. Zivot Decl. ¶¶ 9–12; Pigott Decl. ¶¶ 4–5.

33.     Venous cutdown is an emergency procedure whereby a physician surgically exposes a patient's vein after applying local anesthesia when rapid access is required for intravenous therapy and other less-invasive procedures have failed. That procedure is not authorized by the Protocol. Furthermore, in medical practice generally, cutdowns have fallen out of favor because of the potential for bleeding and because such procedures require surgical expertise. *See* Declaration of Robert Jason Yong, MD, dated October 18, 2022 ("Yong Delc.") at 8. The Yong Declaration is attached as Exhibit C.

34.     A photograph taken during the James autopsy shows the attempted cutdown:



35.     The deeper laceration in the pit of the elbow in the photograph above is indicative of the attempted cutdown procedure. *See* Pigott Dec. ¶ 5; Zivot Dec. ¶¶ 10, 12. The photograph shows what appear to be tissue response and blood in and around the laceration, suggesting that it was made while Mr. James was still alive, as post-mortem wounds do not bleed. *Id.*

36.     The independent autopsy further revealed evidence of puncture wounds in areas of Mr. James' arm that are not in an area where a vein would expect to be located, which suggest that Mr. James was administered an intramuscular injection during the three-hour attempt to access a vein. *See* Zivot Decl. ¶ 9. Intramuscular injections are not permitted by the Protocol.

37.     On information and belief, in the two minutes Mr. James was visible to observers before the administration of the lethal drugs, Mr. James did not open his eyes or move and did not respond when asked if he had any last words. Reportedly, Mr. James had confided in a fellow condemned person that he intended last words, suggesting, consistent with the clinician's observation of an intramuscular injection, that he had been rendered unconscious or otherwise unable to respond before witnesses were permitted to observe by injection with a sedative. *See* Elizabeth Bruenig, *Dead to Rights, What did the State of Alabama do to Joe Nathan James in the three hours before his execution*; The Atlantic (Aug. 14, 2022), available at https://www.theatlantic.com/ideas/archive/2022/08/joe-nathan-james-execution-alabama/671127/; Evan Mealins, *ADOC 'cannot confirm if Joe Nathan James Jr. was fully conscious before his execution*, Montgomery Advertiser (Aug. 2, 2022); available at https://www.montgomeryadvertiser.com/story/news/2022/08/02/joe-nathan-james-jr-execution-adoc-cannot-confirm-if-conscious/10168003002/.

38.     The Protocol states that the Warden "will read the warrant to the condemned offender" and that the "condemned offender will be allowed to make any last remarks." Protocol

§ IX.L; IX.M.  Neither of those steps can be completed if the condemned is unconscious. Accordingly, upon information and belief, the James execution deviated from those Protocol provisions.

39.     ADOC did not disclose what happened during the three hours that Mr. James was not visible to observers.  At a press conference after Mr. James' execution, Commissioner Hamm simply offered the vague explanation that ADOC is "very deliberate in our process of making sure everything goes according to plan" without further elaboration.  Kim Chandler, *Man executed despite calls from victim's family to spare him*, Associated Press (July 28, 2022), available at https://www.newstimes.com/news/article/Alabama-execution-set-over-opposition-from-17334136.php.

40.     Later ADOC issued another vague statement regarding the execution:  "ADOC's execution team strictly followed the established protocol.  The protocol states that if the veins are such that intravenous access cannot be provided, the team will perform a central line procedure. Fortunately, this was not necessary and with adequate time, intravenous access was established." Elizabeth Bruenig, *Dead to Rights*, *supra*.

41.     ADOC did not provide any information about what steps it took to establish an intravenous line, what complications arose that prevented it from doing so for more than three hours, how many attempts it made to establish an intravenous line, whether the process caused bleeding or any other physical or emotional harm to Mr. James, whether the ADOC execution team included people qualified and/or trained to perform the various procedures on Mr. James, whether qualified medical professionals were on hand to perform or supervise those procedures, or anything else about what transpired during those three hours.

42.     Nor has ADOC disclosed that information since.  To the contrary, it has not disclosed the results of its autopsy of Mr. James.  Zivot Decl. ¶ 7.  And it has denied a press request for information shedding light on what occurred during Mr. James' execution.  Bryan Lyman, *Department of Corrections denies request for Joe Nathan James, Jr. execution records*, Montgomery Advertiser (Aug. 16, 2022), available at https://www.montgomeryadvertiser.com/story/news/2022/08/16/joe-james-jr-execution-adoc-denies-advertiser's-request-records/10333449002/?utm-source=montgomeryadvertiser-DailyBriefing&utm_medium=email&utm_campaign=daily_briefing&utm_term=list_article_headline&utm_content=PMOY-1123MA-E-NLETTER65.

43.     And, although Commissioner Hamm stated at the press conference after Mr. James' execution that Mr. James had not been sedated before the lethal drug cocktail was administered, the following day ADOC admitted that it "cannot confirm that" Mr. James was fully conscious when he was executed.  Evan Mealins, *ADOC 'cannot confirm if Joe Nathan James Jr. was fully conscious before his execution*, *supra*.

44.     That is telling.  As one commentator put it: "If the department does not know whether a prisoner is conscious or unconscious at the time of the execution, then they are incompetent to carry an execution out.  If the department does know but will not say, then they cannot be trusted." *Id.*

45.     Given ADOC's lack of transparency, Mr. James' sister has called for an investigation into Mr. James' execution, pointing out that "[o]nly the ADOC employees know what occurred during those three hours."  Evan Mealins, *Sister of Joe Nathan James: Circumstances surrounding execution warrant an investigation*, Montgomery Advertiser (Aug. 3,

2022), available at https://www.montgomeryadvertiser/story/news/2022/08/03/joe-james-sister-calls-investigation-execution/10219862002/.

46.     To date, despite the request of Mr. James' sister, neither ADOC nor any State representative has publicly indicated that any review or other investigation, much less an independent one, of ADOC's lethal injection process to reduce the intolerable risk of torture, cruelty, or substantial pain to which it subjects condemned people is underway or contemplated.

### C.     ADOC Materially Deviated from the Protocol During the Aborted Execution of Mr. Miller

47.     Mr. Miller was scheduled to be executed on September 22, 2022.

48.     Due to pending court proceedings, Mr. Miller's execution began about 10 pm CT when he was walked to the execution chamber and strapped into the gurney at about 10:15 pm. *See Miller v. Hamm*, No. 2:22-cv-00506, Doc. No. 79-1 ¶¶ 100–04 (Oct. 6, 2022) ("Miller Second Am. Compl.").

49.     On information and belief, thereafter, while he was strapped in the gurney in a stress position, two unidentified men in medical scrubs with unknown medical credentials, if any, repeatedly, slapped, poked, prodded, and punctured Mr. Miller for nearly two hours.  They started in his left arm, and then moved sequentially to his right hand, left hand, inner left arm, right foot, and left foot in a futile attempt to establish intravenous access.  *See id.* ¶¶ 109–26.  Having failed to establish intravenous access, the two unidentified men resorted to simultaneously puncturing his left and right arm, respectively,  *See id.* ¶ 127.

50.     On information and belief, a third unidentified man in medical scrubs entered the execution chamber and began slapping the skin on Mr. Miller's neck.  *See id.* ¶ 129.

51.     There was no basis to slap the skin on Mr. Miller's neck to perform any procedure that is authorized under the Protocol.  Zivot Decl. ¶ 14.

52.     On information and belief, all the while, ADOC personnel ignored Mr. Miller's verbal expressions of excruciating pain and his questions about their efforts.  *See* Miller Second Am. Compl. ¶¶ 109–26.

53.     On information and belief, just before midnight when the warrant for his execution expired, ADOC personnel informed Mr. Miller that his execution had been postponed without further explanation, despite Mr. Miller's requests for one.  *See id.* ¶ 135.

54.     On information and belief, even then, Mr. Miller's ordeal did not end as he has continued to suffer emotional and physical pain from the trauma of his aborted execution.  *See id.* ¶¶ 144–53.

55.     ADOC gave only a vague explanation of what occurred during Mr. Miller's aborted execution: "Due to the time constraints resulting from the lateness of the court proceedings the execution was called off once it was determined the condemned's veins could not be accessed in accordance with our protocol before the expiration of the deadline."  *See* USA Today, *'Veins Could Not be Accessed':  Alabama Halts Man's Execution for Time, Medical Concerns* (Sept. 23, 2022), https:www.usatoday.com/story/news/nation/2022/09/23/alabama-alan-miller-execution-halted-medical-concerns/8088788001/.

56.     Subsequently, the State moved on an expedited basis to reschedule Mr. Miller's execution without any assurance that it will be able to establish intravenous access by a procedure authorized in the Protocol.

### D.     ADOC's Lethal Injection Process is Shrouded in Secrecy

57.     The State exercises no greater power than when it executes condemned people. Consequently, the process by which the State does so demands maximum transparency to ensure

that it is consistent with the Constitution and the values of the State's citizens. ADOC's lethal injection process, however, is anything but transparent.

58.     ADOC's conceals from public observation critical portions of the lethal injection process, including the establishment of an intravenous line in the condemned person.

59.     ADOC conceals who is responsible for establishing an intravenous line in the condemned person and does not provide information to ensure that those responsible are qualified for the task.

60.     The only witnesses to that process are unidentified ADOC personnel and the condemned person who (with the rare exception of Mr. Miller) ordinarily does not live to describe it.

61.     Mr. James' execution, Mr. Miller's aborted execution, and other history demonstrate that ADOC cannot be trusted to provide accurate information about what happens during its lethal injection process.

62.     For example, during the scheduled execution of Doyle Lee Hamm on February 22, 2018, there was a two- and one-half hour delay while ADOC staff attempted to establish an intravenous line. During that time, ADOC "[s]taff punctured Hamm at least 11 times in his limbs and groin, causing him to bleed profusely on the gurney." Evan Mealins, *ADOC 'cannot confirm if Joe Nathan James Jr. was fully conscious before his execution*, Montgomery Advertiser (Aug. 2, 2022). ADOC stopped the execution, on information and belief, only when the warrant was about to expire.

63.     Despite having subjected Mr. Hamm to torture, cruelty, or substantial pain, afterwards, then ADOC Commissioner Jefferson Dunn said that Mr. Hamm's execution was called off "out of an abundance of caution" due to "a time issue" and that "I wouldn't necessarily

characterize what we had tonight as a problem." Liliana Segura, *Another Failed Execution: The Torture of Doyle Lee Hamm*, The Intercept (Mar. 3, 2018).

64.     While ADOC could not establish intravenous access in Mr. Hamm, that did not put other condemned inmates on notice that the Protocol is advisory only.

65.     On information and belief, unlike Mr. James, Mr. Hamm was a cancer patient and had a prior history of intravenous drug use, which compromised the ability to access his veins. And the State agreed not to attempt to execute Mr. Hamm again, suggesting that it would take steps to ensure that it did not subject other condemned persons to the same cruel and painful treatment.    In contrast, the State has filed an expedited motion to reschedule Mr. Miller's execution.

66.     During the execution of Ronald Bert Smith on December 8, 2016, Mr. Smith coughed and heaved for nearly fifteen minutes after the administration of midazolam—the first drug in ADOC's lethal drug cocktail—which is supposed to anesthetize condemned people even though it is a sedative, not an analgesic.  *Ronald Smith Put to Death in Controversial Execution*, Alabama Public Radio (Dec. 9, 2016), available at https://www.apr.org/news/2016-12-09/ronald-smith-put-to-death-in-controversial-execution.

67.     If midazolam does not function as an anesthetic, a condemned person will suffer an "objectively intolerable risk of harm" in violation of the Eighth Amendment.  *Baze v. Rees*, 553 U.S. 35, 53 (2008) (plurality op.) (if the first drug in the three-drug lethal injection cocktail does not function properly, "there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride").

68.     Despite the apparent failure of midazolam to render Mr. Smith unconscious and the "constitutionally unacceptable risk" of his experiencing suffocation and pain from administration

of the second and third drugs in ADOC's lethal injection process, ADOC proceeded with Mr. Smith's execution.

69.     Afterwards, then ADOC Commissioner Dunn said "[w]e followed our protocol" and that ADOC did not discuss cancelling the execution despite Mr. Smith's signs of apparent consciousness.  *Id.*  Commissioner Dunn offered no assurance from anyone with medical credentials qualified to make a judgment about whether Mr. Smith was conscious and, thus, experiencing suffocation and pain or even that any such qualified person was available for ADOC to consult before proceeding with the execution.

70.     The same thing happened during the execution of Torrey Twane McNabb on October 18, 2017 when ADOC proceeded with his execution despite his showing visible signs of consciousness after the administration of midazolam when he raised his arms and grimaced, reportedly causing one observer to say, "He's going to wake up." *Alabama executes man convicted of killing police officer in 1997*, Associated Press (Oct. 19, 2017), available at https://www.cbsnews.com/news/torrey-twane-mcnabb-executed-convicted-of-killing-police-officer-in-1997/.

71.     Once again, after the execution, then-Commissioner Dunn offered the assurance that "I'm confident he was more than unconscious at that point," *Alabama executes Montgomery cop killer Torrey Twane McNabb*, Al.com (Oct. 19, 2017), without the advice of any qualified medical professional.

72.     Given ADOC's history of evasion and lack of transparency, there was no way for a condemned person to know that the Protocol is only advisory until that was demonstrated by the facts surrounding Mr. James' execution and Mr. Miller's aborted execution.

73.     And, if Mr. Smith is executed on November 17, 2022, there will be no witnesses to the procedures used other than ADOC personnel, and ADOC has demonstrated that it cannot be trusted to disclose information about those procedures.

**E.     Nitrogen Hypoxia is a Feasible and Readily Available Alternative that Would Significantly Reduce the Intolerable Risk to Mr. Smith from Lethal Injection**

74.     As a matter of law, nitrogen hypoxia is an available and feasible alternative method of execution.  *Price v. Dunn*, 920 F.3d 1317, 1328–29 (11th Cir. 2019).

75.     Execution by inhalation of nitrogen gas would eliminate the need to establish intravenous access, Zivot Decl. ¶ 27, and, therefore, would eliminate the intolerable risk that ADOC will deviate from the Protocol in attempting to do so as it did in Mr. James' execution and Mr. Miller's aborted execution.  In addition, execution by inhalation of nitrogen gas would reduce the risk that a condemned person would suffer pulmonary edema, which autopsies show has occurred in condemned people executed by lethal injection, and which would cause the condemned inmate to experience the sensation of choking or drowning if conscious.

**F.     Plaintiff Did Not Make a Knowing and Voluntary Waiver of His Right to Elect Execution by Nitrogen Hypoxia**

76.     On March 22, 2018, Governor Ivey signed Senate Bill 272, amending Alabama Code § 15-18-82.1 to authorize the use of nitrogen hypoxia as a method of execution.

77.     According to sponsors of the 2018 legislation, nitrogen hypoxia is a "more humane" method of execution than lethal injection, similar "to how aircraft passengers lose consciousness if the plane depressurizes."  Kim Chandler, *Alabama Senate votes to allow execution by nitrogen case*, Associated Press (Feb. 22, 2018), available at https://apnews.com/article/64a91b4e5be147dd8417df80488dc4fc.

78.     Under the amended statute, "[a] death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by . . . nitrogen hypoxia." Ala. Code § 15-18-82.1(a).

79.     The amended statute provided condemned people with "one opportunity to elect that his or her death sentence be executed by . . . nitrogen hypoxia."  Ala. Code § 15-18-82.1(b).

80.     For condemned people like Mr. Smith whose conviction and death sentence already had been affirmed in the Alabama state courts, "[t]he election for death by nitrogen hypoxia is waived unless it is personally delivered to the warden of the correctional facility within 30 days" of the effective date of the amended statute.

81.     Senate Bill 272 became effective on June 1, 2018.

82.     Senate Bill 272 was enacted during the pendency of litigation brought by the Federal Defenders for the Middle District of Alabama ("Federal Defenders") on behalf of several condemned people who challenged lethal injection as an unconstitutional method of execution and proposed nitrogen hypoxia as an alternative.

83.     On or about June 26, 2018, attorneys with the Federal Defenders traveled to Holman to consult with their clients about the amended statute, notify them of their right to elect nitrogen hypoxia as their method of execution, answer any questions about that method, and provide them with an election form ("Election Form") should they wish to elect execution by nitrogen hypoxia.

84.     As the Election Form was intended for use by the Federal Defenders in consultation with its clients, the Election Form did not notify condemned people of the June 30, 2018 deadline for making an election and it did not model or replicate the language of the amended statute.

85.     Plaintiff was not a client of the Federal Defenders. He did not consult with the Federal Defenders about his right to elect execution by nitrogen hypoxia or receive the Election Form from the Federal Defenders.

86.     No earlier than June 26, 2018—four days before the expiration of the opt-in period for execution by nitrogen hypoxia—the then Warden of Holman reportedly asked a corrections officer to distribute the Election Form drafted by the Federal Defenders to all death row inmates.

87.     The Warden did not institute any controls on the distribution and collection of the Election Form or put any system in place to verify that a condemned person received the Election Form.  Nor did the Warden provide any information to condemned people about their rights.

88.     United States Circuit Judge Jill Pryor has described as "feckless" the way in which ADOC, having taken "on the responsibility to inform prisoners about their right to elect death by nitrogen hypoxia within 30 days, did so."  *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 21-13581, 2021 WL 4916001, at *5 (11th Cir. Oct. 21, 2021) (Pryor, J., concurring).

89.     Plaintiff did not receive an Election Form from the Warden or any other ADOC employee.

90.     Nor did the Warden or any other ADOC employee notify Plaintiff of the deadline to elect execution by nitrogen hypoxia, the consequence for failing to do so, or any other information relevant to a decision.

91.     During the 30-day window, ADOC knew or should have known that it had no protocol for conducting executions by nitrogen hypoxia and no prospect for establishing one.

92.     To date, ADOC has not established a protocol for executing condemned people by nitrogen hypoxia despite repeated representations to courts that one is imminent.

93.     Since Senate Bill 272 became effective on June 1, 2018, the State has executed seven condemned people by lethal injection, has scheduled one more for execution, and has moved to set a date to execute Plaintiff by that method.

94.     During the same time, ADOC has not executed any condemned person who chose execution by nitrogen hypoxia, no execution of any such person is scheduled, and the State has not moved to schedule any execution of such a person.

95.     In effect, ADOC has extended an indefinite delay of execution to condemned people who selected nitrogen hypoxia.

96.     Plaintiff had no means to obtain information by himself about Senate Bill 272 or other information relevant to his right to elect execution by nitrogen hypoxia during the 30-day window.

97.     In 2018, the designated law library at Holman was not available to death row inmates.  Instead, a make-shift law library with one computer was available to them at designated times depending on the condemned person's individual cell tier location.

98.     During the 30-day election window, Plaintiff did not know and had no way of knowing that the choice afforded by Senate Bill 272 was between execution by an unknown nitrogen hypoxia process that would not be implemented for years, if ever, and by a lethal injection process that would subject him to an intolerable risk of torture, cruelty, or substantial pain as evidenced by Mr. James' execution.

99.     Due to the lack of notice and the lack of information necessary to make a knowing and voluntary waiver, Plaintiff did not elect to be executed by nitrogen hypoxia within the 30-day window.

100. Had Plaintiff known that his choice was between an indefinite delay of execution under a yet-to-be-determined nitrogen hypoxia protocol and a lethal injection process that subjects him to an intolerable risk of torture, cruelty, or substantial pain, he would have chosen to be executed by nitrogen hypoxia.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Alabama's method of execution by lethal injection violates Mr. Smith's right to be free from cruel and unusual punishments under the Eighth Amendment.**

101. Mr. Smith incorporates paragraphs 1 through 79.

102. The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments." U.S. Const. amend VIII.

103. A method of execution violates the Eighth Amendment if "the risk of pain associated with the State's method is substantial when compared to a known and available alternative." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (citations and internal quotation marks omitted).

104. Defendants intend to execute Plaintiff by lethal injection.

105. Use of Defendant's Protocol will subject Plaintiff to an intolerable risk of torture, cruelty, or substantial pain because the Protocol is advisory only and, as ADOC implements it, authorizes ADOC to use other procedures in its discretion.

106. Nitrogen hypoxia is an available and feasible alternative method of execution.

107. Assuming proper administration, if exposed to pure nitrogen gas, Plaintiff would lose consciousness within seconds, and experience no pain or discomfort while dying within minutes.

108. Plaintiff's feasible and alternative method of execution significantly reduces the intolerable risk of torture, cruelty, or substantial pain associated with Defendants' lethal injection process.

109. Permitting Defendants to execute Plaintiff by lethal injection would violate his rights under the Eighth Amendment.

110. Plaintiff will suffer irreparable harm in the absence of an injunction prohibiting Defendants from executing him by lethal injection.[4]

## PRAYER FOR RELIEF

WHEREFORE, Mr. Smith respectfully requests that this Court grant the following relief:

1. With respect to the First Claim for Relief,

   a. A preliminary and permanent injunction prohibiting Defendant from executing Plaintiff by lethal injection; and

   b. A declaration that executing Mr. Smith by ADOC's Protocol would constitute cruel and unusual punishment in violation of Mr. Smith's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.

2. Such other relief as this Court deems just and proper.

---

[4] As noted in Plaintiff's Motion to Alter or Amend the Judgment, Plaintiff does not seek leave to replead the Second Claim for Relief in his original complaint related to 14th Amendment violations, although he respectfully disagrees with the Court's judgment dismissing that claim and reserves his right to appeal from it.

Respectfully submitted, this 17th day of November 2022.

_____/s/ Andrew B. Johnson_____
Andrew B. Johnson
BRADLEY ARANT BOULT CUMMMINGS, LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
(205) 521-8000
ajohnson@bradley.com

Jeffrey H. Horowitz (NY Bar No. 3949070)
Robert M. Grass (NY Bar No. 2501278)
David Kerschner (NY Bar No. 5126420)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
jeffrey.horowitz@arnoldporter.com
robert.grass@arnoldporter.com
david.kerschner@arnoldporter.com

*Attorneys for Plaintiff Kenneth Eugene Smith*

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the Pacer system, which will send notification to the following:

Richard D. Anderson
Assistant Attorney General
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Richard.Anderson@AlabamaAG.gov

Thomas A. Wilson
Deputy Solicitor General
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
Thomas.Wilson@AlabamaAG.gov

*Attorneys for Defendant*

/s/ Andrew B. Johnson
Of Counsel