# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| KENNETH EUGENE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-00497-RAH |
| v. | ) | |
| | ) | CAPITAL CASE |
| JOHN Q. HAMM, in both his individual | ) | |
| capacity and in his official capacity as | ) | |
| Commissioner, Alabama Department of | ) | |
| Corrections; | ) | |
| | ) | |
| TERRY RAYBON, in both his individual | ) | |
| capacity and in his official capacity as | ) | |
| Warden, Holman Correctional Facility; | ) | |
| | ) | |
| STEVE MARSHALL, in both his | ) | |
| individual capacity and in his official | ) | |
| capacity as Attorney General, State of | ) | |
| Alabama; | ) | |
| | ) | |
| MICHAEL WOOD, in both his individual | ) | |
| capacity and in his official capacity as | ) | |
| Deputy Warden, G.K. Fountain | ) | |
| Correctional Facility; | ) | |
| | ) | |
| JOHN DOES 1–3, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

Plaintiff Kenneth Eugene Smith alleges as follows:

**INTRODUCTION**

1.      Plaintiff Kenneth Eugene Smith is in the custody of the Alabama Department of

Corrections (ADOC) at William C. Holman Correctional Facility ("Holman") under a death

sentence imposed by the State of Alabama despite the jury's recommendation by a vote of 11 to 1

that he be sentenced to life imprisonment without the possibility of parole.  As the Eleventh Circuit

1

Court of Appeals has recognized, "if Smith's trial had occurred today, he would not be eligible for execution because, in 2017, Alabama amended its capital-sentencing scheme," which had allowed elected state court judges to override a jury's sentencing determinations. *See Smith v. Comm'r*, 850 F. App'x 726, 726 n.1 (11th Cir. 2021). But because Alabama's amendment applied only prospectively, Mr. Smith has been denied relief from his death sentence, even though that same sentence could not be imposed today if—as happened in Mr. Smith's case—a jury of his peers recommended life in prison.

2.      On August 18, 2022, Mr. Smith filed this action under 42 U.S.C. § 1983 to enjoin an imminent deprivation of his rights and privileges secured by the Constitution and laws of the United States. He alleged that if Defendants were allowed to execute him by lethal injection, there was a substantial likelihood that he would be subjected to an intolerable risk of torture, cruelty, or substantial pain in violation of his Eighth and Fourteenth Amendment rights.

3.      Mr. Smith feared that he would be tortured based on publicly available information suggesting that Defendants' execution of Joe Nathan James just weeks earlier had gone horrifyingly awry. Mr. James's execution was one of the longest in history—dragging on for more than three hours, almost all of which was hidden from public view. Eyewitnesses have reported that when the curtains to the execution chamber were finally opened three hours after the execution had begun, Mr. James did not appear to be conscious and did not open his eyes or respond when asked to give his final words, even though he allegedly had planned on making a final statement. Mr. James's body bore signs of numerous puncture wounds on his arms and hands. A physician who participated in an independent autopsy of Mr. James's body found evidence of an attempted "cutdown"—a procedure in which an incision is made with a scalpel directly into the skin in an

2

attempt to find a vein—as well as evidence suggesting that Mr. James was given an intramuscular injection.

4.      Upon information and belief, Defendants took no steps to investigate why Mr. James was subjected to a three-plus-hour execution or to prevent similar occurrences in the future. Instead, Defendants sought to carry out more executions.

5.      On September 22, 2022, Defendants tried and failed to execute Alan Miller, who has provided a first-hand account of his ordeal by way of his own lawsuit.  *See Miller v. Hamm*, No. 2:22-cv-506-RAH, DE 79-1 (M.D. Ala.).  According to Mr. Miller, he was strapped to a gurney in a stress position with his arms outstretched and over his head while three men in scrubs poked, prodded, and punctured his arms, hands, and feet for nearly two hours, resulting in what he described as "excruciating" pain.  *Id.* ¶¶ 112–29.  The execution gurney was then lifted to an upright position so that Mr. Miller was left hanging vertically in a crucifixion position—with his chest and outstretched arms strapped to the gurney—for 20 minutes while blood leaked from his wounds.  *Id.* ¶ 134.  Then just before midnight, an ADOC employee told Mr. Miller that his execution had been "postponed," and he was taken to the medical unit where ADOC documented a "body chart" exam but offered no medical assistance for Mr. Miller's pain.  *Id.* ¶¶ 135, 140.

6.      Upon information and belief, Defendants again took no steps to review what happened when they tried and failed to execute Mr. Miller or prevent similar occurrences.  They instead rushed forward to carry out still more executions, and Mr. Smith's was scheduled to be next.

7.     On November 17, 2022, at 7:45 p.m.[1], ADOC's counsel emailed Mr. Smith's counsel to say that they had "recently spoke[n] with emergency clerks at the Supreme Court and Eleventh Circuit and notified them that we are preparing Mr. Smith for execution."  At that time, Mr. Smith's request to stay the execution was pending at the U.S. Court of Appeals for the Eleventh Circuit.  Nonetheless, minutes later, guards entered Mr. Smith's holding cell, where he had been waiting on the phone with his wife, and told him, "We need the phone, Kenny."  The call was ended at 7:57 p.m., after which a swarm of guards placed Mr. Smith in handcuffs and leg irons, took him to the execution chamber, and began strapping him tightly to the gurney.  They did so even though the Eleventh Circuit Court of Appeals had held just hours before that Mr. Smith's federal lawsuit stated a viable claim that his execution by lethal injection would violate the Eighth Amendment's prohibition on cruel and unusual punishments and even though a stay application was pending before the Eleventh Circuit.  *See Smith v. Comm'r, Ala. Dep't of Corr.*, No. 22-13781, 2022 WL 17069492 (11th Cir. Nov. 17, 2022).

8.     At 7:59 p.m., the Eleventh Circuit stayed the execution.   ADOC's attorneys—Deputy Solicitor General Thomas Wilson and Assistant Attorney General Richard Anderson—received direct notice of the order from the Eleventh Circuit, but Mr. Smith's attorneys also notified them of that stay within minutes, at 8:02 p.m., and told them to stop the execution pursuant to the Eleventh's Circuit's order.  The response from ADOC's counsel was only, "Noted."  But the execution continued on in defiance of the Eleventh Circuit's stay, with Mr. Smith remaining strapped to a gurney until nearly midnight.  Mr. Smith was not notified that a federal court had stayed his execution as he lay immobilized for hours by the tight straps all across his

---

[1] All times noted in this Second Amended Complaint are U.S. Central Time.

body, nor was he allowed to communicate with his counsel as his appeals were being submitted and litigated. All told, Mr. Smith was tightly and painfully strapped to the gurney in the execution chamber for approximately four hours.

9.     As the night went on, Mr. Smith's worst fears began to play out much as his federal lawsuit had alleged they would. Mr. Smith endeavored to maintain his composure and focus throughout the ordeal for the sake of his family members and long-time attorney who would be his witnesses at the execution. But those family members and witnesses were never brought to Holman. And as the night progressed, as Mr. Smith was subjected to ever-escalating levels of pain and torture, no one responded to his pleas to stop the pain, told him of the Eleventh Circuit's stay, or answered his questions about what they were doing to him. They were—and he thought they were—executing him.

10.    At around 10:00 p.m., an IV team entered the execution chamber and began repeatedly jabbing Mr. Smith's arms and hands with needles, well past the point at which the executioners should have known that it was not reasonably possible to access a vein.[2] Even when Mr. Smith told them they were sticking the needle in his muscle, which was causing pain, they retorted back, "No I'm not."

11.    Mr. Smith was then tilted in an inverse crucifixion position while strapped to the gurney and left there for several minutes while the IV team left the room. When they returned, he was injected with an unknown substance that, as alleged below and on information and belief, was some sort of sedative and/or anesthetic. He specifically objected to this injection, as he was aware that the State had represented that it "does not deliver intramuscular injections as part of the

---

[2] A little after 10 p.m., the United States Supreme Court vacated the stay of execution. It is not clear when, in relation to that event, the IV team entered the execution chamber.

execution process" and had been ordered not to use "intramuscular sedation" during his execution. Docket Entry No. ("DE") 32 at 9; DE 22 at 15. After this injection, a person of unknown medical credentials wearing a face shield started repeatedly stabbing his collarbone area with a large needle in an attempt to begin a central line IV in his subclavian artery. Against Mr. Smith's will, a prison official physically grabbed and held his head away from the area where the needle was being inserted. Mr. Smith writhed in pain and agony as the executioner repeatedly jabbed him with the large needle, which he could feel going underneath his collarbone. He felt sharp and intense pain, as though he were being "stabbed" in the chest. Those attempts at establishing intravenous access in the collarbone area went well past the point that the executioner should have known he would not achieve access. Throughout the ordeal, Mr. Smith's cries of pain were ignored, as were his requests that officials in the room contact his counsel and the Court because his constitutional rights and the orders of the Court were being violated.

12.     At or around 11:20 p.m., unverified reports that the execution had been called off started circulating from media witnesses who were covering the execution on the internet and social media. Shortly thereafter, Mr. Smith's counsel emailed ADOC attorneys Mr. Anderson and Mr. Wilson asking them to confirm that the execution was called off and to provide information about Mr. Smith's whereabouts and physical condition. They never responded.

13.     At some point before midnight, Defendants stopped their attempted execution of Mr. Smith, but not before inflicting grave physical pain and emotional trauma, the likes of which the human brain is not able to process.

14.     Taken together, ADOC's execution of Mr. James and its failed attempt to execute Mr. Miller and Mr. Smith have made clear that once ADOC is allowed to begin an execution (and perhaps even before federal courts allow it to do so), it will attempt to carry out the execution and

not stop until it becomes clear that they are likely to run out of time under the death warrant, and during that time, will do anything to obtain intravenous access, without regard to its own lethal injection protocol ("the Protocol") or the constitutional rights of the condemned.

15.     All three events underscore that the Protocol is, in practice at least, entirely illusory—meaning executions are being carried out by individuals who are either unable or unwilling to follow the Protocol.  And even if ADOC were to follow the Protocol (which it does not), it is still likely that ADOC will subject the condemned to a lingering death that superadds pain far above the pain necessary to carry out the sentence by repeatedly jabbing the condemned with needles for prolonged periods of time.

16.     On November 21, 2022, Alabama's Governor Kay Ivey announced a temporary suspension of executions pending a "top-to-bottom review" of the Protocol.

17.     Whatever the outcome of Governor Ivey's review, Defendants had their chance to execute Mr. Smith: he was strapped to a gurney for almost four hours and subjected to intense physical and emotional pain as executioners tried and failed to execute him using both methods of intravenous access listed in the Protocol.  They did so despite a federal appeals court holding that Mr. Smith had stated a viable claim that his execution by lethal injection would violate the Eighth Amendment's prohibition on cruel and unusual punishment.  And they did so despite repeated calls from numerous sources that they investigate the reasons why the previous two executions had been botched.  Just as Mr. Smith alleged in his August 18, 2022 federal lawsuit, Defendants subjected him to hours of torture while trying to execute him and exposed him to the severe mental anguish of a mock execution.  The attempted execution of Mr. Smith on November 17, 2022 was cruel and usual and in violation of the Eight Amendment.  Further, to subject Mr. Smith to another execution would be cruel and unusual, in violation of the Eighth and Fourteenth Amendment.

## JURISDICTION AND VENUE

18.     This is an action for declaratory and injunctive relief, money damages, and any other relief available from the Court.

19.     The Court has subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), and 2201(a).

20.     Venue is proper in the Middle District of Alabama under 28 U.S.C. § 1391(b).

## PARTIES

21.     Plaintiff Kenneth Eugene Smith, a citizen of the United States and resident of the State of Alabama, is an inmate at Holman under Defendants' supervision and subject to execution under a State court judgment of conviction for capital murder.

*John Q. Hamm*

22.     Defendant John Q. Hamm, Commissioner of the Alabama Department of Corrections, is sued in his official and individual capacity.   The Alabama Department of Corrections is an administrative Department of the State responsible for administering and exercising the direct and effective control over penal and corrections institutions within the State, including for administering the lethal injection process by which Defendants attempted to execute Mr. Smith.  At all relevant times, Defendant Hamm has been acting under color of law and as the agent and official representative of ADOC, pursuant to ADOC's official policies and procedures.

23.     Defendant Hamm is the alternate statutory executioner of all death row inmates at Holman.  *See* Ala. Code § 15-18-82 ("In the event of the death or disability or absence of both the Warden and Deputy, the executioner shall be that person appointed by the Commissioner of the Department of Corrections."). Moreover, Defendant Hamm is statutorily charged with providing the materials necessary to execute death row inmates. *See id.* ("It shall be the duty of the

8

Department of Corrections of this State to provide the necessary facilities, instruments, and accommodations to carry out the execution.").

24.     Defendant Hamm must be present at Holman for each execution, was present at Mr. Smith's attempted execution on November 17, 2022, and Defendant Hamm is responsible for maintaining an open telephone line to the Governor and Defendant Marshall.

25.     Defendant Hamm is responsible for ensuring that all prisoners committed to the custody of ADOC are treated in accordance with the United States and Alabama Constitutions. He is also responsible for the development and implementation of the Protocol and procedures governing the execution of death-sentenced inmates in Alabama.

26.     Defendant Hamm has the authority to alter, amend, or make exceptions to the Protocol and procedures governing the execution of death-sentenced inmates in Alabama.

*Terry Raybon*

27.     Defendant Terry Raybon, Warden of the Holman Correctional Facility, is sued in his official and individual capacity.  Defendant Raybon has been acting under color of law and as the agent and official representative of the Holman Correctional Facility and ADOC.

28.     Defendant Raybon is the statutory executioner of all Holman death row inmates. *See* Ala. Code § 15-18-82 ("The warden of the William C. Holman unit . . . shall be the executioner. In the case of execution by lethal injection, the warden . . . may designate an employee of the unit to administer the lethal injection.").

29.     Defendant Raybon plays a direct role in each execution that takes place at Holman. Defendant Raybon organizes the execution team.  He is responsible for ensuring on the night of an execution that the execution does not violate any court order or order from the Governor's

9

office.  Defendant Raybon reads the death warrant to the inmate being executed and administers the lethal injection.

30.     Defendant Raybon is responsible for implementing ADOC policies and procedures governing executions, managing the preparations for an execution, and supervising the execution site during the execution. Defendant Raybon also is responsible for protecting the constitutional rights of all persons incarcerated at the Holman Correctional Facility.

31.     Defendant Raybon was present and participated in the attempted execution of Mr. Smith on November 17, 2022.

*Steve Marshall*

32.     Defendant Steve Marshall, Attorney General of the State of Alabama, is sued in his official and individual capacity.  At all relevant times, Defendant Marshall has been acting under color of law and as the agent and official representative of the Attorney General's office.

33.     Defendant Marshall has the power, authority, and obligation to implement, interpret, and enforce Alabama state law, including Ala. Code. § 15-18-82.1, the Alabama Constitution, and the U.S. Constitution.

34.     Defendant Marshall is responsible for initiating the execution process in Alabama in a constitutional manner by identifying individuals for whom he moves to set an execution date. Defendant Marshall has the obligation and responsibility to withdraw motions to set an execution date that are unconstitutional, including when the conditions of the proposed execution are unconstitutional.  He also has the obligation and responsibility to ensure that ADOC complies with all state and federal law, including federal court orders, during an execution.

35.     During each execution, Defendant Marshall is responsible for maintaining an open telephone line to Commissioner Hamm, who attends each execution.

10

36.    On information and belief, Defendant Marshall plays an active role in "clearing" each execution in the State of Alabama to begin.

37.    On information and belief, Defendant Marshall made the decision to proceed with Mr. Smith's execution even when a motion to stay the execution—which was later granted—was pending in the Eleventh Circuit Court of Appeals.  Upon information and belief, Defendant Marshall also made or otherwise participated in the decision to leave Mr. Smith strapped to the gurney even after the Eleventh Circuit Court of Appeals had stayed the execution.

*Deputy Warden Michael Wood*

38.    Michael Wood is a deputy warden at G.K. Fountain Correctional Facility.  He is sued in his individual capacity.

39.    During the attempted execution of Mr. Smith, Deputy Warden Wood actively participated in violating Mr. Smith's constitutional rights by holding down Mr. Smith's head while an unidentified executioner injected Mr. Smith with an unknown substance and repeatedly jabbed his collarbone area with a large needle.

*John Does 1–3*

40.    John Does 1–3 are members of the intravenous (IV) team who actively participated in Mr. Smith's execution.  They are sued in their individual capacities.  Because none of these individuals ever identified themselves or their credentials to Mr. Smith, they are named as Doe defendants and described herein as follows:

41.    Doe 1 is the individual described in paragraph 134 as "Green Scrubs."

42.    Doe 2 is the individual described in paragraph 173 as "Blue Scrubs."

43.    Doe 3 is the individual described in paragraph 174 as "Red Scrubs."

*Additional John Does 4–6*

44.     As discovery develops, Mr. Smith may seek leave to further amend his complaint to add allegations against three other individuals, described generally below, who were present during the execution, along with any other individuals who are revealed to have actively participated in torturing Mr. Smith.  Those three individuals did not identify themselves or their credentials to Mr. Smith.  Because they were wearing business formal attire, they are described herein as "The Suits."

## CASE OR CONTROVERSY

45.     There is a real and justiciable case or controversy between the parties.  Defendants have not communicated an intent not to attempt to execute Mr. Smith again.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

46.     Plaintiff has no available administrative remedies because State law exempts "[t]he policies and procedures of the Department of Corrections for executions of persons sentenced to death . . . from the Alabama Administrative Procedure Act, Chapter 22 of Title 41."  Ala. Code § 15-18-82.1(g).[3]

## FACTUAL ALLEGATIONS

### A.     ADOC's Lethal Injection Protocol

47.     ADOC has never publicly released its Protocol in its entirety.  Only a redacted version has been made available to the public, and even then, only recently.  *See* DE 12-1, Ex. A ("Protocol").  The sections most pertinent to Mr. Smith's claims are summarized below.

---

[3] In a previous litigation, the State has "[a]dmitted" that "[n]o administrative grievance process is available for . . . death row inmates to challenge the procedures to be employed during their executions."  *In re Ala. Lethal Injection Protocol Litig.*, No. 12-cv-316 (M.D. Ala. 2012) Doc. 348 at ¶ 22, Doc. 354 at ¶ 22.

### i.    *Compliance with Court Orders and Stays*

48.    The Protocol provides that before the condemned is taken to the execution chamber, "[t]he Commissioner's telephone line to the Governor's and/or Attorney General's staff will be opened." *See id.* § IX.H.

49.    The obvious purpose of that requirement is to ensure that orders from the courts or the Governor can be rapidly communicated to ADOC staff to avoid violating those orders.

50.    Upon information and belief, Defendant Marshall is responsible for giving ADOC staff permission to proceed with the execution.

51.    The Protocol further provides that the Warden will "check with the Commissioner or his/her designee to see if there has been a last minute stay" before proceeding with his role in the execution, *id.* § IX.O, further demonstrating that the Protocol requires ADOC staff to abide by court orders at all times in carrying out an execution.

52.    Defendants' attempted execution of Alan Miller underscores that before Mr. Smith's execution attempt, Defendants interpreted the Protocol to prevent them from proceeding with an execution where a federal court has stayed the execution.  A federal court order staying Mr. Miller's execution was in place until approximately 9:00 p.m.  *See Miller v. Hamm*, __ F. Supp. 3d __, 2022 WL 16720193, at *2 (M.D. Ala. Nov. 4, 2022).  On information and belief, ADOC officials did not move Mr. Miller into the execution chamber until 9:55 p.m., almost an hour after the U.S. Supreme Court lifted the stay of execution, *id.*, and, upon information and belief, after Attorney General Marshall had given ADOC officials permission to proceed.

### ii.    *The Use of Sedative Injections Is Prohibited*

53.    The Protocol does not specify that any type of sedative injections will be given during the execution.

54.     In light of allegations that Mr. James may have been given an intramuscular sedative that rendered him unconscious before he was executed, this Court has previously sought clarification from ADOC's attorney Richard Anderson about whether any type of injection is permitted by the Protocol, as ADOC interprets it.

55.     During an October 13, 2022 hearing on Mr. Smith's claims, the Court asked Mr. Anderson, "[W]ould the use of an intramuscular sedation be off protocol?"  DE 32 at 10.  Mr. Anderson responded, "That would be off protocol, yes, Your Honor."  *Id.*

56.     The Court then asked Mr. Anderson, "[w]ould the use of lidocaine be an intramuscular sedation?"  *Id.*

57.     Mr. Anderson responded, "No . . . [l]idocaine is a topical anesthetic."  *Id.*

58.     The Court clarified the reason for its question, explaining that in the Court's experience, when a person needs stitches, for example, they may receive "lidocaine shots around the incision site."  *Id.*

59.     Mr. Anderson confirmed that he understood the Court's question and that "there was not an injection of a sedative or painkiller" used in Mr. James's execution.  *Id.* at 11.

60.     Mr. Anderson stated that ADOC was stipulating that "no intramuscular sedative would be administered" during Mr. Smith's execution and "the reason for that is we don't do it. We don't do it historically.  We have no intention of doing it in the future."  *Id.*

61.     After further discussion, and to avoid any doubt on the topic, the Court again asked Mr. Anderson whether lidocaine shots were permitted by the Protocol.  The Court stated, "And so when we talk about an intramuscular sedative . . . I'm still not 100 percent confident I understand what that term is.  A topical cream would be okay, but a shot would not?"  *Id.*

14

62.     Mr. Anderson's unequivocally confirmed the Court's understanding by responding, "Yes, Your Honor." *Id.*

63.     Shortly thereafter, the Court asked Defendant Hamm, who was present at the hearing, as follows:  "Mr. Hamm, you've heard Mr. Anderson talk about what [A]DOC will agree not to do, and his representation to the Court is that [A]DOC will not employ or use a cutdown procedure during the course of Mr. Smith's execution nor will it implement or use intramuscular sedation during the course of an execution by lethal injection as it concerns Mr. Smith.  Do you agree with that?" *Id.* at 12.  Defendant responded, "Judge, yes, I do." *Id.*

64.     Thus, both Defendant Hamm and his counsel previously represented to the Court that a lidocaine (or similar) injection was not used in the James execution, is not permitted by the Protocol, and would not be used on Mr. Smith.

65.     The Court later ordered that ADOC "are to strictly adhere to, and not deviate from, ADOC's established lethal injection protocol during Smith's execution.   In particular, the Commissioner and his agents shall not perform a cutdown procedure or use intramuscular sedation on Smith." DE 22 at 15.

66.     The Court warned, "Sanctions will be swift and serious if counsel and the Commissioner do not honor or abide by their representations and stipulations." *Id.* at 11–12.

67.     And in denying Mr. Smith's motion to alter or amend that judgment, the Court held, among other things, that "Smith has not demonstrated that the gravity of the potential sanctions, including criminal sanctions, is insufficient to deter any conduct violative of the Court's order." DE 33 at 19.

15

### iii.       Procedures for Establishing Intravenous Access

68.      The Protocol authorizes only two methods for establishing intravenous access in a condemned inmate.

69.      According to the Protocol:  "The standard procedure for inserting IV access will be used.  If the veins are such that intravenous access cannot be provided, [REDACTED] will perform a central line procedure to provide an intravenous access."  *See* Protocol, Annex C, ¶ c (redaction in original).

70.      The execution of Mr. James, the botched execution of Mr. Miller, and now the botched execution of Mr. Smith establish that the Protocol serves only an advisory function or at worst, is entirely illusory.  Once an execution begins—and to be clear, it begins, both literally and emotionally, the moment the condemned is shackled and forcibly moved from "the death cell" towards the execution chamber, and certainly includes being strapped tightly to a gurney—ADOC has apparently reserved for itself the right to deviate from the Protocol to attempt to establish intravenous access as long as that is accomplished before the warrant expires at midnight.  And even if ADOC does strictly follow the Protocol, it still may subject an inmate to a lingering death that superadds pain above and beyond what is necessary to carry out the sentence by jabbing needles into the condemned for a prolonged period of time.  If the result is the death of the condemned person, there are no witnesses to what occurred other than ADOC personnel.  And ADOC is not forthcoming about that process.

**B.       ADOC's Execution of Mr. James and Aborted Execution of Mr. Miller Established a Pattern of Superadding Pain During the Execution Process**

### i.       Mr. James's Execution Lasted More Than Three Hours

16

71.     On June 13, 2022, the Alabama Supreme Court scheduled Mr. James's execution for 6 p.m. on July 28, 2022.

72.     ADOC's lethal injection process subjected Mr. James to at least a three- and one-half-hour ordeal, including torture, cruelty, or substantial pain.  That process was replete with violations of the Protocol which amply demonstrate that the "Protocol" is merely advisory in nature, and ADOC officials, whether through incompetence or maleficence, are apparently free to deviate from its provisions to accomplish its end of executing the condemned before the warrant expires.

73.     At the scheduled time, there were no legal obstacles that prevented ADOC from proceeding with Mr. James's execution.  But ADOC did not administer its lethal drug cocktail to Mr. James at or around 6 p.m., as scheduled.

74.     Instead, without explanation from ADOC and without public observation, Mr. James's execution extended for more than three hours.  He did not appear to observers until approximately 9 p.m., and even then he appeared to be unconscious and unresponsive, and was not pronounced dead until 9:27 p.m.

75.     During the three hours of the process that was not open to the public, ADOC strapped Mr. James to a gurney and poked, prodded, and cut him, attempting multiple times to access a vein for intravenous injection of the lethal drug cocktail.  Declaration of Joel B. Zivot, MD, FRCP(C), MA ("Zivot Decl.") ¶ 5 (DE 24-1, Ex. A); *see also* Declaration of David C. Pigott, MD, dated October 12, 2022 ("Pigott Decl.") ¶¶ 4–6 (DE 24-1, Ex. B).

76.     Dr. Joel B. Zivot, a professor and senior member of the Departments of Anesthesiology and Surgery at Emory University School of Medicine in Atlanta, Georgia arranged and participated in an independent autopsy following the execution.  Zivot Decl. ¶ 8.  Dr.

17

Zivot concluded that "[u]pon examination of the body, I found signs that strongly suggested [Mr. James] had been subjected to a torturous process during his execution," meaning "the process caused unnecessary pain in advance of [his] death." *Id.* The autopsy revealed multiple punctures sites in both arms and both hands. *Id.* ¶ 9.

77.   It should not have taken anywhere near three hours for the IV team to either establish IV access by the procedures allowed by the Protocol or to determine that neither was achievable. *Id.* ¶ 5.

78.   The Protocol provides that if IV access cannot be achieved through the standard procedure, a central line procedure should be performed. *See* Protocol, Annex C, ¶ c. Even though it should have been apparent to the IV team within a short period of time—certainly much less than three hours—that the standard procedure was not possible, there is no evidence that a central line procedure was ever attempted. Instead, rather than follow the Protocol, the IV team made multiple unsuccessful attempts through the standard procedure before seemingly moving to a different, unauthorized procedure, as described below.

79.   The independent autopsy and photos taken during that autopsy provide evidence suggesting that ADOC staff attempted a cutdown procedure to access a vein. Zivot Decl. ¶¶ 9–12; *see also* Pigott Decl. ¶¶ 4–5.

80.   Venous cutdown is an emergency procedure whereby a physician surgically exposes a patient's vein after applying local anesthesia when rapid access is required for intravenous therapy and other less-invasive procedures have failed. That procedure is not authorized by the Protocol. Furthermore, in medical practice generally, cutdowns have fallen out of favor because of the potential for bleeding and because such procedures require surgical

expertise.  *See* Declaration of Robert Jason Yong, MD, dated October 18, 2022 ("Yong Decl.") at

8 (DE 24-1, Ex. C).

81.    A photograph taken during the James autopsy shows the attempted cutdown:



82.    The deeper laceration in the pit of the elbow in the photograph above is indicative

of the attempted cutdown procedure.  *See* Pigott Dec. ¶ 5; Zivot Dec. ¶¶ 10, 12.  The photograph

shows what appear to be tissue response and blood in and around the laceration, suggesting that it

was made while Mr. James was still alive, as post-mortem wounds do not bleed.  *Id.*

83.    The independent autopsy further revealed evidence of puncture wounds in areas of

Mr. James' arm that are not in an area where a vein would typically be located, which suggest that

Mr. James was administered an intramuscular injection during the three-hour attempt to access a

vein.  *See* Zivot Decl. ¶ 9.  Intramuscular injections are not permitted by the Protocol.

84.    On information and belief, in the two minutes Mr. James was visible to observers

before the administration of the lethal drugs, Mr. James did not open his eyes or move and did not

respond when asked if he had any last words.  Reportedly, Mr. James had confided in a fellow condemned person that he intended last words, suggesting, consistent with Dr. Zivot's observation of a possible intramuscular injection, that he had been rendered unconscious or otherwise unable to respond before witnesses were permitted to observe by injection with a sedative.  *See* Elizabeth Bruenig, *Dead to Rights, What did the State of Alabama do to Joe Nathan James in the three hours before his execution*; The Atlantic (Aug. 14, 2022), available at https://www.theatlantic.com/ideas/archive/2022/08/joe-nathan-james-execution-alabama/671127/; Evan Mealins, *ADOC 'cannot confirm if Joe Nathan James Jr. was fully conscious before his execution*, Montgomery Advertiser (Aug. 2, 2022); available at https://www.montgomeryadvertiser.com/story/news/2022/08/02/joe-nathan-james-jr-execution-adoc-cannot-confirm-if-conscious/10168003002/.

85.     The Protocol states that the Warden "will read the warrant to the condemned offender" and that the "condemned offender will be allowed to make any last remarks."  Protocol § IX.L; IX.M.  Neither of those steps can be completed if the condemned is unconscious. Accordingly, upon information and belief, the James execution deviated from those Protocol provisions.

86.     ADOC did not disclose what happened during the three hours that Mr. James was not visible to observers.  At a press conference after Mr. James's execution, Commissioner Hamm simply offered the vague explanation that ADOC is "very deliberate in our process of making sure everything goes according to plan" without further elaboration.  Kim Chandler, *Man executed despite calls from victim's family to spare him*, Associated Press (July 28, 2022), available at https://www.newstimes.com/news/article/Alabama-execution-set-over-opposition-from-17334136.php.

20

87.     Later ADOC issued another vague statement regarding the execution:  "ADOC's execution team strictly followed the established protocol.  The protocol states that if the veins are such that intravenous access cannot be provided, the team will perform a central line procedure. Fortunately, this was not necessary and with adequate time, intravenous access was established." Elizabeth Bruenig, *Dead to Rights*, *supra*.

88.     ADOC did not provide any information about what steps it took to establish an intravenous line, what complications arose that prevented it from doing so for more than three hours, how many attempts it made to establish an intravenous line, whether the process caused bleeding or any other physical or emotional harm to Mr. James, whether the ADOC execution team included people qualified and/or trained to perform the various procedures on Mr. James, whether qualified medical professionals were on hand to perform or supervise those procedures, or anything else about what transpired during those three hours.

89.     Nor has ADOC disclosed that information since.  It has denied a press request for information shedding light on what occurred during Mr. James' execution.  Bryan Lyman, *Department of Corrections denies request for Joe Nathan James, Jr. execution records*, Montgomery        Advertiser        (Aug.        16,        2022),        available        at https://www.montgomeryadvertiser.com/story/news/2022/08/16/joe-james-jr-execution-adoc-denies-advertiser's-request-records/10333449002/?utm-source=montgomeryadvertiser-DailyBriefing&utm_medium=email&utm_campaign=daily_briefing&utm_term=list_article_hea dline&utm_content=PMOY-1123MA-E-NLETTER65.

90.     And, although Commissioner Hamm stated at the press conference after Mr. James's execution that Mr. James had not been sedated before the lethal drug cocktail was administered, the following day ADOC admitted that it "cannot confirm that" Mr. James was fully

conscious when he was executed.  Evan Mealins, *ADOC 'cannot confirm if Joe Nathan James Jr. was fully conscious before his execution*, *supra*.

91.     That is telling.  As one commentator put it: "If the department does not know whether a prisoner is conscious or unconscious at the time of the execution, then they are incompetent to carry an execution out.  If the department does know but will not say, then they cannot be trusted."  *Id.*

92.     Given ADOC's lack of transparency, Mr. James's sister called for an investigation into Mr. James's execution, pointing out that "[o]nly the ADOC employees know what occurred during those three hours."  Evan Mealins, *Sister of Joe Nathan James: Circumstances surrounding execution warrant an investigation*, Montgomery Advertiser (Aug. 3, 2022), available at https://www.montgomeryadvertiser/story/news/2022/08/03/joe-james-sister-calls-investigation-execution/10219862002/.

### ii.     Mr. Miller's Aborted Execution Lasted For Nearly Two Hours

93.     Mr. Miller was scheduled to be executed on September 22, 2022.

94.     On information and belief, due to pending court proceedings in which a federal court had issued a stay of execution, Mr. Miller's execution began at about 10 p.m. when he was walked to the execution chamber and strapped into the gurney at about 10:15 p.m.  *See Miller v. Hamm*, No. 2:22-cv-00506, Doc. No. 79-1 ¶¶ 100–04 (Oct. 6, 2022) ("Miller Second Am. Compl.").

95.     On information and belief, thereafter, while he was strapped in the gurney in a stress position, two unidentified men in medical scrubs with unknown medical credentials, if any, made a tour of his body, repeatedly slapping, poking, prodding, and puncturing Mr. Miller for approximately 90 minutes.  They started in his left arm, and then moved sequentially to his right

hand, left hand, inner left arm, right foot, and left foot in a futile attempt to establish intravenous access. *See id.* ¶¶ 109–26.  Having failed to establish intravenous access, the two unidentified men resorted to simultaneously puncturing his left and right arm, respectively, *See id.* ¶ 127.

96.     On information and belief, a third unidentified man in medical scrubs entered the execution chamber and began slapping the skin on Mr. Miller's neck. *See id.* ¶ 129.  There was no basis to slap the skin on Mr. Miller's neck to perform any procedure that is authorized under the Protocol.  Zivot Decl. ¶ 14.

97.     On information and belief, guards in the execution chamber then raised the gurney from a horizontal to vertical position, leaving Mr. Miller hanging vertically from the gurney by this arms, feet and chest.  Miller Second Am. Compl. ¶ 132.

98.     On information and belief, all the while, ADOC personnel ignored Mr. Miller's verbal expressions of excruciating pain and his questions about their efforts. *See id.* ¶¶ 109–26.

99.     On information and belief, just before midnight when the warrant for his execution expired, ADOC personnel informed Mr. Miller that his execution had been postponed without further explanation, despite Mr. Miller's requests for one. *See id.* ¶ 135.

100.     On information and belief, even then, Mr. Miller's ordeal did not end as he has continued to suffer emotional and physical pain from the trauma of his aborted execution. *See id.* ¶¶ 144–53.

101.     ADOC gave only a vague explanation of what occurred during Mr. Miller's aborted execution: "Due to the time constraints resulting from the lateness of the court proceedings the execution was called off once it was determined the condemned's veins could not be accessed in accordance with our protocol before the expiration of the deadline." *See* USA Today, *'Veins Could Not be Accessed':  Alabama Halts Man's Execution for Time, Medical Concerns* (Sept. 23, 2022),

23

https:www.usatoday.com/story/news/nation/2022/09/23/alabama-alan-miller-execution-halted-medical-concerns/8088788001/.

102.     Subsequently, the State moved on an expedited basis to reschedule Mr. Miller's execution without any assurance that it will be able to establish intravenous access by a procedure authorized in the Protocol.

103.     This Court already has concluded that Mr. Miller's allegations about what happened to him in the execution chamber state a claim for violations of the Eighth Amendment. *See Miller*, 2022 WL 16720193, at *13–14.

**D.      Mr. Smith's Lawsuit to Enjoin Imminent Violations of His Eighth Amendment Right to be Free from Cruel and Unusual Punishment.**

104.     On August 18, 2022, Mr. Smith filed a complaint under 42 U.S.C. § 1983 seeking, among other things, a "preliminary and permanent injunction prohibiting Defendants from executing Plaintiff by lethal injection absent a change in Defendants' lethal injection process to reduce the intolerable risk of torture, cruelty, or substantial pain."  DE 1 at 18.

105.     Mr. Smith also sought a "declaration that executing Mr. Smith by Defendants' current lethal injection process would constitute cruel and unusual punishment in violation of Mr. Smith's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution."  *Id.*

106.     On August 26, 2022, ADOC moved to dismiss Mr. Smith's complaint, arguing among other things that his Eighth Amendment claim was a "wholesale challenge" to the lethal injection process and therefore was time-barred.  DE 10 at 4.

107.     On September 19, 2022, Mr. Smith filed his opposition to that motion pursuant to this Court's briefing schedule.  DE 11, 12.

108.    On September 30, 2022, the Alabama Supreme Court issued an order setting Mr. Smith's execution for November 17, 2022 at 6 p.m.  DE 13.

109.    On October 10, 2022, Mr. Smith served discovery, to which ADOC never responded.  DE 17-1, 17-2, 17-3.  He also moved to expedite discovery and to set a scheduling order for Mr. Smith's anticipated preliminary injunction motion.  DE 17.

110.    On October 13, 2022, the Court held a hearing on ADOC's pending motion to dismiss and Mr. Smith's motion to expedite discovery.

111.    At that hearing, the Court and the parties discussed a schedule for preliminary injunction briefing and hearing.  Counsel for Mr. Smith represented that he intended to file a preliminary injunction motion by October 19, and the Court discussed setting November 4 as a hearing date on that motion.  DE 32 at 48–50.

112.    But on October 16, 2022, Mr. Smith's request for expedited discovery and a briefing schedule for a preliminary injunction was mooted when the Court dismissed the complaint with prejudice.  DE 22, 23.

113.    In response to Mr. Smith's assertion that ADOC was likely to violate its own Protocol during the execution, as it had done in the James execution, the Court ordered as follows: "The Commissioner and his agents, which include all ADOC employees involved in Kenneth Eugene Smith's execution, are to strictly adhere to, and not deviate from, the ADOC's established lethal injection protocol during Smith's execution.  In particular, the Commissioner and his agents shall not perform a cutdown procedure or use intramuscular sedation on Smith." DE 22 at 15.  The Court warned, "Sanctions will be swift and serious if counsel and the Commissioner do not honor or abide by their representations and stipulations."  *Id.* at 11–12.

114.    On October 19, 2022, Mr. Smith moved to alter or amend the judgment under Federal Rule of Civil Procedure 59, requesting, among other relief, that the judgment be altered to grant him leave to amend his complaint.  DE 24.  He included with his motion a proposed amended complaint, which was supported by declarations from physicians who, among other things, explained why it would be extremely difficult for the IV team to access Mr. Smith's veins, as had been the case in the James execution and Miller attempted execution.  *See* DE 24-1.  Given his approaching execution date, Mr. Smith requested expedited resolution of his motion.

115.    The Court then requested supplemental briefing on whether Mr. Smith should be granted leave to amend, even after ADOC already had responded to Mr. Smith's motion to alter or amend.  DE 27.

116.    Three weeks elapsed from the time Mr. Smith moved to alter or amend and when the Court entered its order denying Mr. Smith's requested relief.  *See* DE 33.  The Court reversed course on the timeliness of his claim, ultimately holding that it was timely, but nevertheless concluded that leave to amend would be "futile" because his allegations did not state an Eighth Amendment claim.  *Id.*

117.    On November 10, 2022, Mr. Smith appealed that November 9, 2022 order to the U.S. Court of Appeals for the Eleventh Circuit. Mr. Smith filed his opening brief on November 11, 2022, and requested an expedited briefing schedule and stay pending appeal, as his execution was now one week away.

118.    The Eleventh Circuit granted Mr. Smith's request for an expedited briefing schedule and set argument to allow Mr. Smith's appeal to be decided before the execution, making its decision less than four days after briefing was completed and one day after hearing oral

argument on Wednesday, November 16 to accommodate Mr. Smith's request for expedited consideration.

119.    At approximately 3:00 p.m. on November 17, 2022, the Eleventh Circuit issued its decision reversing and remanding the Court's dismissal of Mr. Smith's Eighth Amendment claim. *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 22-13781, 2022 WL 17069492 (11th Cir. Nov. 17, 2022).

120.    The Eleventh Circuit held that Mr. Smith "plausibly alleged that there will be extreme difficulty in accessing his veins.  Because of the difficulty in accessing Smith's veins, Smith plausibly pleaded that, considering ADOC's inability to establish difficult IVs swiftly and successfully in the past, he will face superadded pain as the execution team attempts to gain IV access." *Id.* at *5.

121.    The Court also held that Mr. Smith had plausibly pleaded that nitrogen hypoxia was an available alternative method that would reduce the risk of severe pain, explaining that ADOC's continued argument to the contrary "completely misses [the] point" of the Circuit Court's existing precedent on that precise issue. *Id.*

122.    The Court further held that Mr. Smith's Eighth Amendment claim was not time barred because "[i]t is the emergence of ADOC's pattern of superadding pain through protracted efforts to establish IV access in two previous execution attempts that caused Smith's claim to accrue.  This pattern emerged at the onset of Miller's attempted execution." *Id.*

123.    The Court thus concluded, "the district court erred in denying Smith's motion for leave to amend his complaint on the ground that amendment would be futile." *Id.* at *5.

124.     Having finally obtained reversal of the Court's dismissal of his Eighth Amendment claim, Mr. Smith immediately sought a stay of execution in this Court until such time as his contemporaneously filed motion for preliminary injunction could be decided.

125.     This Court denied that relief at approximately 5:55 p.m., minutes before the execution was scheduled to begin.

126.     Mr. Smith immediately appealed to the Eleventh Circuit Court of Appeals.

127.     At 7:59 p.m., the Eleventh Circuit unanimously granted a stay.  Even the judge who had dissented from the Court's earlier decision finding that Mr. Smith stated an Eighth Amendment claim concluded that a temporary stay was appropriate in light of the majority's holding that Mr. Smith had indeed stated a claim.  DE 57.

128.     In its order, the Eleventh Circuit found that Mr. Smith "has continuously sought to rectify [the] dismissal" of his complaint, that he "has pursued his claims diligently through the district court and here," and that other factors also favored a stay.  *Id.* at 3.

129.     At approximately 10:20 p.m., the U.S. Supreme Court vacated the Eleventh Circuit's stay in a bare order that did not provide any reasoning.  Three justices dissented.

**E.     ADOC Tortured Mr. Smith for Hours During Its Failed Attempt to Execute Him**

130.     Mr. Smith experienced substantial mental and physical pain and agony on the night of November 17 and in the days that have followed.

131.     The events of November 17 substantiate new claims under the Eighth Amendment to the U.S. Constitution and further evidence the injury Defendants caused Mr. Smith in attempting to execute him by lethal injection, all while deviating from its Protocol at various points.

132.     Mr. Smith sets forth here the timeline of Defendants' failed execution to the extent currently possible, given that much of the information and evidence about what took place that night is still in Defendants' sole custody and control.  Mr. Smith will diligently pursue discovery through various means as soon as possible.

>     i.     *November 16, 2022: The Day Before the Execution*

133.     At around 5:00 p.m. on November 16, Mr. Smith had just been returned to a holding cell outside the execution chamber, known to residents of Holman as "the death cell."  Mr. Smith was attempting to collect his thoughts after visiting with family.  To Mr. Smith's surprise, Warden Raybon appeared outside of the cell with a man who Mr. Smith would later learn is a member of the execution IV team.

134.     The man with Warden Raybon never identified himself and never disclosed his credentials to Mr. Smith.  Instead, the man stood silently before the cell, popping a tourniquet that he held in his hands.  He was wearing teal- or green-colored scrubs.  Because the man never identified himself or his credentials, he will hereinafter be referred to as "Green Scrubs."[4]

135.     Because no one had previously told Mr. Smith that the Warden and Green Scrubs would be visiting his cell, Mr. Smith asked with understandable confusion, "What's this about?"

136.     Warden Raybon told Mr. Smith they needed to "check his veins."  Mr. Smith told them that while he did not intend to fight ADOC's efforts to execute him, he could not participate in ending his own life.

137.     Warden Raybon and Green Scrubs left, and they never returned.

>     ii.     *November 17, 2022: Execution Day*

---

[4] Physical descriptions of the unidentified IV team members can be provided to the Court under seal.

29

138.   Mr. Smith spent most of the day on November 17 visiting with his family and friends.  At around 4:00 p.m., Mr. Smith's last meal of fried catfish and fried shrimp arrived in the visitation area.  With Mr. Smith were his wife, mother, son, daughter-in-law, and spiritual advisor.  Corrections officers told Mr. Smith's visitors to leave at around 4:30 p.m.

139.   From the visitation area, Mr. Smith was taken to the infirmary where a nurse created a "body chart."  No member of the execution IV team was present during this visit.

140.   At about 5:00 p.m., Mr. Smith was returned to the death cell.

141.   Approximately ten corrections officers were stationed in chairs directly across from the death cell.  Because the front of that cell is made of metal bars, the ten corrections officers could see and hear everything Mr. Smith did while in the death cell.

142.   Once Mr. Smith was returned to the cell, his spiritual advisor was allowed inside to sit with him while he waited.

143.   While Mr. Smith was meeting with his spiritual advisor, the corrections officers outside his door had a virtual picnic, eating sandwiches from a deli tray, tearing opening packages of chips, and cracking open cans of soda.  Because the death cell door is made of open bars, Mr. Smith's efforts to emotionally and spiritually prepare for what lay ahead in the coming hours were disrupted by the sights and sounds of the guards' eating and drinking.

144.   Sometime between 6:00 p.m. and 7:00 p.m., the corrections officers made Mr. Smith's spiritual advisor leave, leaving Mr. Smith alone in his cell.

145.   Unbeknownst to Mr. Smith, his appeals were still being considered by federal courts at this time: after this Court had denied his stay request at about 6:00 p.m., his attorneys had immediately sought a stay from the Eleventh Circuit Court of Appeals.

146.    At 7:45 p.m.—while the Eleventh Circuit was still considering Mr. Smith's stay request—Deputy Solicitor General Thomas Wilson emailed Mr. Smith's counsel stating, "We recently spoke with emergency clerks at the Supreme Court and Eleventh Circuit and notified them that we are preparing Mr. Smith for execution.  We explained that we would provide notice to you, as well."

147.    Mr. Smith's counsel immediately informed Mr. Wilson that proceeding with the execution before the Eleventh Circuit had ruled was inappropriate and raised a potential violation of the Protocol.

148.    Mr. Wilson did not respond to Mr. Smith's lawyers, and Mr. Smith's counsel were not informed and were not aware of where Mr. Smith was or what was being done to him, even as a federal appeals court was still considering his stay request.  All the while, Mr. Smith also was unaware that courts were still considering whether his execution should be stayed.

149.    At around 7:50 p.m., Mr. Smith was able to call his wife while he waited in the death cell.  Shortly thereafter, Corrections Officer Earle said, "We need the phone, Kenny."  Mr. Smith told his wife goodbye, and the call was ended at 7:57 p.m.

150.    After Mr. Smith hung up the phone, the officers who had been stationed outside the death cell swarmed the cell in a mass.  They directed Mr. Smith to sit on the edge of the bed and to not move.  He did not resist, and told the officers that he did not intend to fight them.  They responded, "We know you aren't, Kenny."

151.    Officer Earle and Sergeant Gillis handcuffed Mr. Smith, and two other corrections officers put him in leg irons.  They told him to stand up and escorted him to the execution chamber with officers surrounding him on all sides.  He did not resist.

152.    At 7:59 p.m., the Eleventh Circuit Court of Appeals entered an order staying the execution.

153.    Upon information and belief, the direct telephone line from the Attorney General's Office to Commissioner Hamm—which the Protocol specifies is to be opened before the condemned is taken to the execution chamber—was either not open, or it was not used to convey that the Eleventh Circuit had stayed the execution, or the Eleventh Circuit's order was disregarded by ADOC staff, whether acting alone or at the direction of the Attorney General and his subordinates.

154.    Instead, given that Mr. Smith ended the call with his wife at 7:57 p.m. and the Eleventh Circuit's stay came just two minutes later—at 7:59 p.m.—it is likely that the officers took Mr. Smith out of the death cell and into the execution chamber at or shortly after 8:00 p.m., after the federal appeals court had already stayed the execution.

155.    Once in the execution chamber, the guards told Mr. Smith to sit on the gurney, turn around, and lie down.  He complied and did not resist.

156.    The swarm of guards then strapped Mr. Smith to the table by his arms, legs and feet.  The straps were painfully tight and Mr. Smith could not move.  He did not resist the guard's efforts to strap him down.

157.    Mr. Smith saw two men and a woman who were formally dressed standing at his left; one was holding an accordion-type folder and the other two had a notepad and pen.  Because none of those individuals ever identified themselves to Mr. Smith, they will hereinafter be referred to as "the Suits."

158.    At 8:02 p.m.—when, upon information and belief, ADOC was already strapping Mr. Smith into a gurney to be killed—his counsel emailed Mr. Wilson to notify Attorney General

Marshall's office of the Eleventh Circuit stay, although as counsel for ADOC in the appeal, both Mr. Wilson and Mr. Anderson would have received notification of the stay as soon as it was issued. Mr. Smith's counsel also asked that ADOC stop the ongoing "preparations" associated with the execution in light of the stay.

159.    Mr. Wilson tersely responded, "Noted, thank you."  Neither Mr. Wilson nor Mr. Anderson ever confirmed that Defendants had ceased their execution attempt.

160.    Indeed, Defendants did not stop their execution attempt, in defiance of the Eleventh Circuit's order staying the execution, which remained in effect until approximately 10:20 p.m. when it was vacated by the U.S. Supreme Court.

161.    Instead, Defendants left Mr. Smith strapped tightly to the execution gurney.  He was never told that the Eleventh Circuit had stayed his execution, and he believed that when he was taken into the execution chamber, all of his appeals had been exhausted (as had been the case with Alan Miller), and that the execution would begin as soon as he was strapped to the gurney. Thus, when Mr. Smith was taken into the execution chamber he believed that there was nothing preventing the State from executing him and that he was to be killed in the coming hours.

162.    But then approximately seven of the guards and the three Suits to his left exited the room, leaving only Officer Quarles, Officer McKenzie, and Deputy Warden Wood remaining in the room with Mr. Smith.

163.    As Mr. Smith lay strapped to the gurney, nobody spoke to him, and he had no idea what was happening.

164.    There was a clock in the execution chamber.  Mr. Smith could not see the clock the entire time but could sometimes see it if he raised his head from the gurney.

165.    Believing he would be executed, Mr. Smith tried to mentally prepare for the next few minutes or hours.  Directly above the execution gurney was a light fixture with two lights forming the shape of a cross.  Mr. Smith, as a man of faith, focused on the glowing, cross-shaped lights and sought to maintain his dialogue with God.  He thanked God for the week he had just had with his family.  He wanted to maintain his composure for his family—his wife, son, and daughter-in-law—who would be there as witnesses.  He sang, "I'm not alone" quietly, as he did not want to disturb the three guards who were in the room with him.

166.    As he lay strapped to the gurney, he felt as though his circulation was being cut off. He also started to become concerned because time was passing and his witnesses still were not there.

167.    He asked the guards where his witnesses were, and they responded that they would be picked up when it was time.  Mr. Smith began panicking, fearing that his family would not make it in time.

168.    By 9:00 p.m., Mr. Smith had been strapped to the gurney for an hour.  He asked the three officers in the room what was happening, and they said they didn't know either.

169.    As he continued to lay strapped to the gurney, Mr. Smith started descending into hopelessness and despair.  He believed that he would die soon and that there was nothing more that could be done to stop it.  He was also extremely distressed because he feared that his witnesses would not make it in time, as they still were not there after over an hour of waiting.

170.    At around 10:00 p.m., Mr. Smith heard a rap on the door.  The three Suits walked back into the execution chamber and stood at Mr. Smith's left side.  At that point, Mr. Smith had already been strapped to the gurney, unable to move, for two hours.

171.    At the same time, three men wheeling a medical cart entered the room.  Upon information and belief, those three men were the "IV team" referred to in the Protocol.

172.    Mr. Smith recognized one of the men as Green Scrubs, who had appeared at his cell door the evening before popping a tourniquet.  Green Scrubs was wearing the same color scrubs as the previous day.

173.    The second man was wearing dark blue scrubs.  Because he never identified himself or his credentials to Mr. Smith, this man will be referred to hereinafter as "Blue Scrubs."  Mr. Smith recalled having seen blue Scrubs "chain smoking" outside of Holman after other executions.

174.    The third man tried to stay out of Mr. Smith's field of vision for most of the execution attempt.  He was wearing red pants and a dark top, and appeared to be directing Green Scrubs and Blue Scrubs.  Because this person never identified himself or his credentials to Mr. Smith, he will be referred to hereinafter simply as "Red Scrubs."

175.    The IV team, the officials in the room, and Defendants all knew or should have known based on the difficulties that occurred during the James execution and the Miller attempted execution that that the IV team would have great difficulty establishing IV access, resulting in severe pain to Mr. Smith.

176.    They further knew or should have known that what had allegedly been done to Alan Miller—as described in his Second Amended Complaint—stated a claim for violations of the Eighth Amendment right to be free from cruel and unusual punishment.  *See Miller*, 2022 WL 16720193, at *14–15.

177.    Despite knowing all of that, they recklessly and knowingly charged ahead at or around 10 p.m. in a rush to execute Mr. Smith before midnight.

35

178.    Green Scrubs stationed himself on Mr. Smith's right, and Blue Scrubs was standing on the left.

179.    At some point, EKG wires were placed on Mr. Smith's chest.

180.    Blue Scrubs tied a tourniquet around Mr. Smith's upper arm and placed a pad under his arm.  Blue Scrubs began sticking a needle in Mr. Smith's arm, and Mr. Smith cried out that Blue Scrubs was in his muscle, which caused him pain.  Blue Scrubs retorted, "No I'm not."  Red Scrubs, who was standing behind Mr. Smith, told Blue Scrubs that he "need[ed] to back it up." Blue Scrubs did so, and then proceeded to hook up tubing to the needle.

181.    As Blue Scrubs was working, one of the Suits appeared to be taking photos with his phone.

182.    By then, Mr. Smith was experiencing extreme emotional distress, believing he would imminently die.

183.    Green Scrubs then started examining Mr. Smith's right hand and slapping it to find a vein.  Green Scrubs began puncturing Mr. Smith's skin with needles in several places on his hand.  With each jab, Mr. Smith could feel the needle going in and out multiple times and moving around under his skin, causing him great pain.  Everyone in the room ignored Mr. Smith's pleas that he was in pain as Green Scrubs continued to jab needles into him.

184.    Mr. Smith asked the Suits to his left if they had any authority to call the Court to report that his constitutional rights were being violated; they did not respond.

185.    Blue Scrubs then walked down to Mr. Smith's feet and removed his shower shoes (the only shoes he was permitted to wear) and socks.  Blue Scrubs and Green Scrubs looked at each of Mr. Smith's feet but then shook their heads at each other.

36

186.    At that point, Blue Scrubs shone a device that emitted a ghostly blue light over Mr. Smith's arms and hands.  Either Blue Scrubs or Green Scrubs started jabbing needles in Mr. Smith's right arm again, sliding it back and forth multiple times with each stick.  Mr. Smith was not attempting to fight, but he was crying out in pain because he felt the needles going into his muscle.  He asked to speak to his lawyers or to the Court and gave his district court case number.

187.    Red Scrubs, who claimed he didn't need the blue light, then started jabbing Mr. Smith's right arm with a needle and did so numerous times.  Red Scrubs, like the others, ignored Mr. Smith's repeated pleas that the needle jabs were causing severe pain.  By that point, Mr. Smith's pain was so intense that he had entirely lost his composure, which he had desperately wanted to maintain for his family, for the witnesses, and for expressing his final words.

188.    The IV team's efforts to establish access through the standard procedure were prolonged, involving numerous needle jabs in Mr. Smith's arms and hands over an extended period of time, and continued well past the point at which it should have been apparent to them that IV access through that method was not possible.

189.    Various persons within the Death Chamber appeared to take photographs of this procedure and Mr. Smith with their cellular phones.

190.    Blue Scrubs then asked the corrections officers to tilt the gurney backwards so that Mr. Smith's feet were pointing upwards.  The corrections officers complied, which left Mr. Smith hanging from the gurney in an inverse crucifixion position with his feet elevated, which caused pain in his neck, shoulders, and back.

191.    Mr. Smith asked the officers and others in the room what was happening, but no one responded or explained why he was being suspended upside down.  Nothing in the Protocol allows an inmate to be suspended from the execution gurney in this manner.

192.    The IV team and the suits then left the execution chamber, with Mr. Smith still suspended upside down.  Once again, Mr. Smith asked what was happening, and no one responded.

193.    Thereafter, the IV team and the suits came back into the execution chamber.

194.    Red Scrubs then entered Mr. Smith's field of vision on his right side.  He was wearing a blue paper surgical gown, a face mask, and a clear plastic face shield.  Before that time, none of the IV team had been wearing face masks or face shields.  Upon information and belief, Red Scrubs wore a clear plastic face shield to protect against spraying blood from the procedure he was about to attempt.

195.    The guards raised the gurney until it was about chest high for Red Scrubs.  Someone then started unbuttoning Mr. Smith's shirt and pulled it back away from his chest.

196.    Red Scrubs asked Mr. Smith to turn his head to the left.  Mr. Smith did not resist, but he indicated that he could not participate in his own execution.  Red Scrubs then stepped back, and Deputy Warden Wood approached Mr. Smith from behind.

197.    Someone rubbed a cold solution on Mr. Smith's neck and collarbone region.  He again asked what they were doing, and no one responded.

198.    Red Scrubs put blue paper drape over Mr. Smith's face.  The drape had a clear plastic insert in the face region that allowed Mr. Smith to see some of what was being done to him.

199.    By that point, Mr. Smith was very fearful because he did not know what was happening, and no one in the room would tell him.

200.    He then saw a clear syringe with a needle coming toward him.  Mr. Smith was terrified at the sight of what appeared to be an injection because he had heard reports that Mr. James may have been sedated as part of his execution and did not appear to be conscious when the curtains to the chamber were opened.  This caused Mr. Smith great emotional distress because

it was important to him that he be composed and focused for his family and witnesses when they saw him for the last time. He was terrified that the nameless people of unknown credentials subjecting him to severe pain were also about to rob him of that final dignity.

201. Mr. Smith told the IV team to stop and pleaded for someone to call the Court, whose order they were violating.

202. Mr. Smith felt multiple needle jabs in his neck or collarbone region, causing him severe pain. He again stated that he needed to speak with the Court and his counsel. No one responded. Mr. Smith, in anguish, asked, "Is there no one who can stop this?" Again, there was only silence. Mr. Smith was distraught and completely devoid of hope because he believed that no one in the room had any regard for his constitutional rights. Upon information and belief, Mr. Smith was injected with a sedative and/or anesthetic.

203. Administering an injection to Mr. Smith was inconsistent with the Protocol and violated both ADOC's commitment to the Court and the Court's order—on penalty of sanctions—that the State not inject Mr. Smith with a sedative and/or anesthetic.

204. After Red Scrubs had stuck Mr. Smith with a needle five or six times, he stepped back.

205. The next thing Mr. Smith saw was a large gauge needle. It was bigger than any needle he had ever seen before.

206. Deputy Warden Wood, who was holding Mr. Smith's head in both his hands, torqued it to the side, saying, "Kenny, this is for your own good." Mr. Smith forcefully expressed his disagreement with that statement but did not resist.

207. Red Scrubs started inserting the large gauge needle into Mr. Smith's collarbone region. Mr. Smith felt like he was being stabbed in the chest and could feel the needle sliding

39

under his collarbone.  Upon information and belief, Red Scrubs was attempting a central line procedure.

208.    Mr. Smith's body contorted away from the pain and against the restraints, injuring his right shoulder.  He was in such physical pain that he had difficulty breathing and his voice weakened.

209.    Blue Scrubs snarled, "You can't feel that" even as Mr. Smith was writhing and shaking uncontrollably, eventually causing his shower shoes to come off and become wrapped in the sheet at his feet.  Mr. Smith responded forcefully that he did feel pain.

210.    Red Scrubs then repeatedly jabbed Mr. Smith's chest with the large needle. Mr. Smith's pain was so intense that he could hardly breathe and was sweating so profusely from the torture he was experiencing that he feared he had urinated on himself.  For Mr. Smith, the needle jabs to his chest area "felt like an eternity."

211.    The IV team's deeply inept efforts to establish a central line were prolonged and continued well past the point at which it should have been apparent that it would not be successful.

212.    No one in the room ever told Red Scrubs or other members of the IV team to stop what they were doing.

213.    But eventually, Red Scrubs removed the paper drape from Mr. Smith's face, and the IV team and the Suits left the execution chamber again.

214.    Mr. Smith remained strapped to the gurney.  His heart was pounding, and he was hyperventilating and crying.  And he was terrified of what they might do next.

215.    Officer McKenzie was pacing around the execution chamber.  Mr. Smith asked Officer McKenzie what was going on, but just then, the IV team came back into the execution chamber and started to pick up items off the floor.

216.    Mr. Smith still had not been told what has happening or whether the execution was still going forward.

217.    Outside of Holman and unbeknownst to Mr. Smith, unverified reports that the execution may have been called off started circulating on the internet at or around 11:20 p.m. Reporters contemporaneously noted in their media reports that they had boarded a van at the Holman Media Center but that the van never moved before they were unloaded from the van. None of Mr. Smith's requested witnesses were ever taken to, or summoned to, Holman.  On information and belief, it is unlikely that the witnesses and media could have been positioned into the viewing room and the execution completed by midnight when the death warrant expired.

218.    At 11:36 p.m., Mr. Smith's attorney Robert Grass emailed Mr. Wilson, Mr. Anderson, and Solicitor General Edmund LaCour, requesting that they "[p]lease confirm that the execution has been called off and advise as to the whereabouts and physical well-being of Mr. Smith."  None of them ever responded.

219.    Back in the execution chamber, at some point before midnight, Green Scrubs placed a hand on Mr. Smith and asked if his pain had eased up at all yet.  Mr. Smith responded, "No, sir."  Green Scrubs stood over Mr. Smith and said, "everything is going to be alright."  Mr. Smith was still terrified about what they might do next.

220.    Mr. Smith asked again what was going on, and Green Scrubs said, "It's over with."

221.    Even then, Mr. Smith still was not sure if he had survived the execution attempt because there was still a needle in one of his arms.

222.    But then Blue Scrubs started removing the needle, carefully explaining what he was doing.  Green Scrubs offered Mr. Smith some water, held his hand, and told him that he would be praying for him.  Meanwhile, Red Scrubs continued trying to hide his face from Mr. Smith.

41

223.    Mr. Smith was still confused and disoriented from his terrifying ordeal over the past four hours—not to mention the IV team's sudden and complete change in demeanor.  He asked again what was going on.  One of the people in the execution chamber said they thought it was "over" because of "legal stuff."  Of course, there had been no legal developments in the courts since the U.S. Supreme Court had vacated the Eleventh Circuit's stay of execution at 10:20 p.m.

224.    Mr. Smith continued to be strapped into the gurney for about 10 more minutes.  He was still hyperventilating from the extreme physical and emotional pain and distress he had just endured.

225.    The other seven guards who had moved him into the execution chamber returned and, along with Deputy Warden Wood, Officer McKenzie, and Officer Quarles, began removing the straps from Mr. Smith's body.

226.    The guards asked Mr. Smith to lift his arms and put his hands together so that they could put him in handcuffs, but he was unable to move his arms.  The officers had to support his arms so that they could place him in handcuffs.

227.    The officers asked Mr. Smith to sit up, but he was unable to do so on his own.  The officers had to support his body to help him get upright, and he immediately became dizzy and felt like he would faint.  The officers told him to sit on the table for a minute.

228.    Mr. Smith was unable to stand up on his own, and the officers did not put leg irons on him.  Instead, Sergeant Gillis and Officer Earle supported him on either side to get him back to the death cell.  There, Mr. Smith sat on the bed for a moment and tried to make sense of what had just happened.

229.    He was then taken to the infirmary, where Officer Earle and Sergeant Gillis had to help him onto the examination table.  He could not unbutton his shirt, so officers assisted him with

that too.  Mr. Smith reported to Nurse Bell that his shoulder was "killing him," that his neck hurt, and that the was dizzy.  Nurse Bell created a "body chart."

230.    Mr. Smith was taken back to the death cell right outside the chamber where he had just been tortured for four hours.  He was still trembling and sweating.  Prison officials wanted to confiscate the prison uniform Mr. Smith had been wearing during the botched execution, and he was unable to undress and dress without assistance from Sergeant Gillis.  No one offered him anything to drink or eat.  He was shocked, disoriented, and experiencing post-traumatic stress.  He was unable to sleep for most of the night.

231.    At a press conference held just before midnight, Commissioner Hamm told the assembled reporters that the "execution team" had made "several" attempts to establish IV access and "attempted a central line" before the execution was halted.  He refused to identify the qualifications of any "medical" personnel allegedly on site at Holman during the attempted execution.  Governor Ivey would later state that the execution could not be carried out "because of last minute legal attempts to delay or cancel the execution."  *See* Jarvis Robertson, *Another execution halted because of difficulties with intravenous lines*, https://www.wvtm13.com/article/stay-of-execution-granted-to-kenneth-smith/41999280#  (Nov. 18, 2022).

232.    Mr. Smith was awoken for breakfast the next morning and paced around the death cell until about 5:55 a.m., when prison officials returned him back to his block and prior cell on Holman's death row.

233.    Mr. Smith continues to be in a great deal of physical and emotional pain from the attempted execution.

234.     Mr. Smith has experienced lingering pain in his arm from repeated needle jabs, and he often keeps it curled close to his body.  Mr. Smith has also experienced lingering pain in the area around his collarbone where, upon information and belief, a central line procedure was attempted numerous times.  He now has back spasms from being tightly strapped to the gurney for about 4 hours.

235.     Mr. Smith struggles to sleep, sometimes sleeping only a few hours per night.  He is often overcome with emotions.  On the morning of Saturday, November 19, officers found Mr. Smith crying in his cell.  They were so concerned about his level of distress that they took him for immediate medical treatment and observation.  He is likely experiencing post-traumatic stress disorder.

236.     Defendants subjected Mr. Smith to precisely the unnecessary and wanton infliction of pain that the Eighth Amendment was intended to prohibit, the same treatment he sought to enjoin by filing this lawsuit on August 18, 2022.

237.     On information and belief, Mr. Smith and Mr. Miller are the only living execution survivors in the United States.  Mr. Smith now lives with psychological trauma that the human brain is not able to process, causing him great distress.

**F.     ADOC's Lethal Injection Process is Shrouded in Secrecy**

238.     The State exercises no greater power than when it executes condemned people. Consequently, the process by which the State does so demands maximum transparency to ensure that it is consistent with the Constitution and the values of the State's citizens.  ADOC's lethal injection process, however, is anything but transparent.

239.     ADOC conceals from public observation critical portions of the lethal injection process, including the establishment of an intravenous line in the condemned person.

44

240.    ADOC conceals who is responsible for establishing an intravenous line in the condemned person and does not provide information to ensure that those responsible are qualified for the task.

241.    The only witnesses to that process are unidentified ADOC personnel and the condemned person who (with the rare exceptions of Mr. Miller and Mr. Smith) ordinarily do not live to describe it.

242.    Mr. James's execution, Mr. Miller's and Mr. Smith's aborted executions, and other history establish that ADOC cannot be trusted to provide accurate information about what happens during its lethal injection process.

243.    For example, during the scheduled execution of Doyle Lee Hamm on February 22, 2018, there was a two-and-a-half-hour delay while ADOC staff attempted to establish an intravenous line.  During that time, ADOC "[s]taff punctured Hamm at least 11 times in his limbs and groin, causing him to bleed profusely on the gurney."  Evan Mealins, *ADOC 'cannot confirm' if Joe Nathan James Jr. was fully conscious before his execution*, Montgomery Advertiser (Aug. 2, 2022).  ADOC stopped the execution, on information and belief, only when the warrant was about to expire.

244.    Despite having subjected Mr. Hamm to torture, cruelty, and/or substantial pain, then-ADOC Commissioner Jefferson Dunn afterwards said that Mr. Hamm's execution was called off "out of an abundance of caution" due to "a time issue" and that "I wouldn't necessarily characterize what we had tonight as a problem."  Liliana Segura, *Another Failed Execution: The Torture of Doyle Lee Hamm*, The Intercept (Mar. 3, 2018).

245.    Following this horrific event, the State agreed not to subject Mr. Hamm to any further execution attempts. Defendants never moved to set a subsequent execution date for Mr.

45

Hamm, and he later died of natural causes. *See* The New York Times, *Doyle Hamm, Who Survived a Bungled Execution, Dies in Prison at 64* (Nov. 29, 2021), https://www.nytimes.com/2021/11/29/us/doyle-hamm-dead.html.

246.    While ADOC could not establish intravenous access in Mr. Hamm, that did not put other condemned inmates on notice that the Protocol is advisory only.

247.    On information and belief, unlike Mr. James (and Mr. Miller and Mr. Smith), Mr. Hamm was a cancer patient and had a prior history of intravenous drug use, which compromised the ability to access his veins. *See Hamm v. Comm'r, Ala. Dep't of Corrs.*, 725 F. App'x 836, 837–38 (11th Cir. 2018) ("Hamm alleges in his complaint that he suffers from lymphoma (a type of blood cancer) and lymphadenopathy (enlarged lymph nodes), which combined with years of intravenous drug use, have rendered his veins inaccessible for the use of a catheter without a complicated procedure carrying the risk of 'a bloody and excruciating experience.'"). And the State agreed not to attempt to execute Mr. Hamm again, suggesting that it would take steps to ensure that it did not subject other condemned persons to the same cruel and painful treatment. In contrast, the State moved on an expedited basis to reschedule Mr. Miller's execution just days after its botched execution attempt.

248.    Given ADOC's history of evasion and lack of transparency, there was no way for a condemned person to know that the Protocol is only advisory until that was demonstrated by the facts surrounding Mr. James' execution and Mr. Miller's aborted execution—and now, Mr. Smith's aborted execution.

**E.      Nitrogen Hypoxia is a Feasible and Readily Available Alternative that Would Significantly Reduce the Intolerable Risk to Mr. Smith from Lethal Injection**

249.    As a matter of law, nitrogen hypoxia is an available and feasible alternative method of execution.  *Price v. Dunn*, 920 F.3d 1317, 1328–29 (11th Cir. 2019).

250.    Execution by inhalation of nitrogen gas would eliminate the need to establish intravenous access, Zivot Decl. ¶ 27, and, therefore, would eliminate the intolerable risk that ADOC will deviate from the Protocol in attempting to do so as it did in Mr. James' execution and Mr. Miller's aborted execution, and now, Mr. Smith's aborted execution.  In addition, execution by inhalation of nitrogen gas would reduce the risk that a condemned person would suffer pulmonary edema, which autopsies show has occurred in condemned people executed by lethal injection, and which would cause the condemned inmate to experience the sensation of choking or drowning if conscious.

### CLAIMS FOR RELIEF

### First Claim for Relief

**Violation of Mr. Smith's Rights Under the U.S. Constitution's Eighth Amendment to be Free from Cruel and Unusual Punishment**

**(Against all Defendants in their Individual and Official Capacities)**

251.    Mr. Smith incorporates paragraphs 1 through 250.

252.    The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments."  U.S. Const. amend VIII.

253.    A method of execution violates the Eighth Amendment if "the risk of pain associated with the State's method is substantial when compared to a known and available alternative."  *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (citations and internal quotation marks omitted).

47

254.   The U.S. Supreme Court has previously described punishments to be unconstitutionally cruel "when they involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 (1890), or when they "involve the unnecessary and wanton infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Eighth Amendment forbids "forms of punishment that intensified the sentence of death with a (cruel) " 'superadd[ition]' " of " 'terror, pain, or disgrace.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019).

255.   The U.S. Supreme Court has also stated that "a series of abortive attempts" at execution raise an Eighth Amendment claim.  *Baze v. Rees*, 553 U.S. 35, 50 (2008); *see also Glass v. Louisiana*, 471 U.S. 1080, 1085-86 (1985)

256.   Both Defendants' botching of Mr. Smith's execution on November 17, and any future attempt to execute Mr. Smith again, constitute cruel and unusual punishment under the Eighth Amendment.

257.   Before the execution attempt on November 17, Defendants were aware of serious constitutional problems with their implementation of the Protocol.  Indeed, just hours before they began their execution attempt, the Eleventh Circuit Court of Appeals had held that Mr. Smith had stated a viable Eighth Amendment claim based on his assertion that ADOC would likely have "extreme difficulty in accessing Smith's veins," which would cause him to face "superadded pain as the execution team attempts to gain IV access." *Smith,* 2022 WL 17069492, at *5.

258.   Moreover, Defendants should have been aware of the likelihood that they would violate Mr. Smith's Eighth Amendment rights in light of the botched James execution and Miller attempted execution.

259.   In light of that knowledge, Defendants had an opportunity to take reasonable steps before November 17, 2022 to ensure that they could access Mr. Smith's veins.

260. The executioners presumably made their best efforts to access Mr. Smith's veins during the four hours that Mr. Smith was strapped to a gurney on November 17, 2022.

261. Despite their prolonged efforts, the executioners were unable to achieve the IV access necessary to execute Mr. Smith by lethal injection on November 17, 2022.

262. Defendants' treatment of Mr. Smith does not fall within society's standards for a constitutional execution. The botched execution was terrifying and extremely painful for Mr. Smith. Defendants undertook repeated attempts to establish veinous access despite their knowledge of their own difficulty establishing IV access and a more humane alternative of nitrogen hypoxia.

263. Mr. Smith is thus in a rare position of having proof that an execution by lethal injection caused him severe pain, despite a feasible and available alternative—nitrogen hypoxia—that would have entirely avoided the veinous access issue, and assuming proper administration, would cause an individual to lose consciousness within seconds, and experience no pain or discomfort while dying within minutes. That feasible and available alternative method of execution significantly reduces the intolerable risk of torture, cruelty, or substantial pain associated with Defendants' lethal injection process.

264. To subject Mr. Smith to a second execution by lethal injection would subject him to a torturous experience of unnecessary physical and psychological pain, as has been established through Alabama's last three execution attempts. Therefore, any further attempts to execute Mr. Smith would violate the Eighth Amendment.

265. Plaintiff will suffer irreparable harm in the absence of an injunction.

**Second Claim for Relief**

**Violation of Mr. Smith's Right to Equal Protection Under the Law**

**(Against Defendants Hamm, Raybon, and Marshall in their Official Capacities)**

266.     Mr. Smith incorporates paragraphs 1 through 250.

267.     Seeking a second attempt to execute Mr. Smith would treat Mr. Smith differently

that Mr. Doyle Hamm, whose execution by lethal injection Defendants also botched due to their

failure to establish veinous access.  After Defendants botched Mr. Hamm's lethal injection, they

entered a confidential settlement and jointly dismissed Hamm's pending civil rights litigation.  On

information and belief, Defendants agreed to not attempt to execute Mr. Hamm again.

268.     Defendants' disparate treatment of Mr. Smith would not be rationally related to a

legitimate government interest.

269.     Mr. Smith has the right to be treated the same as all other Holman death row inmates

who survived botched lethal injection executions by Defendants.

**Third Claim for Relief**

**Violation of the Court's Order**

**(Against All Defendants in their Individual Capacities)**

270.     Mr. Smith incorporates paragraphs 1 through 250.

271.     This Court entered the following Order:  "The Commissioner and his agents, which

include all ADOC employees involved in Kenneth Eugene Smith's execution, are to strictly adhere

to, and not deviate from, the ADOC's established lethal injection protocol during Smith's

execution.  In particular, the Commissioner and his agents shall not perform a cutdown procedure

or use intramuscular sedation on Smith."  DE 22 at 15.

272.    The Order further provided:  "Sanctions will be swift and serious if counsel and the Commissioner do not honor and abide by their representations and stipulations." *Id.* at 11–12.

273.    Despite the Court's Order, Defendants subjected Mr. Smith to intramuscular sedation.

274.    As a result of Defendants' violation of this Court's Order, Mr. Smith experienced severe physical pain and emotional harm, entitling him to compensatory and punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Smith respectfully requests that this Court grant the following relief:

1.    With respect to the First Claim for Relief,

a.   A declaration that Defendants' attempt to execute Mr. Smith on November 17, 2022 violated his Eighth Amendment Right to be free from cruel and unusual punishment.

b.   A declaration that making a second attempt to execute Mr. Smith would constitute cruel and unusual punishment in violation of Mr. Smith's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution, or alternatively, that making a second attempt to execute Mr. Smith by lethal injection would constitute cruel and unusual punishment in violation of Mr. Smith's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.

c.   An award of compensatory and punitive damages against all Defendants for their intentional infliction of pain and their deliberate indifference to Mr. Smith's suffering as a result of his botched lethal injection execution in an amount to be determined at trial;

51

    d.  A preliminary and permanent injunction prohibiting Defendants from making a second attempt to execute Mr. Smith.

2.  With respect to the Second Claim for Relief,

    a.  A declaration that any second attempt to execute Mr. Smith would violate his rights to equal protection under the Fourteenth Amendment; and

    b.  A preliminary and permanent injunction prohibiting Defendants from making a second attempt to execute Mr. Smith.

3.  With respect to the Third Claim for Relief,

    a.  An award of compensatory and punitive damages for the injuries caused by Defendants' violation of this Court's order prohibiting them from using an intramuscular sedation during Mr. Smith's failed execution.

4.  Such other relief as this Court deems just and proper.

Respectfully submitted, this 25th day of November 2022.


                    */s/ Andrew B. Johnson*
                    Andrew B. Johnson
                    BRADLEY ARANT BOULT CUMMMINGS LLP
                    1819 Fifth Avenue North
                    Birmingham, Alabama 35203
                    (205) 521-8000
                    ajohnson@bradley.com

                    Jeffrey H. Horowitz (NY Bar No. 3949070)
                    Robert M. Grass (NY Bar No. 2501278)
                    David Kerschner (NY Bar No. 5126420)
                    ARNOLD & PORTER KAYE SCHOLER LLP
                    250 West 55th Street
                    New York, New York 10019-9710
                    jeffrey.horowitz@arnoldporter.com
                    robert.grass@arnoldporter.com
                    david.kerschner@arnoldporter.com

Angelique Ciliberti (ASB: 1504-T44C)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Tel: 202-942-5000
Fax: 202-942-5999
angelique.ciliberti@arnoldporter.com

*Attorneys for Plaintiff Kenneth Eugene Smith*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2022, I electronically filed the foregoing with the Clerk of the Court using the Pacer system, which will send notification to the following:

Richard D. Anderson
Assistant Attorney General
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Richard.Anderson@AlabamaAG.gov

Thomas A. Wilson
Deputy Solicitor General
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
Thomas.Wilson@AlabamaAG.gov

*Attorneys for Defendant*

_____*/s/ Andrew B. Johnson*_____
Of Counsel