IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KENNETH EUGENE SMITH,           )
                                )
            Plaintiff,          )
                                )
      v.                        )        CASE NO. 2:22-cv-497-RAH
                                )                [WO]
JOHN Q. HAMM, Commissioner,     )
Alabama Department of Corrections, )
*et al.*,                       )
                                )
            Defendants.         )

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Kenneth Eugene Smith is a death row inmate incarcerated at Holman Correctional Facility (Holman).  He was scheduled to be executed by the Alabama Department of Corrections (ADOC) on November 17, 2022.  After Smith spent multiple hours strapped to the gurney and underwent one-to-two hours of attempts to establish both a standard intravenous (IV) line and a central-line IV, the ADOC terminated the execution.  According to Smith, he suffered, and continues to suffer, extreme physical and psychological pain because of this attempted execution.

Smith originally filed this lawsuit on August 17, 2022, under 42 U.S.C. § 1983.[1]  On December 6, 2022, following the failed execution attempt, Smith filed

---

[1] Smith had also sued the ADOC but withdrew those claims in the Second Amended Complaint.

a Second Amended Complaint, asserting claims against Defendants John Q. Hamm, the Commissioner of the ADOC; Terry Raybon, the Warden at Holman; Steve Marshall, Attorney General of the State of Alabama; Michael Wood, the Deputy Warden at the G.K. Fountain Correctional Facility; and several John Doe defendants, including members of the IV team who were personally involved in Smith's execution attempt (collectively, the State or Defendants).  Hamm, Raybon, and Marshall are sued in their individual and official capacities.  Wood[2] and the John Doe defendants are sued in their individual capacities only.

In the Second Amended Complaint, Smith alleges that the State violated his constitutional rights by subjecting him to an unconstitutional level of pain in attempting to execute him by lethal injection.  Additionally, Smith asserts that a second attempt to execute him, generally or by lethal injection specifically, would violate the Eighth and Fourteenth Amendments to the United States Constitution. Finally, Smith claims that the State violated a prior Order of this Court when the

---

[2] The caption of this case states that Wood is sued in his official and individual capacities.  But the body of the Second Amended Complaint states that Wood is sued in his individual capacity only. The caption is not part of the statement of the claim under Rule 8, and accordingly, the unambiguous body of the Second Amended Complaint controls.  *See Marsh v. Butler Cnty.*, 268 F.3d 1014, 1023 n.4 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–63 (2007); *see also U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 935 (2009) ("A person or entity can be named in the caption of a complaint without necessarily becoming a party to the action.").  Wood is accordingly found only to be sued in his individual capacity.

State allegedly used intramuscular sedation during the execution attempt.  He seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

This matter is before the Court on the Defendants' Motion to Dismiss.  Smith has filed a response in opposition, and the Defendants have filed a reply.  This matter is ripe for review.

For the following reasons, the Defendants' Motion is due to be granted in part and denied in part.

## II.   JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.   LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In ruling on a motion to dismiss for failure to state a claim upon which

relief can be granted, the court must accept well-pled facts as true, but the court is not required to accept a plaintiff's legal conclusions. *Id.* at 664.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679 (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). It is the plaintiff's responsibility to allege sufficient facts to support his claims. *Twombly*, 550 U.S. at 555.

## IV.   BACKGROUND

When ruling on the Defendants' Motion to Dismiss, the factual allegations in the Second Amended Complaint are accepted as true and are construed in the light most favorable to Smith. *See Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 854, 864 (11th Cir. 2017).

Certain relevant procedural, factual, and statutory background is set forth in the Court's Memorandum Opinion and Order that previously granted the State's Motion to Dismiss the Amended Complaint, and the Court will not repeat it here. Additional procedural history and facts pertinent to resolving the pending Motion to Dismiss are set forth below.

## A. Eleventh Circuit Opinion Reversing this Court's Prior Order

Smith filed his initial Complaint in this action on August 18, 2022. The State's initial Motion to Dismiss was granted on October 16, 2022, and judgment was entered for the State. However, the Court also entered an order directing the Commissioner of the ADOC and his agents "to strictly adhere to, and not deviate from, the ADOC's established lethal injection protocol during Smith's execution." (Doc. 22 at 15.) Smith subsequently filed a Motion to Alter or Amend the Judgment under Fed. R. Civ. P. 59(e) and to Expedite Resolution of the Motion on October 19, 2022.

After this Court denied Smith's Motion to Alter or Amend the Judgment on November 9, 2022, concluding that filing an amended complaint would be futile, Smith appealed to the Eleventh Circuit. On November 17, 2022, the date of Smith's scheduled execution, the Eleventh Circuit reversed this Court's order denying Smith's motion to amend the judgment and remanded the case back to this Court, concluding that Smith's proposed Amended Complaint would not be futile because

it stated a plausible Eighth Amendment method-of-execution claim and directing this Court to allow Smith to file the Amended Complaint.  In reviewing Smith's proposed Amended Complaint *de novo*, the Eleventh Circuit held that Smith plausibly alleged that the IV team would face "extreme difficulty in accessing his veins," and in light of the IV team's prior difficulties in establishing IV lines swiftly and successfully, Smith would "face superadded pain as the execution team attempts to gain IV access."  (Doc. 41 at 15–16.)  The Eleventh Circuit also reaffirmed its holding in *Price v. Commissioner, Department of Corrections*, 920 F.3d 1317, 1328 (11th Cir. 2019) (per curiam), that nitrogen hypoxia is an available alternative method of execution.  (*Id*. at 16.)

### B. Motion for Stay of Execution

Smith's journey through the federal court system did not end there.  On the afternoon of November 17, 2022, Smith filed an Emergency Motion to Stay Execution by Lethal Injection in this Court.  This motion was denied (Doc. 50), and Smith again appealed to the Eleventh Circuit.  At 7:45 p.m. on November 17, counsel for the State emailed counsel for Smith stating that the State had notified the emergency clerks at the Eleventh Circuit and the Supreme Court that the State was preparing Smith for execution.  At 7:59 p.m., the Eleventh Circuit issued a stay of Smith's execution, reversing this Court's denial of Smith's stay request earlier that

afternoon.  The Supreme Court vacated the Eleventh Circuit's stay of execution without explanation later that evening.  *Smith v. Alabama*, 143 S. Ct. 440 (2022).

### C. The Attempted Execution

At around 4:30 p.m. that afternoon, Smith was taken to the prison infirmary where a nurse created a body chart.  "No member of the execution IV team was present during this visit."  (Doc. 71 at 29.)  Shortly thereafter, Smith was returned to the "death cell."  (*Id.*)  At around 8:00 p.m., Smith was escorted from the death cell to the execution chamber.  Smith was told to lie down on the gurney, and he complied.  Smith was then tied down to the gurney in a "painfully tight" manner.  (*Id.* at 32.)  Over time, he felt as if his circulation was being cut off by the straps.  According to the Second Amended Complaint, Smith was painfully strapped to the gurney for approximately two hours even after the Eleventh Circuit stayed his execution.  Additionally, Smith says he was never informed of the Eleventh Circuit's stay.  The experience of being painfully strapped to the gurney for hours—with no explanation and anticipating that he would die soon—caused Smith extreme distress.

At approximately 10:00 p.m., the IV team, consisting of three men, entered the execution chamber and began to repeatedly stab Smith's arms and hands with needles, attempting to access a vein to establish an IV line to administer the lethal injection drugs.  Since he does not know the names of the men on the IV team, he refers to each one as "Green Scrubs," "Blue Scrubs," and "Red Scrubs," based on

the color of their scrubs.  (*Id.* at 34–35.)  Three individuals wearing suits were also in the execution chamber.  Because Smith does not know these individuals' names, he refers to them as "Suits."  (*Id.* at 32.)  Defendant Wood and several correctional officers were also present in the execution chamber.  Around this same time, the Supreme Court vacated the stay of execution.

Green Scrubs placed himself on Smith's right side, and Blue Scrubs placed himself on Smith's left side.  Red Scrubs appeared to be supervising the other two team members.  Blue Scrubs placed a tourniquet around Smith's upper arm and placed a pad under his arm.  He then began sticking a needle into Smith's arm.  At one point, Smith cried out that Blue Scrubs was sticking the needle into Smith's muscle, causing him pain.  Blue Scrubs responded, "No I'm not."  (*Id.* at 35.)  Red Scrubs then told Blue Scrubs he "need[ed] to back it up," which he did, followed shortly by attaching tubing to the needle.  (*Id.*)  Meanwhile, one of the "Suits" appeared to be taking photographs with his phone.  (*Id.* at 36.)

Next, Green Scrubs examined Smith's right hand and slapped it in order to find a vein.  Green Scrubs then began puncturing Smith's skin with needles in several places on his hand.  Smith felt the needle "going in and out multiple times" and moving under his skin, causing him great pain.  (*Id.*)  He cried out several times, but the personnel in the room ignored him.  Smith then asked the "Suits" if they had any

authority to call the court to report that his constitutional rights were being violated, but they did not respond.  (*Id.*)

Blue Scrubs and Green Scrubs next looked at Smith's bare feet, but after shaking their heads, Blue Scrubs began shining a blue light over Smith's arms and hands.  Either Blue Scrubs or Green Scrubs jabbed needles in Smith's right arm again, sliding it back and forth multiple times with each stick.  Smith felt the needles going into his muscle and cried out in pain.  He again asked to speak to his lawyers or the court, and he gave this case number to the personnel in the room.

Red Scrubs then claimed he did not need the blue light and began jabbing Smith's right arm with a needle multiple times, and he ignored Smith's pleas that the jabs were causing him "severe pain."  (*Id.*)  The pain was so severe that Smith lost his composure, which he was trying to maintain for his family and the witnesses and so he could say his final words.  Various persons in the execution chamber appeared to be taking photographs of the procedure and Smith with cell phones.

Next, Blue Scrubs asked the attendant correctional officers to tilt the gurney backwards so that Smith's feet would point upwards, which they did.  Smith was then left "hanging from the gurney in an inverse crucifixion position with his feet elevated, which caused pain in his neck, shoulders, and back."  (*Id.*)  According to Smith, nothing in Alabama's lethal injection protocol permits an inmate to be suspended from the execution gurney in this manner.  Smith asked the officers and

others in the room what was happening, but they gave no response.  The IV team and the "Suits" then left the room for a period.

When the personnel returned, Red Scrubs appeared next to Smith wearing a surgical gown, a face mask, and a clear plastic face shield.  None of the IV team members had worn face masks or face shields prior.  The guards then raised the gurney to Red Scrubs's height.  Someone subsequently unbuttoned Smith's shirt and pulled it away from his chest.

Red Scrubs asked Smith to turn his head to the left.  Although he did not resist, Smith indicated that he could not participate in his own execution.  Wood then approached Smith from behind.  At this time, someone rubbed a cold solution on Smith's neck and collarbone region, and Red Scrubs placed a blue paper drape over Smith's face which had a clear plastic insert in the face region.  Smith again asked what they were doing, and no one responded.

Next, Smith saw a clear syringe with a needle coming towards him, which terrified him and caused great emotional distress.  He was also concerned he might be injected with a sedative.  He told the IV team to stop and pleaded for someone to call the court.  He nevertheless felt multiple needle jabs in his neck or collarbone from Red Scrubs, causing him severe pain.  Smith asked for the court and counsel again and asked in anguish "Is there no one who can stop this?"  (*Id*. at 38.)  No one responded to his questions.  He then was injected with a sedative and/or anesthetic.

Next, Red Scrubs stepped back, and Smith then saw a large gauge needle—the biggest needle he had ever seen.  Wood held Smith's head in both of his hands and then torqued it to the side, saying, "Kenny, this is for your own good."  (*Id.*)  Smith expressed his disagreement but did not resist.  Red Scrubs began inserting the needle into Smith's collarbone region, which Smith believed was an attempt to establish a central line.  Smith "felt like he was being stabbed in the chest and could feel the needle sliding under his collarbone."  (*Id.*)  "Mr. Smith's body contorted away from the pain and against the restraints, injuring his right shoulder.  He was in such physical pain that he had difficulty breathing and his voice weakened."  (*Id.*)  Meanwhile, "Blue Scrubs snarled, 'You can't feel that' even as Mr. Smith was writhing and shaking uncontrollably, eventually causing his shower shoes to come off and become wrapped in the sheet at his feet."  (*Id.*)  Smith responded that he did feel pain.

Red Scrubs then repeatedly jabbed Smith's chest with the large needle.  "Mr. Smith's pain was so intense that he could hardly breathe and was sweating so profusely . . . that he feared he had urinated on himself."  (*Id.* at 40.)

After an indeterminate amount of time, Red Scrubs removed the paper drape from Smith's face, and the IV team and the Suits left the chamber again.  Meanwhile, Smith remained strapped to the gurney.  "His heart was pounding, and he was hyperventilating and crying."  (*Id.*)  The IV team came back into the chamber and

11

started picking up items off the floor.  No one told Smith what was happening or whether the execution was still going forward.  "[A]t some point before midnight, Green Scrubs placed a hand on Mr. Smith and asked if his pain had eased up at all yet.  Mr. Smith responded, 'No, sir.'  Green Scrubs stood over Mr. Smith and said, 'everything is going to be alright.'" (*Id.* at 41.)  Green Scrubs then said the execution was over.

### D. Aftermath of the Execution Attempt

Blue Scrubs removed the remaining needle from Smith's arm, while Green Scrubs offered Smith some water, held his hand, and said he would pray for him.  Smith remained strapped to the gurney for another ten minutes and continued to hyperventilate.  After another ten minutes, guards came to remove him from the gurney.  Officers had to support Smith's arms to place him in handcuffs.  He was unable to sit up on his own and felt dizzy and faint when the guards propped him up.  Smith also could not stand up on his own, and two officers had to support him on either side to return him to the death cell.

Smith was taken to the infirmary and was assisted onto the examination table.  Smith reported to the nurse that he had severe pain in his shoulder and neck pain and was dizzy.  After the nurse created a body chart, Smith was returned to the death cell.  He was unable to undress and then dress without assistance, and he was unable

to sleep for most of the night.  Smith was also not offered anything to drink or eat.

A few hours later, Smith was returned to his cell on Holman's death row.

Smith has experienced lingering pain in his arm and in the area around his collarbone since the execution attempt.  He also experiences back spasms from being tightly strapped to the gurney.  On the morning of November 19, 2022, Smith was found crying in his cell, and officers were so concerned about his level of distress that he was taken for immediate medical treatment and observation.

**E. Claims Raised in the Second Amended Complaint**

On December 6, 2022, Smith filed a Second Amended Complaint.  In his first claim for relief, brought against all defendants in their individual and official capacities, Smith asserts that his Eighth Amendment rights were violated during the execution attempt on November 17 and would be violated in any future attempt to execute him.   Smith alleges that the Defendants were on notice that their implementation of the lethal injection protocol had serious constitutional problems considering the botched executions of Joe Nathan James and Alan Eugene Miller from earlier in 2022, as well as the Eleventh Circuit's previous ruling in this case. Smith also asserts that the execution team members acted with deliberate indifference to his constitutional rights by repeatedly attempting to establish veinous access "despite their knowledge of their own difficulty establishing IV access and a more humane alternative of nitrogen hypoxia." (*Id.* at 49.)  He asserts that nitrogen

hypoxia is a feasible and readily available alternative that would have avoided the venous access issues which caused so much pain and distress.  Smith also asserts that to subject him "to a second execution by lethal injection would subject him to a torturous experience of unnecessary physical and psychological pain, as has been established through Alabama's last three execution attempts," and therefore would violate his Eighth Amendment rights.  (*Id.* at 49.)

As to his first claim for relief, Smith seeks a declaration that the attempted execution violated his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment; a declaration that a second execution, or alternatively, a second execution by lethal injection, would violate his rights under the Eighth and Fourteenth Amendments; an award of compensatory and punitive damages against all Defendants for their intentional infliction of pain and deliberate indifference to Smith's suffering due to the unsuccessful lethal injection execution; and a preliminary and permanent injunction prohibiting the Defendants from making a second attempt to execute Smith, or alternatively, prohibiting the Defendants from making a second attempt to execute Smith by lethal injection.

Smith's second claim for relief, brought against Hamm, Raybon, and Marshall in their official capacities, asserts that a second attempt to execute Smith would violate his Fourteenth Amendment right to equal protection under the law because it would treat him differently from Doyle Lee Hamm, a former death row inmate at

Holman.  In 2018, the State attempted to execute Doyle Hamm by lethal injection, but its execution efforts were unsuccessful due to venous access issues.  The State later agreed not to attempt to execute Doyle Hamm again.  In contrast to Doyle Hamm, the State has not agreed to forego future attempts to execute Smith.  Smith asserts that no rational basis exists for the State's differential treatment.  Smith seeks a declaration that a second attempt to execute him would violate his equal protection rights under the Fourteenth Amendment, or alternatively, a declaration that a second attempt to execute him by lethal injection would violate his rights to equal protection.  He also seeks a preliminary and permanent injunction prohibiting the Defendants from making a second attempt to execute him, or alternatively, prohibiting the Defendants from attempting a second lethal injection execution.

Smith's third claim for relief against all Defendants in their individual capacities asserts a violation of this Court's previous order enjoining any actions during his execution which do not comply with Alabama's lethal injection protocol.

## V.   DISCUSSION

The Defendants argue that Smith's Second Amended Complaint should be dismissed in its entirety.  In his response, Smith has agreed to withdraw his claim for declaratory and injunctive relief prohibiting the State from attempting to execute him again by any means as well as his claim for declaratory relief that the State's attempts to execute him on November 17, 2022, violated his Eighth and Fourteenth

Amendment rights to be free from cruel and unusual punishment.  (Doc. 82 at 10–11.)  Relatedly, Smith indirectly concedes that he may only seek damages against the Defendants in their individual capacities.  (*See id.* at 10, 22.)  Smith also has withdrawn his third claim for relief as to the alleged violation of this Court's Order prohibiting the use of intramuscular sedation during Smith's execution. (*Id.* at 11 n.1.)

The Court will begin by addressing Smith's remaining claims for relief under the Eighth and Fourteenth Amendments and then will address Smith's request for relief under the Equal Protection Clause of the Fourteenth Amendment.

## A. Eighth Amendment Method-of-Execution Claim Against the Defendants in Their Official Capacities

The Defendants argue that Smith fails to state a plausible method-of-execution claim against the Defendants in their official capacities.

"[T]he Eighth Amendment does not guarantee a prisoner a painless death . . . ." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019).  Instead, the relevant Eighth Amendment inquiry is whether the State's chosen method of execution "'superadds' pain well beyond what's needed to effectuate a death sentence."  *Id.* at 1126–27.  "To determine whether the State is cruelly superadding pain," the Court must ask "whether the State had some other feasible and readily available method to carry out its lawful sentence that would have significantly reduced a substantial risk of pain."  *Id.* at 1127; *see also Boyd*, 856 F.3d at 858 (explaining that a plaintiff

16

asserting an Eighth Amendment method-of-execution challenge "must plausibly plead, and ultimately prove, that there is an alternative method of execution that is feasible, readily implemented, and in fact significantly reduces the substantial risk of pain posed by the state's planned method of execution").  The plaintiff must establish that the challenged method poses a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (citation omitted).

The Defendants argue that difficulty establishing IV access and the pain resulting from being poked and prodded with needles does not rise to the level of cruel and unusual punishment.  But Smith does not claim that the use of needles to establish venous access is per se cruel and unusual punishment.  Instead, Smith claims that a second attempt to execute him by lethal injection would amount to cruel and unusual punishment given the extreme pain and suffering he says he experienced during the first execution attempt, along with the State's prior unsuccessful attempt to execute Alan Miller in September 2022 and the alleged problems with the State's execution of Joe Nathan James in July 2022; and the absence of allegations that the State has made changes to its execution procedures, aside from the public assertion of a "top-to-bottom review" of the protocol.  These allegations permit a reasonable inference that the State's acts and omissions in carrying out (or attempting to carry

out) lethal injection executions amount to an ongoing pattern rather than a mere "isolated mishap." *See Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality op.).

In the Second Amended Complaint, Smith details his own personal experience from the State's first attempt to execute him by lethal injection.    He describes being repeatedly stabbed with needles for one to two hours, including in his muscles, which he says caused him severe pain. *Cf. Bucklew*, 139 S. Ct. at 1133 ("[T]he relevant question isn't how long it will take for [the inmate] to die, but how long he will be capable of feeling pain.").   Smith also describes needles, including the biggest needle he had ever seen, being plunged underneath his collarbone in a futile attempt to establish a central line IV, allegedly resulting in severe pain to his neck and collarbone and a feeling akin to being stabbed in the chest.   Smith also asserts he was placed in a painful stress position on the gurney and was tied so tightly to the gurney that he now suffers back spasms.   Moreover, Smith alleges he was painfully strapped to the execution gurney for approximately four hours, including for approximately two hours after the Eleventh Circuit stayed his execution and before the Supreme Court vacated the stay.   While additional factual development may reveal a legitimate reason why Smith was strapped to the gurney in this manner and for this duration, such a reason is not apparent from the Second Amended Complaint. *See Miller v. Hamm*, --- F. Supp. 3d ----, No. 2:22-cv-506-RAH, 2022 WL 16720193, at *13 (M.D. Ala. Nov. 4, 2022) (making a similar observation).

Furthermore, Smith's experience resulted in him being temporarily unable to move his arms and legs on his own and has caused ongoing shoulder and neck pain. Finally, Smith identifies a feasible and readily implemented alternative execution method—nitrogen hypoxia—that would significantly reduce the risk of pain by avoiding the use of needles.  *See Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1328 (11th Cir. 2019) (per curiam); *Smith v. Comm'r, Alabama Dep't of Corr.*, No. 22-13781, 2022 WL 17069492, at \*5 (11th Cir. Nov. 17, 2022), *cert. denied sub nom. Hamm v. Smith*, 143 S. Ct. 1188 (2023).

These allegations, which must be assumed true at this stage, go well beyond merely being pricked subcutaneously over a brief period in an attempt to establish an IV line.  Rather, Smith's allegations support a plausible claim of cruel superadded pain as part of the execution, as multiple needle insertions over the course of one-to-two hours into muscle and into the collarbone in a manner emulating being stabbed in the chest, in combination with being strapped to the gurney for up to four hours and at one point being placed in a stress position for an extended period of time, goes "so far beyond what [is] needed to carry out a death sentence that [it] could only be explained as reflecting the infliction of pain for pain's sake." *See Bucklew*, 139 S. Ct. at 1126–27.  Moreover, given Smith's allegations that he himself experienced severe pain during a prior execution attempt, and that the prior execution attempt was the latest in an ongoing pattern of the State's difficulties in establishing venous

access when attempting to carry out lethal injection executions, it is plausible, rather than merely possible, that a second lethal injection execution poses a substantial risk of severe pain to Smith.  *See Miller*, 2022 WL 16720193, at *14.  Additional factual development may reveal that what Smith experienced is unlikely to recur because of, for example, changes made as a result of the "top-to-bottom review" of Alabama's execution protocol.  But at this stage, the pleadings plausibly show that a second lethal injection execution attempt would subject Smith to cruel and unusual punishment in violation of the Eighth Amendment.

The Defendants also try to render the Eleventh Circuit's prior holding in this case irrelevant.  The Eleventh Circuit concluded that Smith's proposed First Amended Complaint stated a plausible Eighth Amendment claim where he alleged that an IV team would face extreme difficulty in accessing his veins and that the team had a history of struggling to gain venous access in lethal injection executions. (Doc. 41 at 15–16.)  The Defendants ask this Court to set this holding aside, despite the law-of-the-case doctrine.  They assert that the Eleventh Circuit recently foreclosed Eighth Amendment cruel and unusual punishment claims based on the pain from needle pricks prior to an execution in *Nance v. Commissioner, Georgia Department of Corrections*, 59 F.4th 1149, 1157 (11th Cir. 2023), and since *Nance* is a published, precedential opinion, they argue it supersedes the prior unpublished, nonprecedential panel decision in this matter.

"Under the 'law of the case' doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That & The Other Gift & Tobacco, Inc. v. Cobb Cnty.*, 439 F.3d 1275, 1283 (11th Cir. 2006) (per curiam) (citation omitted).   On a question of law, the law-of-the-case doctrine can be overcome only if "(1) since the prior decision, 'new and substantially different evidence is produced, or there has been a change in the controlling authority'; or (2) 'the prior decision was clearly erroneous and would result in a manifest injustice.'" *Id.* (citation omitted).

The Court finds that it need not decide whether the law-of-the-case doctrine applies here, as Smith states a plausible claim even if *Nance* controls.   First and foremost, the Eleventh Circuit's holding in *Nance* turned on the particular allegations in the operative complaint.   In *Nance*, the plaintiff alleged that his veins were compromised and that he would likely face multiple painful needle insertions when the State of Georgia prepared him for execution by lethal injection.   *Nance v. Ward*, No. 1:20-CV-0107-JPB, 2020 WL 13614924, at *1 (N.D. Ga. Mar. 13, 2020), *aff'd in part, rev'd in part, and remanded sub nom. Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149 (11th Cir. 2023).   Considering that allegation, the Eleventh Circuit upheld the district court's conclusion that the plaintiff "ha[d] no basis to allege that state officials will, effectively, torture him by repeatedly sticking him

with a needle in a fruitless effort to locate a suitable vein," focusing on the plaintiff's discussion of "a futile attempt to locate a vein." *Id.* at 1156.

Smith's allegations here are materially different. He has alleged that he himself suffered extreme pain during the State's prior attempt to execute him, which allegedly involved the IV team repeatedly jabbing or inserting needles over an extended period in an attempt to establish an IV line, and ultimately a central line IV. These allegations, coupled with the allegations of similar venous access problems during the James execution and the attempted execution of Miller and the absence of allegations that the State has made changes to its execution procedures, plausibly show that Smith would face such treatment again if he were subjected to another execution attempt by lethal injection. Moreover, Smith alleges that the ADOC has a track record of subjecting death row inmates to painful and unsuccessful attempts at establishing IV lines in the execution chamber. Such allegations were not made in *Nance*. *See generally* Complaint, *Nance v. Ward*, No. 1:20-CV-0107-JPB, 2020 WL 13614924, at *1 (N.D. Ga. Mar. 13, 2020). And as the Eleventh Circuit has previously indicated, Eighth Amendment method-of-execution claims are fact dependent. *See, e.g.*, *Arthur v. Thomas*, 674 F.3d 1257, 1261 (11th Cir. 2012) ("[T]hat Georgia's method of execution may not have undergone a substantial change in the relevant time period has no bearing on the factual question of whether a substantial change has occurred in the way that

*Alabama* administers its method of execution, as [the plaintiff's] complaint alleges.").  Smith alleges different and additional facts—many of which center on his own personal experience during an attempted execution—from those presented in *Nance*, and the Court is not persuaded that *Nance* controls the outcome here.

Even if *Nance*'s view on the pain generated by needles were controlling, Smith's allegations concerning the level of pain he suffered during his execution attempt go well beyond the pain of repeatedly being stabbed by needles.  They include being held up in a painful stress position on the gurney and being tied so tightly to the gurney that he now suffers back spasms as a result.  Additionally, Smith alleges he was painfully strapped to the gurney for several hours and was subjected to extremely painful needle jabs for one to two hours, whereas the issue of duration was not considered in *Nance*.  *Cf. Bucklew*, 139 S. Ct. at 1132 ("[N]othing in the record . . . suggest[ed] that Mr. Bucklew will be capable of experiencing pain for significantly more than *20 to 30 seconds* after being injected with pentobarbital." (emphasis added)).  Thus, *Nance* does not preclude Smith's Eighth Amendment claim from proceeding at this point.[3]

---

[3] The Defendants also assert in their reply brief that Smith's arguments distinguishing his case from *Nance* only relate to his withdrawn claim seeking to prevent the State from carrying out another attempt at execution.  This is incorrect.  Smith may have withdrawn his request to enjoin the State from carrying out any further attempts at executing him, but he did not withdraw his request to enjoin the State from carrying out another execution by lethal injection.  As all the allegations presented concern execution by lethal injection, these arguments remain relevant to the Court's evaluation of the Second Amended Complaint.  And during a May 24, 2023 telephone

Finally, the Defendants attack Smith's allegation that nitrogen hypoxia is an available alternative method of execution. Both parties acknowledge that the Eleventh Circuit previously held in this case that nitrogen hypoxia is a feasible and readily implemented alternative method of execution, (*see* Doc. 41 at 16), and Smith argues that the Eleventh Circuit's holding is law of the case, (Doc. 82 at 27). In their reply brief, the Defendants raise no argument as to why the law-of-the-case doctrine does not apply, nor can the Court conceive of any. Even if the law-of-the-case doctrine was not controlling on this point, the Eleventh Circuit has previously made clear in a precedential opinion—which has not been overruled by the Supreme Court—that nitrogen hypoxia is a feasible, readily implemented alternative method of execution in Alabama, even if no protocol is yet in place.[4] *Price*, 920 F.3d at 1328. Thus, according to the Eleventh Circuit, nitrogen hypoxia is a feasible and readily available method of execution for Smith. The motion to dismiss is due to be denied as to the Eighth Amendment claim against the Defendants in their official capacities.

---

hearing with counsel, Smith's counsel confirmed that Smith's preferred method of execution is nitrogen hypoxia.

[4] In December 2022, the State filed a petition for writ of certiorari in the United States Supreme Court, challenging the Eleventh Circuit's conclusion in this case (and in *Price*) that nitrogen hypoxia is a feasible, readily implemented alternative method of execution. *See generally* Petition for Writ of Certiorari, *Smith v. Hamm* (No. 22-580) (U.S. Dec. 20, 2022). On May 15, 2023, the Supreme Court denied certiorari. *See generally Hamm v. Smith*, 143 S. Ct. 1188 (2023).

**B. Eighth Amendment Method-of-Execution Claim Against the Defendants in Their Individual Capacities**

Smith also seeks compensatory and punitive damages from the Defendants in their individual capacities for alleged Eighth and Fourteenth Amendment violations during the failed execution attempt on November 17, 2022.  The Defendants argue that they are entitled to qualified immunity because a failed execution attempt is not itself a constitutional violation, nor is an alleged error in the execution process which causes pain, and because in any event the Defendants did not violate any clearly established law.  Smith responds that the clearly established constitutional right asserted here is the right to be free from harm inflicted with deliberate indifference to the inmate's health and safety.  The Court concludes that Smith has failed to meet his burden to plausibly show that the Defendants violated his clearly established constitutional rights based on the specific factual allegations in the Second Amended Complaint.

Government officials sued in their individual capacities are protected by qualified immunity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Eleventh Circuit has established a two-part analysis to determine whether a defendant is entitled to qualified immunity.  A defendant must first show that he was "engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains."  *Holloman ex rel. Holloman*

*v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (citation omitted). If "the court concludes that the defendant was engaged in a discretionary function, the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Id.* To do so, the plaintiff must show "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.*

As the parties do not contest that the Defendants were engaging in a discretionary function on the night of the attempted execution, the Court will focus on whether the Defendants violated Smith's clearly established constitutional rights. Once the defendant has shown he was engaged in a discretionary function, the burden shifts to the plaintiff to show that "that the defendant violated a constitutional right" and that the right violated was "clearly established."[5] *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). The Eleventh Circuit has identified three different ways a plaintiff can show that officials had fair warning of a clearly established right. First, a plaintiff can "show that a materially similar case has already been decided." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). "This category consists of cases where judicial precedents are tied to

---

[5] Courts may consider these prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

particularized facts." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citation omitted).  In determining whether a right is clearly established under this prong, a court looks to "judicial decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the relevant state." *Griffin Indus*., 496 F.3d at 1199 n.6.  Second, a plaintiff can "show that a broader, clearly established principle should control the novel facts" of the particular situation at issue. *Mercado*, 407 F.3d at 1159.  "[T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Loftus*, 690 F.3d at 1205 (alteration in original) (citation omitted).  Put another way, "in the light of pre-existing law the unlawfulness must be apparent." *Id*. (citation omitted).  Third, a plaintiff may show that his case "fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Mercado*, 407 F.3d at 1159. Whatever the plaintiff's method, "existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Smith argues that "a broader, clearly established principle should control the novel facts" presented here, *see Mercado*, 407 F.3d at 1159, but his argument fails. Smith relies upon the line of cases establishing that inmates are entitled to be free

from the unnecessary and wanton infliction of pain under the Eighth Amendment and that prison officials violate inmates' Eighth Amendment rights when they are deliberately indifferent to a substantial risk of serious harm.  (Doc. 82 at 29–31 (citing  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Estelle v. Gamble*, 427 U.S. 97, 102 (1976); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994))).  However, Smith overlooks some of the particularities of Eighth Amendment method-of-execution case law that prevents the Court from concluding that the conduct alleged here violated a clearly established constitutional right.

First and foremost, the Supreme Court has never held that a method of execution is cruel and unusual.  *See Bucklew*, 139 S. Ct. at 1124; *see also Baze*, 553 U.S. at 62 ("Throughout our history, whenever a method of execution has been challenged in this Court as cruel and unusual, the Court has rejected the challenge.").  Smith's severe pain allegedly was caused by the officials' use of needles to establish IV access, use of the straps, and positioning of Smith on the execution gurney, which are customary (and arguably necessary) instruments for carrying out a lethal injection execution, which time and again has been upheld as a constitutional method of execution in Alabama and nationwide.  Smith does not allege that the execution team engaged in conduct which differed in nature from that of a standard execution by lethal injection—even if the conduct alleged differed in degree.

Furthermore, and relevant to the specific facts alleged in Smith's Second Amended Complaint, it was not clearly established in November 2022 that the duration of the attempted execution violated Smith's constitutional rights. For instance, in *Baze*, the Supreme Court expressed no criticism of a lower court's finding that Kentucky's one-hour limit for establishing IV lines in lethal injection executions was "not excessive but rather necessary." *See* 553 U.S. at 55. While the attempt to establish IV lines in Smith allegedly lasted longer than one hour, it is not alleged to have lasted more than two hours; thus, on this record, and in light of the Supreme Court's commentary in *Baze*, it was not "beyond debate" in November 2022 that the duration of Smith's attempted execution was so long that it violated clearly established law. *See Ashcroft*, 563 U.S. at 741. And to the extent that Smith's claims are rooted in the qualifications of the execution team members, the Supreme Court has suggested that executions are not governed by the same standards as medical procedures. *See Baze*, 553 U.S. at 59–60. This supports a finding that, in November 2022, the Defendants were not on notice that alleged deficiencies in the execution team members' medical qualifications would open the door to monetary damages liability.

As explained above, Smith does plausibly allege that he risks suffering superadded pain in a future lethal injection execution attempt, based in part on his earlier experience, such that he may pursue his Eighth Amendment claim against the

Defendants in their official capacities.  But given the high bar required for establishing a violation of a clearly established constitutional right and the deference the Supreme Court has afforded states in carrying out executions, the Court is not persuaded that every reasonable official would have known, in November 2022, that their actions during Smith's attempted execution would subject them to individual liability—though the Court does not foreclose this possibility in another case with different facts.  To the extent that the Defendants violated Smith's constitutional rights during his attempted execution, those rights were not clearly established in November 2022, and certainly were not "beyond debate."  *See Ashcroft*, 563 U.S. at 741.

The Court is constrained to conclude that Smith's allegations are insufficient to establish that "every objectively reasonable government official facing the circumstances would [have] know[n]" in November 2022 that their conduct violated Smith's constitutional rights.  *See Loftus*, 690 F.3d at 1205.  Thus, the Defendants are entitled to qualified immunity as to Smith's monetary damage claims against them in their individual capacities.  Consequently, the motion to dismiss is due to be granted as to the individual capacity claims, and Smith's request for monetary damages in the prayer for relief is due to be stricken.

## C. Equal Protection

The Defendants also ask the Court to dismiss Smith's "class of one" equal protection claim in Count Two, where Smith alleges that the Defendants are treating him differently from Doyle Hamm. The Defendants previously attempted to execute Doyle Hamm by lethal injection, but this attempt was unsuccessful. Thereafter, the Defendants allegedly agreed not to subject Doyle Hamm to another execution by lethal injection. The Defendants argue that Smith and Doyle Hamm are not similarly situated, and that even if they are similarly situated, the State has a rational basis for "preserving the dignity of the procedure" by allocating its resources to ensure expeditious executions and accordingly not executing death row inmates with severely compromised veins. (Doc. 78 at 20.) Lastly, the Defendants argue that a class-of-one claim is not viable in this context because it is an attempt to cabin a state action that necessarily involves discretionary decision making. The Defendants' arguments fail at this preliminary stage of the proceedings.[6]

A plaintiff may successfully allege a violation of his equal protection rights as a "class of one" by showing "that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in

---

[6] Since Smith has conceded all claims seeking declaratory and injunctive relief to prevent the Defendants from executing him by any means, this analysis will only focus on Smith's alternative basis for his equal protection claim—that a second attempt to execute him *by lethal injection* would violate his constitutional rights.

treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "[W]here the challenged governmental decision is simple or one-dimensional—for example, where the decision involves the application of a single criterion to a single issue—making out a 'class of one claim' is generally easier than in cases where governmental action is 'multi-dimensional, involving varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time.'" *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) (citation omitted). When the governmental decision is simple or one-dimensional, the "similarly situated requirement" may be analyzed "succinctly and at a high order of abstraction." *Grider v. City of Auburn*, 618 F.3d 1240, 1265 (11th Cir. 2010) (citation omitted). The plaintiff must nevertheless show that he is similar to the party of comparison in all legally relevant respects. *See Griffin Indus.*, 496 F.3d at 1204–07.

Since no fundamental right is at stake here, nor do the parties assert such, the rational basis test applies to Smith's equal protection claim. "The rational basis test asks (1) whether the government has the power or authority to regulate the particular area in question, and (2) whether there is a rational relationship between the government's objective and the means it has chosen to achieve it." *Leib*, 558 F.3d at 1306.

For purposes of resolving the State's motion to dismiss, the Court finds that Smith has made out a plausible claim that he and Doyle Hamm are similarly situated.[7]  Smith asserts that the State failed to establish venous access with Doyle Hamm due to compromised veins stemming from health issues, including cancer. Smith also asserts that the State failed to establish venous access while attempting to execute him.  While Smith does not expressly allege that he has compromised veins stemming from his own health issues, Smith nonetheless has plausibly alleged that he and Doyle Hamm are similarly situated because Smith alleges that the State attempted to execute both him and Doyle Hamm by lethal injection but failed in both instances because officials could not establish venous access.  More details may come to light during discovery which suggest that Smith and Doyle Hamm are not similarly situated.  *See id.* at 1307.  But given the nature of the allegations in the Second Amended Complaint, Smith has met his burden to plausibly assert that he and Doyle Hamm are similarly situated.  *See Iqbal*, 556 U.S. at 678.[8]

---

[7] Smith argues in his response brief that Alan Miller is a comparator in this case as well.  Since Smith did not allege such in his Second Amended Complaint, however, the Court declines to consider it here.  *See Henderson v. McMurray*, 611 F. Supp. 3d 1287, 1295 (N.D. Ala. 2020), *aff'd*, 987 F.3d 997 (11th Cir. 2021) ("[A] plaintiff cannot amend a complaint through arguments in briefs.").

[8] The Defendants also argue that they never agreed not to execute Doyle Hamm after the failed first attempt.  But this is what is factually alleged in the Second Amended Complaint.  (Doc. 71 at 46.)  And at this stage of the proceedings, all well-pled factual allegations are taken as true.  *See Iqbal*, 556 U.S. at 664.  Such factual rebuttals by the Defendants are inappropriate at this stage.

The Defendants argue in the alternative that they have a rational basis for treating Doyle Hamm and Smith differently, as they need to be careful in how they allocate their resources to achieve the legitimate state interest of preserving the integrity of the death penalty.  But it is not apparent from the four corners of the Second Amended Complaint what rational basis could exist for treating Doyle Hamm and Smith differently, when both suffered venous access issues during their execution attempts yet one (Smith) remains subject to another execution attempt and the other (Doyle Hamm) did not.  This is particularly so given that the Defendants assert that "[i]t is rational for the State to forgo administering lethal injection to an inmate with inaccessible veins while proceeding with the lethal injection of other inmates." (Doc. 84 at 12.)  There is nothing in the pleadings to suggest that Smith's veins are not equally inaccessible.  At this stage, a plausible reading of the facts in the Second Amended Complaint, which must be assumed true and must be viewed in the light most favorable to Smith, suggests that Smith's veins may also be just as inaccessible as Doyle Hamm's, and that the State does not have a rational basis for its differential treatment.

Additionally, since determining a rational basis for intentional differential treatment between two similarly situated individuals is fact-specific and would more readily be determined based on record evidence, and since there is a plausible case to be made that there is no rational basis for the differential treatment here, it is more

appropriate to consider arguments as to the rational basis prong of the equal protection claim at the summary judgment stage following discovery and further factual development. *See Hope for Fams. & Cmty. Serv., Inc. v. Warren*, No. 3:06-CV-1113-WKW, 2008 WL 630469, at *9 (M.D. Ala. Mar. 5, 2008) (denying motion to dismiss an equal protection claim when the complaint could plausibly negate conceivable rational bases for a challenged governmental regulation, finding the argument more appropriate for summary judgment); *see also SmileDirectClub, LLC v. Lacefield*, No. 1:18-CV-02328-SDG, 2023 WL 2763662, at *7–8 (N.D. Ga. Mar. 31, 2023) (observing that "while the black-letter rational basis standard appears clear enough, it imposes an exceptionally weighty burden on plaintiffs that seems as stringent as the *Twombly/Iqbal* pleading standard is lenient," and concluding that this burden should not be used to grant a motion to dismiss when an equal protection claim is not "implausibly pled and incapable of proof"). Discovery may reveal that Smith and Doyle Hamm are not similarly situated. Discovery may also reveal that the State has a rational basis for treating them differently, and that the State's execution-related decisions require a substantial amount of discretion. But at this stage of the litigation, Smith's equal protection claim may proceed. The motion to dismiss is due to be denied as to Smith's equal protection claim.

## VI.    CONCLUSION

For the reasons stated, it is ORDERED as follows:

1) The Defendants' Motion to Dismiss (Doc. 78) is GRANTED IN PART to the following extent:

    a. Smith's request for money damages in the Second Amended Complaint's prayer for relief is STRICKEN. Furthermore, Smith's requests for relief predicated upon a second execution attempt irrespective of the method of execution are STRICKEN.

    b. Smith's claim for relief concerning Defendants' violation of this Court's order (Count Three) is DISMISSED WITHOUT PREJUDICE.

    c. The individual capacity claims are DISMISSED WITHOUT PREJUDICE as to all Defendants.

    d. Michael Wood is dismissed as a defendant.

2) In all other respects, the Defendants' Motion to Dismiss is DENIED. This case shall proceed forward on Counts One and Two against the remaining Defendants in their official capacities for declaratory and injunctive relief that a future execution attempt by lethal injection would violate his Eighth and Fourteenth Amendment rights (Count One) and his Fourteenth Amendment equal protection rights (Count Two).

**DONE** on this the 5th day of July, 2023.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE